IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GRADY BRINKLEY | ) | CASE NO. 4:06CV0110 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | |
| MARC C. HOUK, WARDEN, | ) | MEMORANDUM OF OPINION |
| | ) | AND ORDER |
| Respondent | ) | |

This matter is before the Court upon Grady Brinkley's ("Brinkley") Motion for Allotment of Funds to Retain Experts pursuant to 18 U.S.C. § 3599(f). (ECF 56). The Respondent, Marc C. Houk, ("Respondent") has not objected to the Motion, but reserves the right to argue that any documents generated or obtained by the expert(s) and/or investigator should not be considered in support of any motion to expand the record or for evidentiary hearing. (ECF 60).

In a capital case, an individual seeking a writ of habeas corpus (28 U.S.C. § 2254) to vacate a state court conviction is entitled to expert assistance. 18 U.S.C. §3599 (formerly 21 U.S.C. § 848(q)(9)). The statute allows appointment of experts only if the petitioner can show that such services are reasonably necessary for his representation. *Id.* The statute does not define "reasonably necessary." However, Congress intended to provide prisoners with "all resources needed to discover,

-1-

plead, develop, and present evidence determinative of their 'colorable' constitutional claims." *Patrick v. Johnson*, 48 F.Supp.2d 645, 646 (N.D. Tex.1999) (quoting J. Liebman & R. Hertz Federal Habeas Corpus Practice and Procedure § 19.3 at 702 (3d ed.1998)). "The determination of a habeas claim often depends on the full development of factual issues, and experts play an important role in the fact-finding process." *Id.* 48 F.Supp.2d at 646 (citing *McFarland v. Scott,* 512 U.S. 849, 855 (1994)). Specific allegations must be presented which demonstrate that the petitioner is confined illegally and entitled to relief. *Id.* "Otherwise, the appointment of an expert is not 'reasonably necessary.'" *Id; Woodward v. Epps,* 380 F.Supp.2d 788, 790 (S.D. Miss. 2005).

Although there are few cases defining when appointment of experts is "reasonably necessary," the request must elucidate some factual allegation of a claim yet unexplored The services of an expert are reasonably necessary if either: (a) the services are needed to prepare the claims in the habeas petition, or to obtain evidence not yet acquired to support a claim in the habeas petition; or (b) the habeas petition raises claims entitling the petitioner to a hearing at which an expert would testify. *Lawson v. Dixon*, 3 F.3d 743, 753 (4th Cir. 1993) (holding that habeas petitioner did not need services of a psychiatrist because: (i) petitioner had already filed his petition and so did not need a psychiatrist to prepare his claims; and (ii) the psychiatrist had already formed an opinion on the elements of petitioner's claim, so petitioner has already acquired the evidence sought). *Id.* Also, a request for appointment of experts should set forth both the necessity for the expert and the expert's exact duties. *See DeLong v. Thompson*, 790 F.Supp. 594, 617 (E.D. Va. 1991)( citing *United States v. Goodwin*, 770 F.2d 631 (7th Cir. 1985)). A district court's decision to grant or deny expert or investigatory funds and the amount allowed is discretionary. *Bonin v. Calderon*, 59 F.3d 815, 837 (9th Cir. 1995).

First, Brinkley requests the assistance of a qualified criminal investigator to assist in the

development of additional facts concerning Brinkley's claims that the State presented false testimony and that it violated *Brady v. Maryland*. (See Habeas Petition, Eighteenth and Nineteenth Grounds for Relief).

  This claim concerns the testimony of Samuel Miller. Miller testified at trial that, while in jail with Brinkley, Brinkley told him that he was going to kill Shantae Smith. This testimony helped the State to argue that one of Brinkley's motives for killing Smith was that she had started seeing someone else while he was in jail for the City Diner robbery. Tr. Vol. 13, pg. 1728-30. During the post-conviction relief investigation, Miller allegedly told an investigator that he never heard Brinkley say anything about wanting to kill Smith. He supposedly was pressured by another inmate, Jones, to testify as he did because Brinkley had robbed this inmate's girlfriend. Brinkley asserts that Miller informed the prosecutors that his earlier statements were not true and he did not want to testify at Brinkley's trial. Further, Miller claims that the State's representatives threatened to hinder Miller's future efforts to be released on parole if he refused to testify. According to Brinkley, it was actually Jones who heard Brinkley say he was going to kill Smith. Miller was allegedly called to testify instead of Jones because the State was not willing to offer him an acceptable deal.

  Brinkley argues that Miller told the prosecutors that Brinkley never told him he was going to kill Smith. If the prosecution intended to use Miller's testimony in spite of the fact that he was admitting it was not true, they allegedly had an obligation to reveal to the defense that Miller had recanted his earlier statements against Brinkley. Brinkley requests the assistance of an experienced investigator to fully develop the facts, including interviewing Miller and Jones.

  The Court finds that Brinkley has not shown that the services of an investigator to

-3-

determine whether Miller recanted his accusations against Brinkley to prosecutors is reasonably necessary. Miller's attorney submitted an affidavit in the post-conviction relief proceedings denying Brinkley's claim. The attorney, Joseph R. Scalzo, Jr. stated:

> I was appointed by Judge Jensen to represent an inmate named Samuel L. Miller during the pendency of the above styled case. Mr. Miller was a potential witness against the defendant, Grady Brinkley. The Lucas County Prosecutor's Office had requested that Samuel L. Miller be represented by competent counsel to negotiate any terms or conditions regarding testimony.
> I was present for all meetings that occurred between my client and representatives from the Lucas County Prosecutor's Office. At the time of his testimony, my client had reached the end of his prison sentence. Samuel L. Miller's only condition for testifying was that he wanted to be released directly from the Lucas County Jail and not be processed and released from the Ohio Department of Rehabilitations and Corrections because he was concerned about the consequences of being labeled a "snitch" while he was in the custody of the Ohio Department of Rehabilitations and Corrections.
> 
> \*\*\*
> 
> During these meetings, Samuel L. Miller never changed his story or recanted about what happened during the time he was confined with Grady Brinkley, in the Lucas County Jail. He never told the prosecutors that Grady Brinkley didn't tell him that he was going to kill Shantae Smith. Furthermore, the prosecutors never threatened to hurt Samuel L. Miller with the Parole Board.

Apx. Vol. 10, pg. 85-86. Miller never spoke to prosecutors out of the presence of his attorney who has stated that Miller never recanted and that the prosecutors never threatened him. Jones failure to testify had no effect as to whether Miller told prosecutors that Brinkley did not make any inculpatory admissions to him, that he told prosecutors that Jones pressured him into testifying, or that Miller attempted to recant his statements. The statute was not intended to allow a fishing expedition to gather proof to support a claim. *Woodward,* 380 F.Supp.2d at 793. *See Bell v. True*, 366 F. Supp.2d 403, 408 (W.D. Va. 2005)(funds not available for investigative services that would amount to a fishing expedition or to investigate claims founded on suspicion).

Second, Brinkley seeks the assistance of a licensed psychologist/psychiatrist and/or a

mitigation specialist to further develop, confirm and present evidence regarding Brinkley's psychological and/or psychiatric disorders as identified, at least in part, in the report of Dr. Robert L. Smith, Ph.D., which was submitted by Brinkley to the Ohio state courts during the post-conviction proceedings, Apx. Vol. 9, pgs. 132-41, and to further develop Brinkley's claims that his trial counsel were ineffective in the mitigation phase of Brinkley's trial. (See Habeas Petition, Eleventh Ground for Relief).

During post-conviction proceedings, Dr. Robert L. Smith, Ph.D. prepared a psychological assessment of Brinkley that was based on a review of records allegedly ignored by trial counsel and on interviews with witnesses that were allegedly either ignored or insufficiently considered by trial counsel. His report allegedly reveals the following significant facts that should have been presented at trial:

> 1) As a result of his grief over the loss of his beloved grandmother when Brinkley was 10 years old, Brinkley lost interest in school and started abusing alcohol and other substances.
> 2) After his release from a juvenile facility, Brinkley's usage of alcohol and drugs escalated. By the time he was 15, Brinkley was using LSD, homemade wine, and marijuana. By the age of 21 (1988), he was using alcohol and powder cocaine on marijuana. Between 1994 and 1999, he switched to drinking Tequila, a fifth or more per day. His cocaine use was variable, ranging from $100 to $500 worth of crack cocaine per day. This pattern of alcohol and
> cocaine use continued up to the time of Brinkley's arrest for the instant offense.
> 3) During one of his juvenile placements, Brinkley obtained his graduate equivalent degree ("GED") in 1985 at the age of 18.
> 4) Dr. Smith performed a psychological/chemical dependency assessment of Brinkley for PCR. Brinkley was diagnosed as suffering from three psychiatric conditions: childhood trauma, narcissistic personality disorder, and alcohol and cocaine dependence.
> 5) The trauma Brinkley experienced as a child is overwhelming in this case: the violent death of his father, the death of his beloved grandmother to lung cancer, the neglect by his young and immature mother, the abuse by his step-father. The childhood trauma contributed to Brinkley's development of a the narcissistic personality disorder. This disorder, coupled with the alcohol and drug abuse, has prevented Brinkley from developing a "normal" or healthy

> personality.
> 6) An individual with a personality disorder will have emotional reactions to situations and events that are inconsistent and not in proportion to the seriousness of the event. Their interpersonal relationships are often dysfunctional and filled with conflict and struggle, and they have great difficulty with impulse control.
> 7) When a narcissist is criticized, his fantasies are challenged or his expectations are not met, he will be emotionally hurt and can respond with impulsiveness and irrational actions, including rage and aggression toward the person they perceive as hurting them.
> 8) Each of these three disorders alone was sufficient to significantly impair Brinkley's perceptions and behavior at the relevant time. In combination, these disorders have a multiplicative effect. Each disorder exacerbates the effects of the other, with the result being that Brinkley's behavior would be impulsive, irritable, emotionally labile and illogical.

Apx. Vol. 9, pgs. 132-41.

The Supreme Court, in *Rompilla v. Beard*, 545 U.S. 374 n. 7 (2005) and *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), has unequivocally declared that a thorough and complete mitigation investigation is absolutely necessary in capital cases. *See Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) (conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland's* requirements). Review of the record shows that the mitigation phase of the trial was very short. Testimony consisted, besides Brinkley, of Brinkley's mother, sister and two aunts. None of the above potential evidence was presented at Brinkley's trial. Under these circumstances, the court believes that it would benefit by the assistance of a psychologist/psychiatrist or mitigation specialist. Brinkley's request for a court funded psychologist/psychiatrist or mitigation expert to investigate mitigating factors in this case is therefore allowed in the amount of $5000.00.

Accordingly, Brinkley's Motion for Allotment of Funds to Retain Experts is granted in part and denied in part. (ECF 56). The court authorizes the services of a psychologist/psychiatrist or mitigation expert, payment not to exceed $5000.00. The motion for experts and an investigator

is denied in all other respects. Services of the expert shall be completed within 60 days of this Order.

      IT IS SO ORDERED.


   <u>May 24, 2007</u>                               <u>*/s/ John R. Adams*</u>
Date                                         John R. Adams
                                              District Judge