IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

GRADY BRINKLEY,                    )    CASE NO.  4:06CV0110
                                   )
            Petitioner,            )
                                   )
       v.                          )    JUDGE JOHN R. ADAMS
                                   )
MARC C. HOUK, WARDEN,              )    MEMORANDUM OF OPINION
                                   )     AND ORDER
            Respondent.            )

        Petitioner, Grady Brinkley ("Brinkley" or "Petitioner"), has filed a Petition for Writ of Habeas

Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (ECF 15). He challenges his conviction and

sentence for the aggravated murder of Shantae Smith that were imposed by the Lucas County, Ohio

Common Pleas Court. Brinkley also asserts that the Ohio death penalty statutes, R.C. 2903.01 through

2929.05, are unconstitutional. Along with the Petition, the Court has reviewed the Respondent, Marc

C. Houk's ("Respondent"), Return of Writ (ECF 47), the Petitioner's Traverse (ECF 53) and the

Respondent's Sur-reply. (ECF 54). For the following reasons, Brinkley's Petition for Writ of Habeas

Corpus is denied.

I. Factual Background

        Brinkley was indicted three times.[1] The first indictment, July 7, 2000, included counts of

aggravated murder with prior calculation and design, the offense committed while the offender was

committing aggravated robbery and aggravated murder in the course of an aggravated robbery. The

_____

        [1] The first two indictments were dismissed before trial.

-1-

second indictment on August 14, 2000, added the aggravating circumstance of committing the crime for the purpose of escaping detection, apprehension, or punishment for another offense committed by the offender. The final indictment, which occurred on October 24, 2000, consisted of five counts: (1) aggravated robbery of the City Diner on November 6, 1999, with a firearm specification, in violation of R.C. 2911.01(A)(1); (2) robbery of the City Diner, in violation of R.C. 2911.02(A)(2); (3) aggravated murder of Shantae Smith on January 7, 2000, in violation of R.C. 2903.01(A) (i.e., purposely causing death with prior calculation and design), and including the (A)(3) and (A)(7) aggravating circumstances; (4) aggravated murder of Shantae Smith on January 7, 2000, in violation of R.C. 2903.01(B) (i.e., felony murder), and including the (A)(3) and (A)(7) aggravating circumstances and; (5) aggravated robbery of Shantae Smith on January 7, 2000, in violation of R.C. 2911.01(A)(3).

Attorneys Timothy F. Braun and David L. Klucas were appointed to represent Brinkley on November 30, 1999. Apx. Vol. 1, pg. 19. On September 15, 2000, July 18, 2000 and August 4, 2000, Donald Cameron and Ronnie L. Wingate were appointed to represent Brinkley replacing Klucas and Braun. Apx. Vol. 1, pg. 43, Vol. 2, pgs. 16, 31. He entered a plea of not guilty on November 3, 2000. Tr. Vol. 1, pgs. 2, 3. On the same day, the State requested, and the trial court granted, dismissal of the first two indictments as well as the case related to the City Diner robbery. Apx. Vol. 1, pg. 47. [2]

Brinkley appeared in court on September 26, 2001. On that date the court set a trial date for January 9, 2002, a pretrial conference for October 4, 2001 and a suppression hearing for October 26,

---

[2]  When Brinkley returned to the jail, the sheriff's department mistakenly released Brinkley based on these dismissals. He remained free until approximately September 2001.

2001. Tr. Vol. 4, pgs. 1-18. On January 16, 2002, the court denied Brinkley's Motion to Suppress. Apx. Vol. 4, pg.198.

At a hearing on December 4, 2001, the court, granting Brinkley's Motion to Change the Trial Date, continued the trial until April 3, 2002. Tr. Vol. 4, pg. 3.

Another hearing was held on March 21, 2002 at which time Brinkley's counsel moved to withdraw. Tr. Vol. 4, pgs. 2-16. On March 27, 2002, the court replaced them with Merle Dech and John Thebes. Trial was reset for September 23, 2002. Tr. Vol. 4, pgs. 2-10.

On May 1, 2002, Brinkley filed a Motion for Relief from Prejudicial Joinder to sever the City Diner robbery charge which the court denied on September 5, 2002. Apx. Vol. 4, pg. 238, Tr. Vol. 4, pg. 16.

Trial commenced on September 18, 2002. Tr. Vol. 5-9, pgs. 2-1160. Opening statements began on September 24, 2002. Tr. Vol. 10, pg. 1178. Before the opening statements began, counsel for Brinkley again moved for severance of the City Diner robbery charges. The Motion was denied, but counsel was allowed a continuing objection as to each witness that would testify as to those charges. Tr. Vol. 9, pgs. 1162-63.

The facts as stated by the Ohio Supreme Court are as follows:

On November 6, 1999, Grady "Snoop" Brinkley, defendant-appellant, robbed Rick's City Diner in Toledo, and police pursued and arrested him that same afternoon. On December 17, 1999, Brinkley's girlfriend, Shantae Smith, posted bond for him, and he was released from pretrial confinement. On January 7, 2000, Brinkley killed Smith in her apartment by cutting her throat. Then he stole her ATM card and winter coat and fled to Chicago. On January 13, 2000, the FBI arrested Brinkley in Chicago. Thereafter, Brinkley was convicted of the aggravated robbery of the City Diner and the aggravated robbery and aggravated murder of Smith and was sentenced to death.

City Diner Robbery

In November 1999, Brinkley worked at Rick's City Diner on Monroe Street in Toledo. Though scheduled, Brinkley did not report for work on November 6, but he arrived at the diner at 1:00 p.m. and told the staff that he was waiting for the owner. At times,

Brinkley waited inside the diner and joked with Marissa Brown, the hostess. At other times, he waited outside with Olivia Hunter, who had driven him to the diner. After the 2:00 p.m. closing time, Brown counted the money in the cash register, placed a bank deposit slip and the day's proceeds, $2,211, into a paper bag, and put the paper bag into her orange purse.

After Brown got into her car, Brinkley "came up with a [silver] gun and told [Brown] to give him the bag." Brown "thought he was joking" and "slapped the gun out of [her] face." In response, Brinkley "cocked the gun back and then punched [her] and told [her] he wasn't playing, so [she] gave him the bag." Brinkley then demanded her orange purse and car keys and "told [her] to get out of [her] car and run." Hunter confirmed that Brinkley had a small, "silver" handgun with him that day.

After Hunter and Brinkley drove off, Brown went back into the diner and told the cook, "Snoop robbed us." The cook noticed that Brown's "mouth [was] full of blood" and "she was all scared." Toledo police were called and responded.

Hunter testified that after Brinkley got back into her car, he told her to drive him to the Greyhound bus station. He then changed his mind and directed Hunter to drive to a house on Junction Street. Once there, Brinkley introduced Hunter to his girlfriend, Shantae Smith, and gave the orange purse to an older man. Then Hunter drove Brinkley to an apartment complex in Toledo. Police later recovered the purse, which contained the City Diner bank-deposit slip, from a trash can behind that Junction Street house.

After talking with witnesses at the City Diner, police traced Hunter and Brinkley to the Toledo apartment complex and arrested them that afternoon. Police found $800 hidden in Brinkley's sock and recovered $400 from Hunter. However, police never recovered the balance of the City Diner receipts, approximately $1,011.

Events After the Robbery and Before the Murder

On December 3, 1999, Brinkley was arraigned on the City Diner robbery charge, and a bond of $20,000 was set. A pretrial hearing was scheduled for January 6, 2000, and Brinkley's trial was scheduled for January 18, 2000. Brinkley was confined in the county jail from November 6 until being released on bond on December 17, 1999.

Brinkley's 18-year-old girlfriend, Smith, changed her life after Brinkley's arrest. She moved into an apartment on Collingwood, started a new job, and met new co-workers and friends, Lamont Pettaway and Valarie Vasquez. Smith told Vasquez that she wanted to "be free from" Brinkley, and she told Vasquez and Pettaway that she was afraid of Brinkley. Smith became romantically involved with Pettaway; they planned to live together and talked of marriage.

While in the county jail, Brinkley talked with fellow inmate Samuel Miller about the City Diner robbery. Brinkley told Miller that he had "waited on [Brown] to come out and stuck the pistol in her face and took the money from her." Brinkley told Miller that "the gun was real."

Brinkley told Miller that Brinkley's girlfriend, Smith, had visited him every week during most of November but less frequently after Thanksgiving. Brinkley also told Miller that Smith "was sleeping with [a co-worker] and riding back and forth to work with him, and she [Smith] wanted to know * * * was [Brinkley] going to do anything

-4-

to her if she got him out on bond." Brinkley told Miller that "he played along with [Smith] so she can go ahead and pay the bond. * * * [But] when he got out he was going to hit a lick [i.e., get some cash]," and he "wasn't coming back to court * * * on the robbery charge." Instead, he "was going back home, to Chicago." Brinkley also said, "I'm going to kill that bitch [Smith] before I leave town."

On December 17, 1999, Smith withdrew $2,000 from her Huntington Bank account and arranged with a bail bond company to post a $20,000 bond to secure Brinkley's release. Smith and Brinkley each personally guaranteed payment of $20,000 if Brinkley did not show up for future court appearances. Brinkley was released that day, and after his release, he stayed with Smith at her Collingwood apartment.

On January 6, 2000, at approximately 12:35 p.m., Smith withdrew $50 from her bank account using her Huntington Bank automatic teller machine (ATM) card. That day, Smith worked her normal shift of 3:00 p.m. until 11:00 p.m. In the early morning of January 7, Pettaway dropped her off at home after work. Smith never arrived at work that afternoon.

On January 6, 2000, Brinkley did not appear for his pretrial hearing on the City Diner robbery charge, and the trial court issued a capias warrant for Brinkley's arrest. Ameritech business records establish that on January 6 and 7, several telephone calls were made from Smith's home telephone to the Greyhound bus terminal, and on January 7, a call was made to the Huntington Bank. Also on January 7, a call was placed from the Chicago residence of Brinkley's mother to Smith's telephone number. Huntington Bank records show that on January 7, 2000, someone tried 16 times to use Smith's Huntington ATM card in various ATMs to access her bank funds. These attempts failed because no valid personal identification number (PIN) was entered.

Nine of these attempts to use Smith's ATM card occurred between 3:37 p.m. and 3:42 p.m. at the Madison Avenue ATM that Smith herself had successfully used the previous day. Photographs taken at the ATM do not fully reveal the face of the person who tried to withdraw funds. A Huntington Bank investigator explained that the ATM cameras, set for users of average height, did not capture the user's face because the user was too tall. Brinkley is six feet, four inches tall. The photos do depict a male wearing a winter coat identical to a coat that Smith owned. Smith's blue winter coat was later recovered from Brinkley in Chicago.

According to Greyhound Bus Company business records, a prepaid ticket was purchased in Chicago at 3:29 p.m., CST, on January 7, 2000, and electronically forwarded for pickup in Toledo. The password needed to pick up the ticket was Alberta, the name of Brinkley's mother. The ticket was issued for a Grady Brinkley to travel to Chicago and was in fact used to travel on the 6:50 p.m. bus from Toledo to Chicago that night. Bus terminal surveillance video depicts Brinkley in the terminal at 6:29 p.m., when the ticket was claimed. A Greyhound manager identified Brinkley as the person who had claimed the ticket. Huntington Bank records revealed that two unsuccessful attempts to use Smith's ATM card occurred at 6:33 p.m. and 6:34 p.m. on January 7 at the bus terminal ATM.

After 7:00 p.m. on January 8, 2000, Smith's mother forced her way into her daughter's locked apartment through a back door, found her daughter's body, and called police.

-5-

Deputy Coroner Dr. Diane Scala-Barnett concluded that at the time Smith's mother found her, Smith had been dead for more than 30 hours. The killer had attempted to strangle Smith, rendering her unconscious, and had then cut her throat, killing her.

Smith's body rested on a quilt, and police discovered at least four partial shoeprints in blood on the quilt. DNA from blood on the quilt exactly matched Smith's DNA. Brinkley's Nike tennis shoes were later recovered in Chicago. Ted Manasian, a forensic scientist for Ohio's Bureau of Identification and Investigation ("BCI"), compared Brinkley's tennis shoes with the bloody shoeprints. The patterns on Brinkley's shoes were identical to those in the bloody shoeprints, and Manasian could not "find any differences that would allow [him] to eliminate [Brinkley's] shoe" as having made the shoeprints.

On a shelf near the kitchen, police found a handwritten note to the landlord, worded as follows: "Will be gone to Atlanta for 7 days to see my friend, could you please not come fix my sink until I come back." The note was dated "1-7-99 [sic]," and was signed with Smith's name. However, the handwriting on the note, including the purported signature, appears to be Brinkley's. Moreover, police found Brinkley's left thumbprint on the note. No other evidence suggests that Smith had planned to go to Atlanta.

Police determined that the last person in the apartment before Smith's mother broke in had left through the locked front door. The apartment's back door had been locked from the inside with a security chain, and the front door had been locked from the outside with a key.

On January 13, 2000, members of a fugitive task force arrested Brinkley at his mother's Chicago residence. When Brinkley was arrested, the weather was cold, and Brinkley put on a winter coat and a pair of size 15 Nike tennis shoes to walk to the FBI car. The coat looked odd on Brinkley because it was too small for his six-foot-four-inch" frame. Witnesses verified that this coat belonged to Smith. Smith had been wearing that coat when she withdrew ATM funds on January 6. The person who tried to use her ATM card on January 7 had worn an identical coat.

When FBI Special Agent David Browne placed Brinkley into his car, he advised him of his *Miranda* rights but told him, "I would prefer if you didn't talk." Nevertheless, Brinkley began to talk. Brinkley said he doubted that "the FBI would have come and got him for a robbery." Brinkley asked whether Ohio was a death-penalty state, and Browne told him he did not know but would check. According to Browne, Brinkley then said "that he was willing to confess * * *, but he needed to talk to his mother to find out whether or not Ohio was a death penalty state." Browne then allowed Brinkley to call his mother on Browne's cell phone.

According to Browne, Brinkley also said that he "didn't think that it was right to make the State of Ohio pay 30 thousand dollars a year to keep him alive and that he wanted to get this all over with."

At the police station, Browne again allowed Brinkley to call his mother. After he did so, Brinkley told Browne that "he was not going to make a confession, but he would talk to [Browne] if [he] had some questions to ask." Browne again advised Brinkley of his *Miranda* rights. Brinkley then waived his rights and agreed to talk with Browne.

> Brinkley said that he had thrown away his key to Smith's apartment. He admitted that the Nike tennis shoes he was wearing were his and claimed that Smith had given him her winter coat, a blue down jacket. While at the station, Brinkley also "[s]aid he was going to kill [Browne]" and "could do [Browne] like he had done other people."

*State v. Brinkley*, 105 Ohio St.3d 231, 231-235 (2005).

The defense rested its case on September 26, 2002 without putting on any evidence. Tr. Vol. 13, pgs. 1794-96, 1806-07. On September 26, 2002, the jury convicted Brinkley as charged. Tr. Vol. 13, pgs. 1975-80. The mitigation phase of the trial began on September 30, 2002. The State rested without presenting any evidence. Tr. Vol. 14, pg. 2039. Brinkley presented five family members as witnesses and made an unsworn statement. On the same day, the jury found that the State had proved beyond a reasonable doubt that the aggravating circumstances which Brinkley was found guilty of committing outweighed the mitigating factors and recommended the death penalty.  Tr. Vol. 14, pgs. 2131-34.

On October 2, 2002, the court found that the aggravating circumstances outweighed the mitigating factors and that a sentence of death be imposed on Brinkley. Apx. Vol. 4, pg. 361. Further, the court sentenced Brinkley to 10 years plus three years for the firearm specification for the aggravated robbery of the City Diner and ten years for the aggravated robbery of the murder victim. Tr. Vol. 15, pgs. 10-16.  The sentences were to be served consecutively to each other. Tr. Vol. 15, pg. 14.

II. Procedural History

A. Direct Appeal

Brinkley filed a direct appeal to the Ohio Supreme Court on November 25, 2002 raising the following issues:

**PROPOSITION OF LAW NO. 1:** ABSENT PROOF BEYOND A REASONABLE DOUBT THAT

-7-

A CAPITAL DEFENDANT COMMITTED THE AGGRAVATED MURDER "FOR THE PURPOSE OF ESCAPING DETECTION, APPREHENSION, TRIAL, OR PUNISHMENT FOR ANOTHER OFFENSE," A TRIAL COURT SHOULD GRANT A MOTION FOR JUDGMENT OF ACQUITTAL ON AN R.C. 2929.04 (A) (3) SPECIFICATION.

**PROPOSITION OF LAW NO. 2:** WHEN CHARGES ARE IMPROPERLY AND PREJUDICIALLY JOINED DUE TO BAD FAITH BY THE PROSECUTOR, THE REMEDY IS A NEW TRIAL.

**PROPOSITION OF LAW NO. 3**: WHEN AN APPELLATE COURT REVIEWING A SENTENCE OF DEATH BASED ON FINDINGS OF MULTIPLE R.C. 2929.04(A) SPECIFICATIONS DETERMINES THAT ONE OF THE SPECIFICATIONS IS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN THE RECORD, THE DEATH SENTENCE MUST EITHER BE REFORMED TO ONE OF THE LIFE SENTENCES OR THE CASE MUST BE REMANDED FOR A NEW SENTENCING HEARING AT WHICH A JURY WILL DETERMINE WHETHER THE REMAINING SPECIFICATION OR SPECIFICATIONS OUTWEIGH BEYOND A REASONABLE DOUBT THE MITIGATING FACTORS PRESENTED.

**PROPOSITION OF LAW NO. 4:** A TRIAL COURT ERRS TO THE PREJUDICE OF A CRIMINAL DEFENDANT WHEN IT DENIES A MOTION TO SUPPRESS ORAL STATEMENTS TO POLICE OFFICERS TAKEN IN VIOLATION OF HIS DUE PROCESS RIGHTS GUARANTEED UNDER THE FOURTH, FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. 5**: IT IS ERROR FOR A TRIAL JUDGE TO INDICATE TO PROSPECTIVE CAPITAL JURORS, DURING THE DEATH QUALIFICATION PROCESS, THAT IF THE LAW REQUIRES A DEATH SENTENCE THEY MUST VOTE TO IMPOSE DEATH AS A SENTENCE BUT IF THE LAW REQUIRES A LIFE SENTENCE THEY MUST CONSIDER VOTING FOR LIFE AS A SENTENCE.

**PROPOSITION OF LAW NO. 6**: A TRIAL COURT MAY NOT DISQUALIFY A JUROR FOR CAUSE PURSUANT TO *WITHERSPOON* AND *WITT* ON THE BASIS THAT THE JUROR WILL NOT VOTE FOR DEATH BASED ON ONE OF THE PARTICULAR AGGRAVATING CIRCUMSTANCES CHARGED AND ON AN INACCURATE STATEMENT OF THE LAW.

**PROPOSITION OF LAW NO. 7**: A TRIAL COURT COMMITS ERROR TO THE PREJUDICE OF A CRIMINAL DEFENDANT WHEN IT DENIES A DEFENSE MOTION FOR MISTRIAL WHERE A WITNESS TESTIFIES IN VIOLATION OF A RIGID COURT ORDER REGARDING EXCLUDED TESTIMONY.

**PROPOSITION OF LAW NO. 8**: A CRIMINAL DEFENDANT IS ENTITLED TO CROSS-EXAMINE A JAILHOUSE SNITCH WITH QUESTIONS DESIGNED TO DEMONSTRATE THAT HIS TESTIMONY IS MADE WITH THE HOPE OR EXPECTATION OF SUBSTANTIAL GAIN.

**PROPOSITION OF LAW NO. 9**: A TRIAL COURT COMMITS ERROR TO THE PREJUDICE OF A CRIMINAL DEFENDANT WHERE IT PERMITS A WITNESS TO RENDER AN EXPERT OPINION WHEN THAT WITNESS HAS NOT BEEN QUALIFIED AS AN EXPERT AS REQUIRED BY EVID. R. 702

**PROPOSITION OF LAW NO. 10**: A CRIMINAL DEFENDANT IS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILS TO OBJECT TO

THE TESTIMONY OF A WITNESS WHO RENDERS AN EXPERT OPINION WITHOUT BEING QUALIFIED AS REQUIRED BY EVID. R. 702.

**PROPOSITION OF LAW NO. 11**: THE FAILURE OF THE TRIAL COURT TO SECURE THE PRESENCE OF THE ACCUSED OR TO OBTAIN A WAIVER OF SUCH RIGHT, VIOLATES THE ACCUSED'S RIGHT UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

**PROPOSITION OF LAW NO. 12:** A TRIAL COURT ERRS TO THE PREJUDICE OF A CRIMINAL DEFENDANT WHEN IT DENIES A MOTION FOR ACQUITTAL PRESENTED BY THE DEFENSE AT THE CONCLUSION OF THE PRESENTATION OF EVIDENCE WHERE THE EVIDENCE DOES NOT SUPPORT THE CONVICTION.

**PROPOSITION OF LAW NO. 13**: THE ACCUSED'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT.

**PROPOSITION OF LAW NO. 14**: A CRIMINAL DEFENDANT IS DENIED DUE PROCESS AND THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE ACTIONS OF HIS TRIAL COUNSEL FALL BELOW ANY ACCEPTED STANDARD OF COMPETENCE IN VIOLATION OF HIS FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. 15**: ERRORS IN THE MITIGATION PHASE JURY INSTRUCTIONS OF A CAPITAL TRIAL VIOLATE A DEFENDANT'S CONSTITUTIONAL RIGHTS AND REQUIRE RESENTENCING.

**PROPOSITION OF LAW NO. 16**: A CRIMINAL DEFENDANT AND A CRIMINAL APPELLANT IN A DEATH PENALTY CASE IS DENIED DUE PROCESS OF LAW GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHERE THE ABILITY TO CONDUCT AN INDEPENDENT ANALYSIS OF THE APPROPRIATENESS OF THE DEATH SENTENCE IS RESTRICTED BY THE OHIO SUPREME COURT'S DECISION IN *STATE V. McGUIRE*.

**PROPOSITION OF LAW NO. 17**: PERVASIVE PROSECUTORIAL MISCONDUCT DENIES A CAPITAL DEFENDANT HIS RIGHTS TO FAIR TRIAL AND DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

**PROPOSITION OF LAW NO. 18**: THE TRIAL JUDGE IN A CAPITAL CASE MAY NOT HOLD AN OFF-THE-RECORD, EX PARTE DISCUSSION WITH THE JURY AFTER THEY RETURN THEIR SENTENCING VERDICT BUT BEFORE THE JUDGE IMPOSES THE SENTENCE.

**PROPOSITION OF LAW NO. 19**: A CAPITAL DEFENDANT CANNOT BE CHARGED AND CONVICTED OF A SINGLE SPECIFICATION ALLEGING THAT HE WAS THE PRINCIPLE (sic) OFFENDER OR THAT, IF HE WAS NOT, HE ACTED WITH PRIOR CALCULATION AND DESIGN.

**PROPOSITION OF LAW NO. 20**: WHEN A TRIAL COURT MAKES UP FACTS NOT IN EVIDENCE, AND CONSIDERS AS AN ADDITIONAL AGGRAVATING CIRCUMSTANCE ONE THAT SHOULD HAVE MERGED, TO SUPPORT ITS DECISION THAT THE AGGRAVATING CIRCUMSTANCES OF A CAPITAL CRIME OUTWEIGH THE MITIGATING FACTORS AND

THAT A SENTENCE OF DEATH SHOULD BE IMPOSED, THE DEFENDANT IS DENIED HIS RIGHTS TO FAIR TRIAL AND DUE PROCESS AND SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT.

**PROPOSITION OF LAW NO. 21**: CUMULATIVE ERRORS MAY DEPRIVE A CRIMINAL DEFENDANT AND CRIMINAL APPELLANT OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, NINTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. 22**: WHEN A CRIMINAL DEFENDANT'S TRIAL COUNSEL IS DEEMED TO HAVE WAIVED OR FAILED TO PRESERVE ISSUES HE WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. 23:** IN ORDER TO COMPORT WITH DUE PROCESS, THE RIGHT TO MEANINGFUL APPEAL, AND AVOID CRUEL AND UNUSUAL PUNISHMENT, THE UNIVERSE OF CASES TO BE EXAMINED FOR REVIEW OF PROPORTIONALITY MUST INCLUDE ALL THOSE IN WHICH A CAPITAL SPECIFICATION HAS BEEN CHARGED.

**PROPOSITION OF LAW NO. 24**: OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL BOTH IN THE ABSTRACT AND AS APPLIED.

The Ohio Supreme Court affirmed Brinkley's conviction and death sentence on April 13, 2005. *State v. Brinkley*, 105 Ohio St.3d 231 (2005).

## B. Post-conviction Relief

On September 8, 2003, while his direct appeal was pending, Brinkley filed a Motion for Post-conviction Relief with the trial court under R.C. 2953.21 raising the following fifteen grounds for relief:

1. Petitioner's judgment and/or sentence are void or voidable because the State presented false material evidence through the trial testimony of State's witness, Samuel Miller. This action by the prosecutor violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

2. Petitioner's judgment and/or sentence are void or voidable because defense counsel ineffectively cross-examined State's witness Samuel Miller about the timing and substance of his sentences immediately before and after Miller spoke to the lead investigator in Petitioner's case. This action by the defense attorney violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

3. Petitioner's judgment and/or sentence are void or voidable because the State withheld impeachment

evidence that would have shown bias on the part of State's witness, Lamont Pettaway. This action by the prosecutor violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

4. Petitioner's judgment and/or sentence are void or voidable because the State withheld impeachment evidence that would have shown dishonesty on the part of State's witness, Lamont Pettaway. This action by the prosecutor violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

5. Petitioner's judgment and/or sentence are void or voidable because trial counsel failed to cross-examine Lamont Pettaway when material impeachment evidence was available. This action by the defense counsel violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

6. Petitioner's conviction and/or sentence are void or voidable because he was denied the effective assistance of counsel when trial counsel failed to obtain and utilize the expert services of a trained mitigation specialist at the penalty phase of his capital trial. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Sections 1, 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution.

7. Petitioner's convictions and sentence are void or voidable because his trial counsel failed to reasonably investigate and present adequate evidence to mitigate the sentence of death after he was convicted of aggravated murder. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Sections 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution.

8. Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial by his trial counsel's failure to prepare the witnesses before they testified. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Sections 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution.

9. Petitioner's conviction and sentence are void or voidable because his trial counsel failed to present adequate expert psychological assistance in his defense during the capital trial and mitigation hearing. This action by the defense attorneys violated Petitioner's rights as guaranteed by the Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

10. Petitioner's judgment and sentence are void or voidable because his trial attorneys failed to present evidence to support their argument that the death penalty is applied in an arbitrary manner. As a result, Petitioner was denied his rights to effective assistance of counsel, due process, and a fair trial as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Sections 2, 5, 9, 10, 16 and 20, Article I of the Ohio Constitution.

11. Petitioner's convictions and sentence are void or voidable because his death sentence was disproportionate to similarly situated capital defendants in Lucas County, Ohio. As a result, Petitioner was denied his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Sections 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution.

12. Petitioner's convictions and sentence are void or voidable because the death penalty law permits

-11-

the imposition of capital punishment in an arbitrary, capricious and discriminatory manner due to the uncontrolled discretion afforded elected Lucas County prosecutors in determining when to seek the death penalty. The arbitrary, capricious, and discriminatory application of the death penalty in Lucas County is obvious from the analysis of Lucas County's indictments and case dispositions. As a result, Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and §§ 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution are violated.

13. Petitioner's convictions and sentence are void or voidable because the statutory proportionality reporting system for death penalty cases is inaccurately and ineffectively processed in Lucas County, Ohio. Consequently Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and Sections 2, 5, 9, 10, 16 and 20 of Article I of the Ohio Constitution are violated.

14. Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. amends. VIII, IX, XIV; Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution; *Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998)(five justices holding that the Due Process Clause protects "life" interest at issue in capital cases).

15. Petitioner's judgment and sentence are void or voidable because, assuming arguendo that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights secured by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

On February 10, 2004, the Lucas County Common Pleas Court dismissed his Petition without a hearing. Apx. Vol. 10, pg. 273.

Brinkley filed an appeal to the Ohio Sixth District Court of Appeals which affirmed the trial court's denial of his Petition for Post-conviction Relief on October 22, 2004. *State v. Brinkley*, 2004 WL 2384455 (Ohio App. 6th Dist., Oct. 22, 2004). He raised the following three assignments of error:

Assignment of Error No. 1: The trial court erred by dismissing appellant's postconviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

Assignment of Error No. 2: Ohio's postconviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

Assignment of Error No. 3: Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

Brinkley then sought review in the Ohio Supreme Court which declined jurisdiction on June

-12-

29, 2005. *State v. Brinkley*, 106 Ohio St.3d 1412 (2005).  The following five propositions of law of

error were presented to that court:

**PROPOSITION OF LAW NO. 1**: The Court of Appeals erroneously upheld the trial court's
determination that all but appellant's first post-conviction claim was barred by the doctrine of *res
judicata*, thereby violating appellant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth
Amendments to the U.S. Constitution and Article I, §§ 1, 2, 9, 10, 16, and 20 of the Ohio
Constitution.

**PROPOSITION OF LAW NO. 2**: The presentation of perjured testimony by the State violates the
Appellant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S.
Constitution and Article I, §§ 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

**PROPOSITION OF LAW NO. 3**: The trial court erred by dismissing Appellant's post-conviction
petition, where he presented sufficient operative facts and supporting exhibits to merit an evidentiary
hearing and discovery.

**PROPOSITION OF LAW NO. 4**: Ohio's post-conviction procedures neither afford an adequate
corrective process nor comply with due process and equal protection under the Fourteenth
Amendment.

**PROPOSITION OF LAW NO. 5**: Considered together, the cumulative errors set forth in
appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction
process.

A Petition for Writ of Certiorari was submitted to the United States Supreme Court. That Court

denied the Petition on December 5, 2005. *Brinkley v. Ohio*, 126 S. Ct. 799 (2005).

*C. Murnahan*

On July 12, 2005, Brinkley filed an Application for Reopening Pursuant to App. R. 26(B) and

*State v. Murnahan*, 63 Ohio St.3d 60 (1992), in the Ohio Supreme Court raising the following two

propositions of law:

**PROPOSITION OF LAW NO. I**: Where Trial Counsel's performance in a capital case falls below
professional standards for reasonableness, counsel has rendered ineffective assistance, thereby
prejudicing the defendant in violation of his constitutional rights.
*Voir Dire* Issues:
Failure to rehabilitate or challenge for cause a juror who possessed an incorrect predetermined concept
of who should be sentenced to death (Prospective Juror No. 16).
Trial Phase Issues:
1. Failure to make a motion that all references to State's Exhibit 20 be stricken from the record and
that the court give curative instructions.
2. Failure to object to prosecution's misstatement of facts related to the use of the victim's ATM card

-13-

while telephone calls were made from Shantae Smith's apartment after the state claimed she was dead.
3. Trial counsel provided ineffective representation when he conceded Appellant was guilty of the City-Diner robbery.

**PROPOSITION OF LAW NO. II**: Prosecutorial misconduct denied appellant his rights to a fair trial and due process guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.
1. The state suppressed material evidence related to blood in the kitchen sink that appeared in State Exhibit 20.
2. In its opening remarks and closing argument the prosecutor misstated crucial facts related to the use of Shantae Smith's ATM card while telephone calls were being made from her apartment.

The Application was denied without opinion on October 5, 2005. *State v. Brinkley*, 106 Ohio St.3d 1529 (2005).

### III. Federal Habeas Corpus

On January 17, 2006, Brinkley filed a Notice of Intent to File a Petition for Writ of Habeas Corpus. His Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 was filed on November 22, 2006 raising the following twenty-eight grounds for relief:

Ground I: There Was Insufficient Evidence to Establish the Capital Specification that the Aggravated Murder Was Committed "For the Purpose of Escaping Detection, Apprehension, Trial, or Punishment for Another Offense."
Ground II: There Was Insufficient Evidence to Establish the Capital Specification that the Aggravated Murder Was Committed in the Course of an Aggravated Robbery and Insufficient Evidence that Brinkley was Guilty of An Aggravated Robbery of Shantae Smith on January 7, 2000.
Ground III: There Was Insufficient Evidence to Establish Brinkley's Guilt of the Offense of Aggravated Murder.
Ground IV: Brinkley Was Denied His Rights to Due Process and a Fair Trial Because of the Prosecutor's Misconduct in Improperly and Prejudicially Joining Unrelated Criminal Charges. Those Unrelated Charges Should Have Been Severed as Requested by the Defense. The Failure of the Trial Court To Do So, and to Bar Evidence of the City Diner Robbery, Denied Brinkley's Constitutional Rights.
Ground V: Brinkley's Oral Statements to Police Officers Must Be Suppressed. All Statements

-14-

Obtained in Violation of *Miranda* Violate the Protections Under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.

Ground VI: Brinkley Was Denied His Right to a Fair Trial with an Impartial Jury Because a Prospective Juror Who Expressed Reservation About the Death Penalty Was Improperly Excused by the State.

Ground VII: The Failure of the Trial Court to Secure Brinkley's Presence at Critical Stages of the Proceedings, and to Obtain Knowing, Intelligent and Voluntary Waivers of His Presence When He Did Not Attend, Violated Brinkley's Rights Under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Ground VIII: The Trial Court's Failure to Permit a Meaningful Cross Examination of the Jailhouse Snitch That Would Challenge His Veracity and Expose His Bias Deprived Brinkley of His Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Ground IX: The Trial Court Gave Constitutionally Defective "Reasonable Doubt" Instructions During Both Phases of the Trial.

Ground X: The Ineffective Assistance of Trial Counsel During the Guilt/Innocence Phase of the Case Denied Brinkley His Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Ground XI: The Ineffective Assistance of Trial Counsel During the Sentencing Phase of the Case Denied Brinkley His Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, and Deprived Him of a Reliable Sentence.

Ground XII: The Ineffective Assistance of Appellate Counsel Denied Brinkley His Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Ground XIII: Brinkley Was Denied His Right to a Fair Trial Because the Trial Judge Provided the Jury with Erroneous Jury Instructions in the Penalty Phase of the Trial.

    A. Instruction Concerning Sympathy and Mercy.

    B. Instruction Regarding "Equipoise" .

    C. Mistakes in the Instructions Submitted to the Jurors.

Ground XIV: The Trial Court Committed Numerous Other Errors of Fact and Law Thereby Depriving Brinkley of His Rights to a Fair Trial, Due Process of Law, and Equal Protection Under the Law.

    A. The Trial Court Applied the Wrong Standard in Conducting the Death Penalty *Voir Dire*.

    B. The Trial Court Permitted a Witness to Testify About the Victim's Fear of Brinkley in Violation of a Court Order.

    C. The Trial Court Permitted a Witness to Testify as an Expert with Regard to Matters on Which the Witness Had Not Been Qualified as an Expert.

    D. Mistakes in the Instructions Submitted to the Jurors .

Ground XV: The Trial Judge's *Ex Parte* Meeting with Jurors after Their Sentencing Recommendation, But Before the Judge Imposed the Sentence, Deprived Brinkley of His Rights to Due Process, a Fair Trial, and a Reliable Sentencing Proceeding, and Subjected Him to Cruel and Unusual Punishment.

Ground XVI: Brinkley Was Denied His Right to a Fair Trial Because of Repeated Instances of Prosecutorial Misconduct Throughout Both Phases of His Trial.

Ground XVII: Because the Capital Specifications in the Indictment Charged Brinkley Both as Being the Principal Offender in the Commission of the Aggravated Murder and as Committing the Aggravated Murder with Prior Calculation and Design, the Indictment and the Subsequent Flawed Proceedings Thereon Violated Brinkley's Constitutional Rights.

Ground XVIII: The State Improperly, Illegally and Unconstitutionally Withheld Exculpatory, Mitigation and/or Impeachment Evidence from the Defense in Violation of its Obligations Under *Brady v. Maryland*.

Ground XIX: Brinkley's Conviction And/or Death Sentence Violate His Rights to Due Process and a Fair Trial Because They Were Obtained as a Result of the State's Presentation of False Material Evidence Through the Trial Testimony of State's Witness, Samuel Miller.

Ground XX: Brinkley Was Denied Due Process Because Both The Trial Court and The Ohio Supreme Court Failed To Fulfill Their Statutory Duties in Imposing and Reviewing His Sentence of Death, and the Ohio Supreme Court Failed to Fulfill Its Obligation to Meaningfully Review the Proportionality of Brinkley's Death Sentence.

Ground XXI: Brinkley Was Denied the Effective Assistance of Counsel Because His Attorneys Failed to Investigate and Present Available Evidence to Support Their Argument That the Death Penalty is Applied in an Arbitrary Manner.

Ground XXII: Ohio's Post-Conviction Procedures, and Its *Murnahan*/App. Rule 26(B) Procedures for Re-Opening a Direct Appeal, Neither Afford an Adequate Corrective Process Nor Comply With Due Process and Equal Protection Under The Fourteenth Amendment.

    A. The Post-Conviction Process .

    B. The *Murnahan* / App. Rule 26(B) Process .

Ground XXIII: Brinkley's Death Sentence Is Unconstitutional Because It Is Not Reliable, It Is Based on "Facts" Not Established by the Evidence and On Invalid "Aggravators," and Because the Mitigating Factors Outweigh The Aggravating Circumstances.

Ground XXIV: The Ohio Supreme Court Denied Brinkley Due Process By Failing To Properly Consider the Proportionality of His Death Sentence and to Conduct a Meaningful Independent Analysis of its Appropriateness.

Ground XXV: The Death Penalty Is Applied Arbitrarily and Capriciously in Lucas County, Ohio.

Ground XXVI: Ohio's Death Penalty Statute Is Unconstitutional in Numerous Respects.

    A. Constitutional Flaws in Trial Proceedings Created by the Ohio Statutory Scheme.

    B. Constitutional Flaws in Sentencing Proceedings Created by the Ohio Death Penalty Statute.

    C. Constitutional Flaws in Appellate Proceedings Created by the Ohio Death Penalty Statutes.

    D. Societal Interests are Not Served by the Ohio Death Penalty Statutes.

    E. Imposition of the Death Penalty Demonstrates a Blatant Disregard for the Value of Human

Life, Entails Unnecessary and Wanton Infliction of Pain and Diminishes the Dignity of Man. F. The Ohio Death Penalty Statute Violates the Supremacy Clause of the United States Constitution and Various International Laws Including, but not Limited to, the Organization of American States Treaty and the American Declaration of the Rights and Duties of Man.

Ground XXVII: Brinkley Is Entitled to Habeas Relief as to His Conviction and Sentence Because the Death Penalty as Administered by Lethal Injection in the State of Ohio Violates His Constitutional Rights to Protection from Cruel and Unusual Punishment and to Due Process of Law.

Ground XXVIII: Brinkley's Conviction and Sentence Are Unconstitutional Because of the Cumulative Effect of the Many Errors That Occurred During His Trial and in All Subsequent Proceedings.

A. Cumulative errors at trial and sentencing .

B. Cumulative errors at all stages of the case.

## IV. Standard of Review

The Anti Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") amending 28 U.S.C. § 2254, became effective on April 24, 1996. The AEDPA changed the standard of review to be applied by the federal court to Petitions for Writ of Habeas Corpus. Brinkley filed his Petition on November 22, 2006, after the AEDPA became effective, so the Court will utilize the amended standard which gives deference to the state court's decision. The AEDPA provides in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1)-(2).

The United States Supreme Court explained the applicable AEDPA provision in *Williams v.*

-17-

*Taylor*, 529 U.S. 362 (2000). First, the Court determined that the words "contrary to" and "unreasonable" have independent meanings. *Id.* at 404. Every clause and every word of a statute must be given effect. *Id.* (citing *United States v. Manasche,* 348 U.S. 528, 538-39 (1955)). A state court decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by this Court in a question of law" or (2) "if the state court confronts facts that are materially undistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to it. *Id.* at 405. Since the word "contrary" means "diametrically different," "opposite in character or nature," or "mutually opposed," as defined in Websters Third New International Dictionary 495 (1976), the state court's decision must be substantially different from the Supreme Court precedent. *Id.* Further, a state court decision would be contrary to clearly established Supreme Court law if (1) the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if (2) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and still arrives at a result different from the Court's precedent. *Id.* at 405-06.

A state court decision can be considered an "unreasonable application" of clearly established precedent if "the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. An unreasonable application is distinguishable from an incorrect application of federal law. A writ of habeas corpus may not be issued just because the court concludes that a state court decision applied

-18-

clearly established law erroneously or incorrectly. The application must be unreasonable. *Id.* at 411. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (petitioner must show that he would have satisfied applicable Supreme Court precedent if his claim was analyzed in the first instance because petitioner must show more than that the state-court decision applied Supreme Court precedent incorrectly, but must show that the court applied precedent in an objectively unreasonable manner).

The *Williams* Court referred to *Teague v. Lane*, 489 U.S. 288, 301 (1989), for aid in interpreting the "clearly established law" requirement. The *Teague* case involved a determination of whether a new rule of law was retroactive. The Court did not attempt to define what may or may not constitute a new rule for retroactivity purposes. It stated that in general, a case announces a new rule when it breaks new ground or imposes a new obligation on the states or federal government. A case sets forth a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *Williams* considered the *Teague* case the equivalent of a statutory provision requiring exclusive reliance on "clearly established law." *Id.* 529 U.S. at 379. What would qualify as an old rule under *Teague* constitutes "clearly established law." *Id.* 529 U.S. at 412; *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001) (district court cannot look to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law).

V. Exhaustion and Procedural Default

A. Exhaustion

-19-

A state prisoner must exhaust his state remedies before bringing a claim in a federal court for habeas corpus relief. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Rose v. Lundy,* 455 U.S. 509 (1982). Exhaustion is satisfied when the highest court in the state in which the prisoner has been convicted has had a full and fair opportunity to rule on the claims. *O'Sullivan*, 526 U.S. at 842. If the petitioner has the right under state law to raise a claim under any available procedure, he has not exhausted his state remedies.  28 U.S.C. § 2254(b), (c); *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir. 1994). The petitioner has the burden of demonstrating that he has exhausted all his available remedies. *Prather v. Rees*, 822 F.2d 1418, 1420 n. 3 (6th Cir. 1987).

### B. Procedural Default.

A federal court cannot consider any claim raised in a Petition for Writ of Habeas Corpus that has not been resolved on the merits in state court. *Wainright v. Sykes*, 433 U.S. 72, 87 (1977). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991). *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit set forth a four part test to determine if a claim is procedurally defaulted: "(1) the court must determine that there is a state

procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." In order to show cause, the petitioner must demonstrate that an objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice is proven by showing a disadvantage infecting the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982). The claim must be presented to the state courts under the same theory in which it is later presented in federal court. *Lott v. Coyle*, 261 F.3d 594, 607, 611, 617, 619 (6th Cir. 2001), *cert. denied*, 534 U.S. 1147 (2002); *Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998).

Issues that could be raised on direct appeal are barred by the doctrine of *res judicata*.  In *State v. Perry*, 10 Ohio St.2d 175 (1967), the Ohio Supreme Court ruled that "[U]nder the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial,

-21-

which resulted in that judgment of conviction, or on appeal from that judgment." *Id.* at 180. *See State v. Roberts*, 1 Ohio St.3d 36, 39 (1982). The Sixth Circuit has held that the "Perry" rule is regularly and consistently applied by Ohio courts and is an adequate and independent state ground upon which to procedurally bar consideration of habeas claims. *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001), *cert. denied*, 534 U.S. 977 (2001).[3]

Post-conviction issues supported by evidence *de hors* the record as well as evidence appearing on the record are not subject to *res judicata*. *State v. Smith*, 17 Ohio St.3d 98 (1985). Evidence outside the record will permit issues to be litigated that were not raised or could have been raised on appeal.

---

[3]     The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 45 Ohio St. 2d 71 (1976). *Hester* concluded that, where the record does not disclose that the issue of competent trial counsel has been adjudicated, *res judicata* is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Cole*, 2 Ohio St.3d 112. 114 (1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief.

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Morales v. Coyle*, 98 F. Supp. 2d 849, 861. (N.D. Ohio 2000).

*Res judicata* will not apply if the evidence outside the record shows that the petitioner could not have appealed the constitutional claim based upon information in the original trial record. *State v. Combs*, 100 Ohio App.3d 90, 97 (Ohio App., 1st Dist. 1994). Any evidence presented outside the record must satisfy the same restricted standard of validity, otherwise it would be too easy to defeat the doctrine of *res judicata* as set forth in *Perry*. *State v. Lawson,* 103 Ohio App.3d 307, 315 (Ohio App. 12th Dist. 1995).  The evidence that was available to the petitioner at the time of the direct appeal is not *de hors* the record simply because it was not raised at that time. *State v. Blackmon,* 1997 WL 423047 *1 (Ohio App., 9th Dist. Jul. 16, 1997). Nor could the evidence be in existence and available for use at time of trial. *State v. Smith*, 1994 WL 273267 * 5 (Ohio App., 1st Dist. Jun. 22, 1994). *See State v. Williams*, 149 Ohio App.3d 434, 442-43 (Ohio App., 6th Dist. 2002), *cert. denied*, 541 U.S. 963 (2004) (evidence *de hors* the record must demonstrate that the petitioner could not have appealed the claim based on information in the trial record). The evidence *de hors* the record presented during post-conviction proceedings cannot be excessive or cumulative to the evidence on record. It must support the claim in a manner that the record lacked.  *Cowen v. Bagley,* 236 F. Supp.2d 841, 862 (S.D. Ohio 2002) (citing *State v. Powell*, 90 Ohio App.3d 260, 268 (Ohio App., 1st Dist. 1993)).

Under Ohio law, errors which are not preserved by objection at the trial are considered waived and may not be raised upon appeal. *Stores Realty Co. v. Cleveland Bd. of Bldg. Standards and Bldg. Appeals*, 41 Ohio St.2d 41, 43 (1975). The objection must be made contemporaneous to the challenged testimony. *See Engle v. Isaac*, 456 U.S. 107, 124 (1982), *overruled in part on other grounds*,

*Thompson v. Keohane*, 516 U.S. 99 (1995) (violation of Ohio's contemporaneous objection rule barred appellate review). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground. *Williams v. Bagley*, 380 F3d 932, 968 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 1939 (2005). "Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default." (citations omitted)). Further, plain error review by an appellate court constitutes enforcement of Ohio's contemporaneous objection rule. *Id.*; *Hinkle* v. *Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

A state procedural bar may be invalidated because of later actions by a state court. *Ylst,* 501 U.S. at 801. The procedural bar is removed if the last state court to be presented with a particular issue reaches its merits. *Id.* If the last state court bases its ruling both on the merits and alternatively on a procedural ground, the procedural ground ruling prevails. *Harris v Reed*, 489 U.S. 255, 264 n. 10 (1989); *Baze v. Parker* 371 F3d 310, 320 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005). Where the decision rests primarily on federal law, it is presumed that the state court did not rely on procedural default unless it clearly stated that it did so. *Harris*, 489 U.S. at 262-263. The question whether a state court relied on procedural default is often a difficult one. *Id*. 489 U.S. at 263. Before the *Harris*

-24-

presumption can be applied, the federal court must make a preliminary finding that there is no independent and adequate state ground for the decision. *Coleman,* 501 U.S. at 738. Therefore, the habeas court must examine the wording used in the state court decision.

Failure to show cause and prejudice for procedural default may be overcome if petitioner can show that his conviction is a result of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. This is accomplished by the petitioner demonstrating that he is actually innocent of the crime for which he was convicted. *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *Lott*, 261 F.3d at 602. Proof of innocence must be so strong that a court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 316.

When a defendant was represented by the same counsel at trial and on direct appeal, claims of ineffective assistance of trial counsel are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial. *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 2260 (2005).

Procedural default may be excused by proving counsel's ineffectiveness in failing to properly raise the claims on direct appeal. *Franklin v. Anderson,* 434 F.3d 412, 418 (6th Cir. 2006); *Burroughs v. Makowski*, 411 F.3d 665, 667 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 653 (2005). An ineffective assistance of counsel claim raised as cause for procedural default of another claim can be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Jamison v. Collins,* 100 F. Supp.2d 521, 551 (S.D. Ohio, 1998) (a petitioner may not bring an ineffective assistance of counsel claim as cause

for a default when that ineffective assistance of counsel claim itself is procedurally barred).  A claim of ineffective assistance of appellate counsel must be raised in a motion for reconsideration in the court of appeals under Rule 26(B). *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *Murnahan*, 63 Ohio St. 3d at 65.

## VI. Analysis of Grounds for Relief

### First, Second, and Third Grounds for Relief

The first, second and third claims for relief raise the issue of insufficiency of the evidence. Since they involve the same issue, they will be discussed together.

The United States Supreme Court set forth the standard of review to be used by a habeas court when reviewing an insufficiency of the evidence claim in *Jackson v. Virginia*, 443 U.S. 307 (1979), *overruled on other ground by Schlup v. Delo,* 513 U.S. 298 (1995).  The Court ruled that the habeas court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The trier of fact has the responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-402 (1993); *Malcum v. Burt*, 276 F. Supp.2d, 664, 668 (E.D. Mich., 2003). The federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Mathews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003), *cert. denied*, 547 U.S. 1034 (2006). The habeas court must limit itself to

evidence adduced at trial because a sufficiency of the evidence review under *Jackson* is limited to

evidence of record. *Jackson* does not allow consideration of newly discovered evidence. *Herrera*, 506

U.S. at 402; *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005); *D'Ambrosio v. Bagley*,

2006 WL 1169926 *49 (N. D. Ohio, Mar. 24, 2006), *aff'd*, 527 F.3d 489 (6th Cir. 2008). The *Jackson*

standard applies whether the evidence was direct or circumstantial. *Scott v. Elo*, 302 F.3d 598, 602

(6th Cir. 2002) (citing *Spalla v. Foltz*, 788 F.2d 400, 402 (6th Cir. 1986)).

First Ground for Relief

In his first claim for relief, Brinkley asserts that there was insufficient evidence to support his

conviction of the aggravated circumstance under R.C. 2929.04(A)(3). The (A)(3) aggravating

circumstance is satisfied where "[T]he offense was committed for the purpose of escaping detection,

apprehension, trial, or punishment for another offense committed by the offender." R.C.

2929.04(A)(3). The Respondent agrees that this claim was presented to the Ohio Supreme Court and

is preserved for federal habeas review.

The Ohio Supreme Court found this claim to be without merit stating:

> In proposition of law I, Brinkley argues that the trial court erred in rejecting a Crim.R.
> 29 motion for acquittal as to the R.C. 2929.04(A)(3) specification. Essentially,
> Brinkley challenges the sufficiency of evidence to prove that he killed Smith "for the
> purpose of escaping detection, apprehension, trial, or punishment for another offense
> committed by the offender." *Id*.
> In a review for sufficiency, "[t]he relevant inquiry is whether, after viewing the
> evidence in a light most favorable to the prosecution, any rational trier of fact could
> have found the essential elements of the crime proven beyond a reasonable doubt."
> *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the

-27-

syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The weight to be given the evidence and the credibility of witnesses are primarily jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

In this case, we find that the evidence was sufficient to establish Smith's guilt of the R.C. 2929.04(A)(3) specification beyond a reasonable doubt. First, the evidence firmly established that Brinkley fled Toledo to avoid trial and punishment for the City Diner armed robbery. Brinkley did not appear at his court hearing on January 6. Instead, he fled to Chicago on January 7, after he had killed Smith. His flight to Chicago was clearly made for the purpose of avoiding trial and punishment for the City Diner robbery. Second, the jury could reasonably conclude that Brinkley killed Smith, at least in part "for the purpose of escaping * * * trial, or punishment" for the City Diner robbery. Brinkley's contention that if he killed Smith, he did so only because she had fallen in love with someone else does not fit the facts. After his release on December 17, Brinkley stayed with Smith for over two weeks. But by January 7, he had skipped his pretrial hearing on the City Diner robbery, and he needed funds to escape to Chicago. On January 7, the day he killed Smith, Brinkley attempted 16 times to use Smith's ATM card to obtain those funds.

Under these facts, a jury could reasonably conclude that Brinkley killed Smith, at least in part to steal her coat and ATM card to facilitate his escape from trial and punishment for the City Diner robbery. Also, Smith posed a risk to Brinkley because Smith was personally liable for Brinkley's bond. Hence, Smith had a strong incentive to tell authorities or the bail bondsman about Brinkley's plans to flee to Chicago. We find that the evidence supports the jury's finding of guilt as to the R.C. 2929.04(A)(3) specification, and we reject proposition of law I.

*State v. Brinkley*, 105 Ohio St.3d 231, 238-239 (2005).

The Ohio Supreme Court reviewed the facts in support of the aggravating circumstance conviction. This Court agrees that the jury could reasonably conclude that Brinkley fled Toledo to avoid a trial and punishment for the robbery of the diner, and that his conduct in this regard was connected to Smith's murder. Even though a motive might have been the fact that Smith was seeing

-28-

another man, she was a co-signer on the bond application and was liable for the full amount of bail if Brinkley did not appear for trial. She knew that he was fleeing to Chicago where his mother lived. Smith had a motive to notify the police of Brinkley's location so Brinkley may have killed her to aid in his escape.

In his Traverse, Brinkley argues that the testimony of a jailhouse snitch, Sam Miller, was not truthful, and the trial court did not allow his counsel to cross-examine him about pending criminal charges. These allegations are raised in Brinkley's eighth, tenth and nineteenth claims for relief and will be found to lack merit.

The Court finds that the decision of the Ohio Supreme Court that the conviction for violation of R.C. 2929.04(A)(3) was supported by sufficient evidence was not contrary to, or an unreasonable application of federal law as determined by the United States Supreme Court.

## Second Ground for Relief

The second claim for relief concerns the sufficiency of the evidence with respect to the aggravating circumstance set forth in R.C. 2929.04(A)(7). Although Brinkley did not distinctly raise this claim in State court, the Respondent noted that the Ohio Supreme Court discussed his Section 2929.04(A)(7) claim in proposition of law XX. Also Justice Paul Pfeifer addressed the issue in his dissent. Therefore, this Court will considered it as having been preserved for federal habeas review.

Ohio Revised Code Section 2929.04(A)(7) contains the following aggravating circumstance:

The offense was committed while the offender was committing, attempting to commit,

> or fleeing immediately after committing or attempting to commit . . . aggravated robbery . . . and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design.

Brinkley committed robbery by stealing Smith's coat and ATM card after murdering Smith. He contends that the evidence was weak because, as Justice Pfeifer stated in his dissenting opinion, the ATM card had no intrinsic value and the coat was cheap. The value of the stolen property has no consequence as to whether R.C. 2929.04(A)(7) is satisfied. Aggravated robbery is defined as a theft offense.  R.C.  2911.01, 2913.01(K). A theft of property worth less than $150.00 is considered a theft offense. R.C. 2913.02.  Satisfaction of the aggravated circumstance should not depend on the value of the property stolen.  The aggravated robbery statute does not distinguish between felony theft and petty theft.

The ATM card had intrinsic value when stolen by Brinkley. It had the potential for value, as shown by his sixteen failed attempts to use it. It became valueless only because he was unsuccessful in entering the correct PIN number. Furthermore, the (A)(7) aggravated circumstance includes "attempt to commit" aggravated robbery. Therefore the aggravated circumstance was satisfied by Brinkley taking the ATM card, irrespective of whether he was ultimately successful in withdrawing funds from Smith's bank account using her ATM card.

Accordingly, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

-30-

Third Ground for Relief

Brinkley contends that there was insufficient evidence to support his conviction for aggravated

murder. The Respondent acknowledges that this claim was presented to the Ohio Supreme Court and

agrees that it has been preserved for federal habeas review.

The Ohio Supreme Court reviewed the evidence that established that Brinkley was guilty.

In proposition of law XII, Brinkley challenges the sufficiency of the evidence to establish his identity as the person who murdered and robbed Smith. But "[t]he relevant inquiry [in a review for sufficiency] is whether * * * any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

In this case, the state proved through a plethora of evidence that Brinkley was the individual who murdered Smith and stole her coat and ATM bank card.

A. After Smith posted bond for Brinkley on December 17, Brinkley stayed at Smith's apartment. On January 7, 2000, the day of Smith's murder, Ameritech business records show phone calls from Smith's apartment to the Greyhound bus terminal and a call from Brinkley's mother's home in Chicago to Smith's apartment.

B. At the murder scene, police found bloody shoeprints on the quilt on which Smith's body lay. The shoeprints exactly matched the patterns on Brinkley's Nike tennis shoes, and Brinkley wore these shoes when he was arrested in Chicago.

C. At the murder scene, police found a handwritten note falsely advising the landlord that Smith planned to go to Atlanta for seven days. Brinkley's thumbprint was on that note, and the handwriting appeared to be Brinkley's.

D. Brinkley was living with Smith at the time of her death. Whoever killed Smith had a key to her apartment. Brinkley admitted he had had a key and that he had thrown it away in Chicago because he no longer needed it.

E. ATM photographs at the Greyhound bus station establish that on the day Smith was killed, Brinkley tried to use Smith's ATM card. Other ATM photographs and records establish that on the day Smith was killed, someone wearing a coat identical to hers made multiple attempts to gain access to her Huntington Bank account. When Brinkley was arrested in Chicago, he had Smith's coat.

F. On January 7, 2000, the day Smith was killed, Brinkley left Toledo at 6:50 p.m. on a Greyhound bus to Chicago. The ticket he used had been purchased in Chicago for

-31-

> travel that evening from Toledo to Chicago.
>
> G. At the time of his arrest, Brinkley told FBI Agent Browne "that he was willing to confess" but needed to find out whether "Ohio was a death penalty state." He also told Browne that "he was going to kill [Browne]" just "like he had done other people."
>
> In sum, compelling evidence established that Brinkley purposefully killed Smith and robbed her of her coat and ATM card. Under the *Jenks* test, a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. We reject proposition XII.

*State v. Brinkley*, 105 Ohio St.3d at 239-240.

Brinkley asserts that there is only circumstantial evidence pointing towards him as the killer, there was no scientific evidence linking him to the crime, he was able to establish his whereabouts at the time of the crime and an Ohio judge stated in a dissenting opinion that the evidence does not support the conclusion that the murder of Smith was an aggravated murder.

None of these assertions have merit. Circumstantial evidence is sufficient to convict a defendant. Such evidence need not remove every reasonable hypothesis except that of guilt. *Tilley v. McMackin,* 989 F.2d 222, 225 (6th Cir. 1993); *Neal v. Morris,* 972 F.2d 675, 678 (6th Cir. 1992); *Hartman v. Bagley*, 333 F.Supp.2d 632, 666 (N.D. Ohio, 2004), *aff'd*, 492 F.3d 347 (6th Cir. 2007), *cert. denied,* 554 U.S. 924 (2008); *Thomas v. Hageman,* 2006 WL 1526061 * 9 (N. D. Ohio, May 30, 2006). Scientific evidence was present in the form of Brinkley's fingerprint and shoeprint. Contrary to Brinkley's assertion, the shoeprint was not given great weight. It was only one of seven pieces of evidence pointed out by the Ohio Supreme Court. The Ohio judge believed the evidence did not show aggravated murder, but he did not conclude that Brinkley did not kill Smith. Viewing the evidence

in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of aggravated murder beyond a reasonable doubt.

### Fourth Ground for Relief

In his fourth claim for relief, Brinkley argues that the prosecutor improperly and in bad faith brought an indictment joining the City Diner robbery and the homicide of the victim even though the State's theory did not support a finding that the homicide was committed with the purpose to escape apprehension, trial or punishment for the City Diner robbery. The Respondent acknowledges that this claim was presented to the Ohio Supreme Court and agrees that it has been preserved for federal habeas review.

Although Brinkley brought this claim as prosecutorial misconduct, the Court will consider it as an improper joinder question. The defense filed a motion for severance which the court denied. Such claim is generally a matter of state law. Therefore, in determining whether the State court's denial of severance was prejudicial, the issue before the court is whether the failure to sever denied the Petitioner due process of law under the Fourteenth Amendment. *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007). Brinkley must show that misjoinder of the counts resulted in prejudice so great as to deny him his right to a fair trial. *Id.* Ohio Crim.R. 8(A) permits the joinder of offenses "if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common

-33-

scheme or plan, or are part of a course of criminal conduct." In such a situation a single trial is favored. *Payne v. Bobby*, 2006 WL 508784 *7 (S.D. Ohio, Feb, 27, 2006)(citing *State v. Lott*, 51 Ohio St.3d 160 (1990)). Although a prejudicial effect may exist, it is justified on the grounds that the jury is expected to follow instructions in limiting this evidence to its proper function, and the convenience of trying different crimes against the same person in the same trial is a valid governmental interest. *Davis,* 475 F.3d at 778 (citing *Spencer v. Texas*, 385 U.S. 554, 562 (1967)). The Sixth Circuit in *Davis* stated:

> Left to our own devices, we might well remain skeptical, despite the wealth of settled law, about the degree to which Ohio's joinder provisions undercut the protection afforded a capital defendant by Ohio Revised Code § 2929.022(A), especially given the heightened concerns regarding undue prejudice in a capital case. Nevertheless, a habeas corpus proceeding is not an appropriate vehicle for this court to substitute its own judgment for that of the State of Ohio. "[A] state rule of law does not run afoul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at bar." *Spencer,* 385 U.S. at 564 (internal quotation marks and citation omitted). Because the denial of Davis's motion for severance did not constitute a denial of the petitioner's due process right to a fair trial, that ruling cannot be said to have rendered his waiver of a jury trial involuntary.

*Davis*, 475 F.3d at 778- 79.

The Ohio Supreme Court, in determining this issue stated:

> In proposition of law II, Brinkley argues that he is entitled to a new trial because the prosecutor, acting in bad faith, improperly joined for trial the City Diner robbery charges with charges relating to the aggravated robbery and murder of Smith. Brinkley also complains because the prosecutor included a R.C. 2929.04(A)(3) death-penalty specification (murder to escape trial or punishment for another offense) in that aggravated-murder charge.

-34-

Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple criminal offenses in a single trial under Crim.R. 8(A)." *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. See, also, *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.

Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder," a trial court may grant a severance. Crim.R. 14. The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance. *Torres,* 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

As we noted in *Lott,* 51 Ohio St.3d at 163, 555 N.E.2d 293, "[a] prosecutor can use two methods to negate such [defense] claims of prejudice." First, if one offense could have been introduced under Evid.R. 404(B) at the trial of the other offense, no prejudice could have resulted from joinder. Evid.R. 404(B) recognizes that evidence of other crimes may "be admissible for * * * proof of motive, opportunity, intent, preparation, plan." Second, the state can refute prejudice by showing "that evidence of each of the crimes joined at trial is simple and direct." *Franklin,* 62 Ohio St.3d at 122, 580 N.E.2d 1.

Here, the trial court did not abuse its discretion by rejecting Brinkley's motion to dismiss the R.C. 2929.04(A)(3) specification or to sever the charges relating to the aggravated robbery of the City Diner. For several reasons, we conclude that Brinkley's claims of bad faith and improper joinder lack merit.

First, the prosecution properly introduced evidence of the City Diner robbery to prove the R.C. 2929.04(A)(3) death-penalty specification included in the aggravated-murder charges relating to Smith. That specification charged Brinkley with killing Smith in order to escape "apprehension, trial, or punishment for another offense committed by the offender." The other "offense" in question was the City Diner robbery, and thus robbery of the City Diner was a crucial element of the R.C. 2929.04(A)(3) specification. Second, the diner robbery and the offenses against Smith could be tried together because they were "connected together" and constituted parts of a "course of criminal conduct." Crim.R. 8(A). The evidence firmly established that Brinkley had intended to escape trial and punishment for the City Diner robbery. Smith posted bail at Brinkley's direction. Then, Brinkley did not show up for his pretrial court hearing on January 6 but instead fled to Chicago on January 7. His murder of Smith occurred on January 7 after he failed to appear in court for his pretrial but before he fled to

Chicago. Thus, the jury could reasonably infer that Brinkley murdered and robbed Smith to facilitate his flight from prosecution for the City Diner robbery.

Third, the evidence relating to the City Diner robbery was properly admissible under Evid.R. 404(B) as "other acts" evidence to help prove that Brinkley killed and robbed Smith. As permitted by Evid.R. 404(B), that robbery evidence helped to prove Brinkley's motive, his intent, his preparation, and his plan as to the Smith offenses. Shortly after robbing the City Diner, Brinkley directed Hunter to drive to Smith and introduced Hunter to Smith. Police arrested Hunter and Brinkley within an hour or so of the robbery. Although police quickly arrested Hunter and Brinkley, police recovered only $1,200 from them, even though Brinkley had stolen over $2,200 in the City Diner robbery. On these facts, the jury could reasonably infer that Smith, who was Brinkley's girlfriend, was holding money for Brinkley and later used this money on December 17 to arrange Brinkley's release on bond.

Moreover, after Brinkley persuaded Smith to post bail, Smith became personally liable, in the sum of $20,000, for Brinkley's later court appearances. Thus, Smith represented a risk to Brinkley. Smith knew about Brinkley's mother because Smith had visited her home in Chicago, and Smith would have known where Brinkley planned to go when he fled Toledo. The jury could have reasonably concluded that Brinkley killed Smith in part so that she could not help authorities or the bail bondsman locate Brinkley after he jumped bail.

Further, in making his escape to Chicago to avoid his upcoming trial, Brinkley stole Smith's coat and bank ATM card when he killed her. Thus, the City Diner robbery and the aggravated murder and robbery of Smith were related. The admissibility of such "other acts" evidence negated any claims of prejudice that Brinkley makes as to the joinder. See *Torres,* 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus; *Franklin,* 62 Ohio St.3d at 122, 580 N.E.2d 1.

Finally, we have recognized that when simple and direct evidence exists, an accused is not prejudiced by joinder. *Lott,* 51 Ohio St.3d at 163, 555 N.E.2d 293. See, e.g ., *State v. Johnson* (2000), 88 Ohio St.3d 95, 109, 723 N.E.2d 1054; *Franklin,* 62 Ohio St.3d at 122, 580 N.E.2d 1. In Brinkley's case, the proof of each offense was separate and distinct and unlikely to confuse jurors. To prove the City Diner robbery, the testimony of the victim, Marissa Brown, and Brinkley's accomplice, Hunter, was simple, direct, and compelling. Although evidence proving the murder was more complex, the jury would not have been confused about what evidence proved the City Diner robbery and what evidence proved the aggravated robbery and murder of Smith. In sum, the Smith and City Diner offenses were properly joined, and the state properly introduced evidence of the City Diner robbery to prove the R.C. 2929.04(A)(3) death-

penalty specification. The offenses were interconnected and constituted a course of criminal conduct. Claims of prejudice were negated by the admissibility of the City Diner robbery as "other acts" evidence and the fact that proof of the City Diner robbery was unlikely to confuse jurors. We reject Brinkley's proposition of law II.

*State v. Brinkley,* 105 Ohio St.3d at 236-238.

The Ohio Supreme Court set forth how the murder and the City Diner robbery were connected. The jury could have reasonably inferred that Brinkley killed Smith because he feared arrest and punishment for the diner robbery. His conduct after the robbery, i,e, failing to appear in court, Smith's personal liability for his bail and the fact that she knew he was fleeing to Chicago, and Brinkley's stealing Smith's coat and ATM card show that the City Diner robbery, the aggravated murder and robbery of Smith were related. Brinkley was not denied due process by the trial court's denial of severance. The Ohio court's ruling was not contrary to, or an unreasonable application of federal law as determined by the United States Supreme Court.

## Fifth Ground for Relief

Brinkley alleges that oral statements made to police were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The Respondent acknowledges that this claim was presented to the Ohio Supreme Court and agrees that it has been preserved for federal habeas review.

*Miranda* requires that a person in police custody being interrogated must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney. These rights may be waived after the warnings

-37-

have been received if the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Whether or not *Miranda* rights have been waived can be determined by answering two questions. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran,* 475 U.S. at 421. When a person in custody speaks to law enforcement officials with full awareness and understanding of the *Miranda* rights his waiver is knowing and intelligent within the requirements of *Miranda. Slaughter v. Brigano*, 2005 WL 2453092 * 9 (S.D. Ohio, Sept. 30, 2005) (citing *Colorado v. Spring*, 479 U.S. 564, 574-75 (1987)).

The state has the burden of proving by a preponderance that a defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Abela v. Martin,* 380 F.3d 915, 928 (6th Cir. 2004). The Sixth Circuit using a totality of the circumstances test to determine whether a petitioner's statements were involuntary considers factors such as: (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of his *Miranda* rights. *Id*. (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). *See*

*Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001).

Brinkley's arrest in Chicago took place at approximately 6:00 a.m. He was twice advised of his *Miranda* rights after he was placed in the police car and at the police station at approximately 7:30 a.m. Brinkley contends that law enforcement officers should have made a determination or inquiry as to whether he was sleep deprived or groggy because of the early morning arrest.

The Ohio Supreme Court found that the evidence did not support Brinkley's claim that he was sleepy or groggy. Before the officers entered his mother's apartment they called twice informing the occupants that they were there and were not leaving. They knocked and spent several minutes trying to convince Brinkley's mother to open the door which she did after officers threatened to break it down.

When the officers entered the apartment, they found Brinkley sitting at a table. He was coherent and did not appear intoxicated. His mother and sister were screaming, and his sister tried to obstruct the arrest. Brinkley attempted to calm them down. He then put on his shoes and coat, was handcuffed, and walked out of the building and got into an FBI car. At the police station, he decided to answer questions. Brinkley never said he was tired or that he did not want to talk to the FBI. *State v. Brinkley*, 105 Ohio St.3d at 241-42. If Brinkley was sleepy or groggy, surely the events of his arrest would have wakened him. There was no indication of coercion by law enforcement officers.

The Court concludes that the Ohio court's ruling was not contrary to, or an unreasonable application of federal law as determined by the United States Supreme Court.

-39-

Sixth Ground for Relief

In his sixth claim for relief, Brinkley alleges that he was denied his right to an impartial jury

because a prospective juror who expressed reservations about the death penalty was excused for cause.

This claim was raised in the Ohio Supreme Court and is therefore preserved for federal habeas review.

> A prospective juror may be excused for cause if "the juror's views would prevent or
> substantially impair the performance of his duties as a juror in accordance with his
> instructions and his oath". *Williams,* 380 F.3d at 953 (quoting *Wainwright v. Witt*, 469
> U.S. 412, 424 (1985)).Challenges for cause permit the categorical and unlimited
> exclusion of jurors exhibiting an inability to serve fairly and impartially in the case to
> be tried, as noted in [*Witt*]. In *Witherspoon,* the Court held that the Constitution does
> not tolerate such a categorical exclusion of jurors who merely express moral scruples
> about or general objections to capital punishment unless it would "prevent or
> substantially impair the performance of his duties as a juror in accordance with his
> instructions and his oath."

*Brown v. North Carolina*, 479 U.S. 940, 940 (1986) (O'Connor, J., concurring)(quoting *Wainwright,*

469 U. S. at 424).

The trial court's decision as to the impartiality of a prospective juror is a factual determination

entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *Williams*, 380 F.3d at

953; *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003), *cert. denied*, 543 U.S. 842 (2004).

Because of the trial judge's proximity to the venire and the determination of credibility and demeanor

that is involved in *voir dire,* the judge's decision to excuse or not is deferential on review. *Id*. A juror

may not be excluded based on his or her mere reservations or scruples regarding the death penalty.

*Keith v. Mitchell,* 455 F.3d 662, 688 (6th Cir. 2006), *cert. denied*, 549 U.S. 1308 (2007). Exclusion

-40-

of a juror under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), for the juror's mere reservations or scruples, constitutes trial court error that is presumed prejudicial, and the death sentence must be reversed. *Gray v. Mississippi,*  481 U.S. 648, 667-668 (1987). The improper exclusion of even one qualified juror under *Witherspoon* or *Wainwright v. Witt*, 469 U.S. 412 (1985), may result in a jury more likely than the average jury to impose death, thus rendering the jury partial. *Keith,* 455 F.3d at 688 (citing *Gray*, 481 U.S. at 667-69.

The Ohio Supreme Court ruled in favor of Respondent as follows:

In proposition of law VI, Brinkley contends that the trial court improperly questioned and excused prospective juror 52 based on the prospective juror's death-penalty views. The test for excluding prospective jurors based upon their death-penalty views "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers*(1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. Brinkley argues that the trial court sustained the state's challenge to prospective juror 52 based on a question "grounded in a few of the facts of the case and based on an inaccurate statement of the law." But the defense counsel never objected to the phrasing. Here, the record demonstrates that the court and counsel fairly *voir dired* prospective juror 52, and the trial court did not abuse its discretion in excusing the juror. Prospective juror 52 noted her religious and philosophical opposition to the death penalty. At first, she asserted that "there is only one person who has that right to take another life. There are so many other alternatives." When asked if she could vote for death, she responded, "[T]o be honest, I can't answer. I don't know."
At various times, the prospective juror stated that she could vote for the death penalty, but said, "If given a choice I'm not for it." At other times, she stated, "I don't think I could" sign a death verdict. She again reiterated that she could not sign, although she agreed to follow the law as a juror to the best of her ability. When asked yet again whether, if "the law required the death penalty, [she would] * * * sign [her] name on a verdict form," she answered, "[T]o be honest, I can't imagine anything at this point that would make me * * * go in that direction."

-41-

The court then asked, "If the law said that if another individual took a life of somebody else while committing a felony * * * and the law said * * * the penalty of death is the appropriate penalty, * * * [would that be] the kind of circumstances where you would vote to impose the death penalty?" The prospective juror responded, "I don't believe so." Then she reiterated, "Given what I know now, my answer would be no, that I would not vote for the death penalty." When asked, "Even if the law required it?" she answered, "Even if the law required it." The trial court then concluded that the prospective juror "cannot imagine any set of circumstances" under which she would vote for the death penalty and sustained the state's challenge for cause.

In view of the juror's answers as to signing a death-penalty verdict, the trial court's decision to sustain the challenge was within its discretion. Cf. *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 391, 721 N.E.2d 52; *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576. A "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." Id. at 31, 553 N.E.2d 576. Accord *State v. Fears* (1999), 86 Ohio St.3d 329, 337, 715 N.E.2d 136; *State v. McNeill* (1998), 83 Ohio St.3d 438, 445, 700 N.E.2d 596. Clearly, "deference must be paid to the trial judge who sees and hears the juror." *Wainwright,* 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841. See, also, *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Hence, we reject proposition VI.

*State v. Brinkley*, 105 Ohio St.3d at 244-245.

Although the juror in question did say she could follow the law and vote for the death penalty, Tr. Vol. 7, pgs. 637, 643, she stated many times that she could not do so. Tr. Vol 7, pgs. 640, 642.

The record contains the following questions and answers:

Mr. Braun:                              And sitting here right now there is really no circumstance that you could imagine where you could - you yourself could ever make that decision that somebody would be executed?

Prospective Juror:                      Not at this point.

-42-

| | |
|---|---|
| Mr. Braun: | There is nothing I can say to you that would change your mind on that point, is there? |
| Prospective Juror: | No. |

The judge, hearing conflicting answers decided to question this juror again. The juror again said she could follow the law, but indicated she could not after the following question.

| | |
|---|---|
| The Court: | That's where I take it. You say you can't imagine any set of circumstances. (That would allow her to impose the death penalty.)  If the law said that if another individual took a life of somebody else while committing a felony, another felony of sorts, and if the law said under those circumstances the penalty of death is the appropriate penalty, are you telling me that if that was presented to you, that's not the kind of circumstances where you would vote to impose the death penalty? |
| Prospective Juror: | I don't believe so. |
| The Court: | And let me go back to Mr. Braun, because here is where the conflict came in from the State. You answered him in response to a question he asked you were there any set of circumstances that you can imagine right now as we sit here where you would vote to impose the death penalty, and you answered no. |

-43-

| | |
|---|---|
| Prospective Juror: | Because I can't imagine, but during the trial I'm sure different things come up. Given what I know now, my answer would be no, that I would not vote for the death penalty. |
| The Court: | Even if the law required it? |
| Prospective Juror: | Even if the law required it. |
| Mr. Dech (defense counsel): | Your honor, I would ask her to stay because she did previously state she could follow the law if she takes the oath as a juror. |
| The Court: | Yeah. And that's why I inquired further. However, she has indicated she cannot imagine any set of circumstances and I gave her an example that fit within the context of the charges that I read yesterday. She indicated that those weren't a set of circumstances upon which she could vote to impose the death penalty, so the Court is going to grant the State's motion for cause finding that this juror has indicated that under the circumstances as set forth yesterday by the Court, the indictment and the charges and the examples given to her, she could not follow the Court's instructions and would not follow the law and consider the death penalty as required and therefore she would be excused. |

Tr. Vol. 7, pg. 645-48.

Brinkley points out that the juror told the judge that she could sign her name on the verdict form if the law required a death sentence. She further said, "I can't imagine anything at this point that would make me - would go in that direction." Tr. Vol. 7, pg. 645.

| | |
|---|---|
| The judge then said: | That's where I take it. You say you can't imagine any set of circumstances. If the law said if another individual took a life of somebody else while committing a felony of sorts, and the law said under those circumstances the penalty of death is the appropriate penalty, are you telling me that if that was presented to you, that's not the kind of circumstances where you would vote to impose the death penalty? |
| Prospective Juror: | I don't believe so. |
| The Court: | And let me go back to Mr. Braun, because here is where the conflict came in from the State. You answered him in response to a question he asked you were there any set of circumstances that you can imagine right now as we sit here where you would vote to impose the death penalty, and you answered no. |
| Prospective Juror: | Because I can't imagine, but during the trial different things come up. Given what I know now, my answer would be no. |

-45-

that I would not vote for the death penalty.

The Court:                               Even if the law required it?

Prospective Juror:                       Even if the law required it.

Tr. Vol 7, pg. 646.

     The Ohio Supreme Court's decision is not an unreasonable application of *Witt.* The trial judge's questions clarified the prospective juror's answers to *voir dire* questions. She finally stated she could never impose the death penalty.  She clearly stated her partiality. This Court concludes that the juror's views would prevent or substantially impair the performance of her duties as a juror in accordance with the court's  instructions and her oath.[4]

Seventh Ground for Relief

     Brinkley argues that he was unconstitutionally deprived of his right to be present at every critical stage of his trial. There were numerous instances where he was not present and had not waived this right: a hearing where defense counsel, prosecutors and the court discussed Brinkley's demand that he receive new counsel (Hearing Transcript (3/21/02)); a pre-trial hearing discussing Brinkley's library privileges and a representation by defense counsel concerning discovery issues (Hearing Transcript (10/12/02)); a reference to an off the record discussion regarding the presence of jurors (Tr.

---

[4]      In *Kieth*, 455 F.3d at 675, the court held that since Keith was not
claiming actual innocence, the exclusion of scrupled jurors did not
so unfairly affect the proceedings as to result in the improper
imposition of the death penalty.

-46-

Vol. 9, pg. 1092); an off the record bench conference followed by a meeting between the court and counsel in chambers at the end of one day's worth of trial (Tr. Vol. 11, pg. 1488); a reference to a jury charge conference (Tr.Vol 13, pg. 1800); and a number of other off the record bench conferences (Tr. Vol. 6, pg. 457, Vol. 9, pg. 963, Vol. 12, pgs. 1621-22, 1676, Vol. 13, pgs. 1793, 1806). This claim was raised in the Ohio Supreme Court and is therefore preserved for federal habeas review.

A criminal defendant has a constitutional right to be present at all critical stages of the trial. *Reeshen v. Spain*, 464 U.S. 114, 117 (1983). His due process right consists of his right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). *See also Faretta v. California,* 422 U.S. 806, 819, n. 15 (1975). The Fourteenth Amendment requires the presence of the defendant only to the extent that a fair and just hearing would be thwarted by his absence. *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934), overruled *on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). But the Constitution does not require the defendant to be present when his presence would be useless. *Snyder,* 291 U.S. at 106-07.

> The Ohio Supreme Court considered the facts as well as the law in determining this issue.
>
> In proposition of law XI, Brinkley argues that the trial court's failure to secure his personal presence or obtain a waiver of his presence during certain trial conferences violated his constitutional rights to confrontation and due process.
> An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just

hearing would be thwarted by his absence, *and to that extent only.*" (Emphasis added.) *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674. In *United States v. Gagnon* (1985), 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486, the Supreme Court held that under certain circumstances, a defendant's absence from a hearing at which his counsel are present does not offend due process. In *Kentucky v. Stincer* (1987), 482 U.S. 730, 746, 107 S.Ct. 2658, 96 L.Ed.2d 631, the court found no due-process or Confrontation Clause violation when an accused was excluded from a hearing on the competency of two child witnesses. *See, e.g .,* State v. *Williams* (1983), 6 Ohio St.3d 281, 285-286, 6 OBR 345, 452 N.E.2d 1323 (absence at hearings can be harmless error); *State v. Roe* (1989), 41 Ohio St.3d 18, 27, 535 N.E.2d 1351. *See, also*, Fed.R.Crim.P. 43(b)(3) (accused need not be present at "a conference or hearing on a question of law").

In this case, the record demonstrates that the trial court was acutely aware of Brinkley's right to be present. When the court was about to consider the admission of exhibits, Brinkley stated that he wanted to go back to his cell. Then, the court carefully explained Brinkley's right to be present and obtained from him a voluntary, knowing, and intelligent waiver of that right.

The record does not support Brinkley's claims that his rights were violated by his absence at other conferences. Prior to the March 21, 2002 conference, Brinkley's counsel privately informed the court that they could no longer represent Brinkley. However, Brinkley was present at the March 21, 2002 conference and agreed that counsel "cannot fully and fairly and effectively represent" him. Brinkley also explained why he wanted to change lawyers, and the court thereafter appointed new attorneys for him.

Nor do Brinkley's other references to the record establish any violation of his right to be present at critical stages of his trial. At conferences on October 10 and October 12, 2001, counsel discussed with the court Brinkley's complaints about the jail and jail personnel, but these complaints did not involve his trial. One of Brinkley's references to an "off the record discussion" simply involved a decision to *voir dire* a juror out of the normal order because her bus had been late. The record does not reflect that Brinkley was absent during a brief, unrecorded in-chambers discussion. The court's reference to "at least 2 charge conferences with counsel for both parties on the jury instructions" also did not indicate that Brinkley was absent. Nor does the record establish that Brinkley was absent during unrecorded bench conferences during the trial. Even if we were to assume that Brinkley was absent from the unrecorded in-chambers or bench conferences, counsel could have waived his presence. *See United States v. Gagnon,* 470 U.S. at 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (trial court "need not get

an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); *United States v. Gallego* (C.A.2, 1999), 191 F.3d 156, 171 (waiver can be implied by accused's failure to object to exclusion); *State v. Green,* 90 Ohio St.3d at 371, 738 N.E.2d 1208; *State v. Hill* (1995), 73 Ohio St.3d 433, 444, 653 N.E.2d 271.

Moreover, at these conferences, the jury never received testimony or evidence, and no critical stage of the trial was involved. *Cf. State v. Taylor* (1997), 78 Ohio St.3d 15, 24, 676 N.E.2d 82. Nor has Brinkley established the content of the discussions. The conferences may well have involved legal or scheduling issues within the professional competence of counsel. *Cf. United States v. Brown* (C.A.6, 1978), 571 F.2d 980, 987 (accused must establish prejudice from absence at in-chambers conference); *State v. Green,* 90 Ohio St.3d at 371, 738 N.E.2d 1208; *State v. White* (1998), 82 Ohio St.3d 16, 26, 693 N.E.2d 772 (accused's absence during hearing on proposed instructions did not deprive him of fair trial). For these reasons, we reject proposition XI.

*State v. Brinkley*, 105 Ohio St.3d at 248-250.

Brinkley was present at the critical stages of his trial. The Ohio Supreme Court reviewed Brinkley's claim, noting that the court was aware of his right to be present. At the times complained of, Brinkley was actually present, asked to go back to his cell, or his presence was not needed.

The Court finds that the Ohio court's ruling was not contrary to, or an unreasonable application of federal law as determined by the United States Supreme Court.

### Eighth Ground for Relief

In his eighth claim for relief, Brinkley asserts that the trial court wrongfully limited the cross-examination of a State's witness. One of the State's key witnesses in Brinkley's case was jailhouse snitch Samuel Miller. Tr. Vol. 13, pgs. 1714-1740. Miller had been convicted of felonious assault in 1991 and of having weapons while under a disability and escape in 1999. Tr. Vol. 13, pgs. 1714-16.

-49-

He was confined in the same cell block as Brinkley at the Lucas County Jail. According to Miller, Brinkley told Miller on his (Brinkley's) last day in jail, after Brinkley was bonded out by Shantae Smith, that he was going to kill Smith. Tr. Vol 13, pgs. 1729-1731, 1736. Miller purportedly told his story to Toledo police officers on January 10, 2000, within days of Shantae Smith's murder. He was found guilty of the escape charge, a second degree felony, about two weeks after speaking to the officers about Brinkley's case. And, although he had been sent to prison on both of his earlier criminal cases (felonious assault and weapons under disability), Miller received a community control sanction for the escape conviction, an allegedly shockingly light sentence under the circumstances for a second-degree felony. Tr. Vol. 12, pgs. 1698-1713. There allegedly is a strong inference from the timing of Miller's assistance to the State in Brinkley's case that Miller was able to obtain such an exceedingly light sentence for his escape conviction at least in part because of the cooperation he provided to the State in Brinkley's case. There allegedly is also a strong inference that Miller's assistance was provided only because he expected (regardless of whether he actually got it or not) that there would be consideration provided to him with respect to his pending criminal charges. At trial, Brinkley's counsel wanted to cross-examine Miller to suggest that Miller had received a deal and a favorable sentence in 2000 because he informed on Brinkley and/or that he informed on Brinkley in expectation of such a deal and favorable sentence regardless of whether the sentence was in fact related to his cooperation. Pet. pgs. 32-33. This claim was raised in the Ohio Supreme Court and is therefore preserved for federal habeas review.

-50-

The Ohio Supreme Court stated:

In proposition of law VIII, Brinkley argues that the trial court unfairly limited cross-examination of a jailhouse informant "designed to demonstrate" that the witness's testimony was given "with the hope or expectation of substantial gain." At trial, informant Samuel Miller testified about his conversations with Brinkley between November 6 and December 17, 1999, when they were confined together in the county jail. On January 10, 2000, after he learned of Smith's murder, Miller told the police about these conversations. In January 2000, Miller was convicted on a charge of escape from parole and was sentenced to community control for that offense.

At trial, Brinkley wanted to cross-examine Miller to suggest that Miller had received a deal and a favorable sentence in 2000 because he informed on Brinkley. But the trial court ruled, "Absent some reasonable basis to believe the State has granted or had anything to do with this [sentence of] community control, the Court is going to deny inquiry with respect to that." In fact, the attorney who prosecuted Miller in January 2000 verified that neither he nor the sentencing court knew about Miller's conversations with the police as to what Brinkley had told Miller. Hence, that assistance had no effect on Miller's sentencing in 2000.

Under these circumstances, Brinkley has not established that the trial court abused its discretion. "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.' " *State v. Green* (1993), 66 Ohio St.3d 141, 147, 609 N.E.2d 1253, quoting *Alford v. United States* (1931), 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624. Accord *State v. Woodard* (1993), 68 Ohio St.3d 70, 74, 623 N.E.2d 75 (upheld limits on cross-examination of co-accused). Moreover, Evid.R. 607(B) specifies that "[a] questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." See, also, *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph two of the syllabus ("A cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists"). Here, the trial court did not unfairly limit cross-examination, because no good-faith basis existed to cross-examine Miller about a nonexistent January 2000 deal. When Miller talked with police, Brinkley's trial was more than two and one-half years away, and the state had not yet begun assembling its witnesses. The prosecutor and the judge involved in Miller's prosecution knew nothing of Miller's conversations with the police about Brinkley.

-51-

> Moreover, the jury had all the information it needed to assess Miller's credibility, and the defense cross-examination was not otherwise restricted. The jury knew of Miller's previous convictions. The jury also knew that, in exchange for his truthful testimony against Brinkley, the state had agreed that Miller would be held in the county jail pending his release on parole instead of in a state prison. Accord *State v. Robb* (2000), 88 Ohio St.3d 59, 71, 723 N.E.2d 1019. Accordingly, we reject proposition VIII.

*State v. Brinkley*, 105 Ohio St.3d at 246.

Generally, errors in decisions regarding the admission or exclusion of evidence, are usually not grounds for federal habeas relief. *Miskel v. Karnes,* 397 F.3d 446, 452-53 (6th Cir. 2005); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), *cert. denied*, 540 U.S. 930 (2003). A federal habeas court will not disturb a state court's exclusion of evidence unless the relevance and probative value is so apparent and great that excluding the evidence would deprive the petitioner of due process of law. *Jones v. Smith,* 244 F. Supp.2d 801,  814 (E.D. Mich., 2003) (citing *Hopkinson v. Shillinger*, 866 F.2d 1185, 1199 (10th Cir. 1989); *Cosmo v. Elo*, 2000 WL 246592 * 3 (E.D. Mich., Feb. 4, 2000)).

Pursuant to the Sixth Amendment's confrontation clause, an accused has the right to confront witnesses against him. The purpose of the Amendment is to provide the accused the opportunity of cross-examination of adverse witnesses to uncover potential biases, prejudices and expose the witness's motivation to testify. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). A judge has a duty to ensure that only reliable evidence is introduced at trial. *United States v. Scheffer*, 523 U.S. 303, 309 (1998). But cross-examination is not entirely without limits and is subject to reasonable restrictions.  *Id.* at 308. The Supreme Court in *Van Arsdall*

stated:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment
> prevents a trial judge from imposing any limits on defense counsel's inquiry into the
> potential bias of a prosecution witness. On the contrary, trial judges retain wide
> latitude insofar as the Confrontation Clause is concerned to impose reasonable limits
> on such cross-examination based on concerns about, among other things, harassment,
> prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive
> or only marginally relevant. And as we observed earlier this Term, "the Confrontation
> Clause guarantees an opportunity for effective cross-examination, not
> cross-examination that is effective in whatever way, and to whatever extent, the
> defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20(1985) (per curiam )

475 U.S. at 679.

In accordance with Ohio law, the trial court excluded cross-examination on whether Miller

received a favorable sentence because there was no reasonable basis to believe that the State had

anything to do with Miller receiving the community control sentence. Miller was sentenced in 2000,

two weeks after Smith's murder. The prosecutor in Miller's case verified that neither he nor the

sentencing court knew about Miller's conversations with police as to what Brinkley told Miller. Tr.

Vol. 12,  pg. 1710. *State v. Brinkley*, 105 Ohio St.3d at 247. Brinkley's trial was more than two and

one half years away and the State had not yet begun assembling its witnesses. *Id.* No promises were

made to Miller with the exception that in exchange for his truthful testimony against Brinkley, he

could serve out the remainder of his sentence in the Lucas County Jail rather than with the Ohio

Department of Rehabilitations and Corrections.  *Id.* Also, the jury had sufficient information to assess

Miller's credibility, including the housing accommodation and his prior convictions.

-53-

Brinkley cites *Bell v. Bell*, 460 F.3d 739, 754 (6th Cir 2006), *vacated, reh en banc*, 512 F.3d 223 (6th Cir 2008), *cert. denied*, 129 S.Ct. 114 (2008). a *Brady* violation case, wherein the court held that "if a petitioner proves that a witness approached the prosecution to testify with the expectation of some benefit, and that the prosecution understood this expectation and fulfilled the expectation by actually bestowing some benefit, the petitioner has sufficiently demonstrated a tacit agreement that must be disclosed under *Brady*."  As Miller was sentenced well before Brinkley's trial and Miller's prosecutor knew nothing about Miller's conversation with police about Brinkley's case, Brinkley has not shown the existence of a tacit agreement between the State and Miller.  Brinkley's prosecutor had no involvement in Miller's sentencing.

The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court.

### Ninth Ground for Relief

Brinkley contends that the reasonable doubt instruction given to the jury was constitutionally defective. This claim was heard and summarily rejected by the Ohio Supreme Court. *State v. Brinkley*, 105 Ohio St.3d at 255. Thus, it is preserved for federal habeas review.

 The reasonable doubt instruction given to the jury was Ohio's statutory definition of reasonable doubt. The Sixth Circuit has ruled that Ohio's definition of reasonable doubt does not violate due process. *Buell*, 274 F.3d at 366; *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1963); *Benge v. Johnson*, 312 F. Supp.2d 978, 1029 (S.D. Ohio, 2004), *aff'd*, 474 F.3d 236 (6th Cir. 2007,

*cert. denied*, 552 U.S. 1028 (2007).; *Taylor v. Mitchell*, 296 F. Supp.2d 784, 814 (N.D. Ohio, 2003).

The court's jury instruction on reasonable doubt was not improper.


Tenth Ground for Relief

In his tenth ground for relief, Brinkley alleges that he was denied ineffective assistance of counsel in various ways during the guilt/innocence phase of his trial. Some, but not all, of the allegations were presented to the Ohio courts. The Court will discuss the procedural default aspect when considering the individual issues.

In analyzing claims of ineffective assistance of counsel, the Supreme Court has established a two prong test against which counsel's performance must be evaluated.  *Strickland v. Washington*, 466 U.S. 668 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687. A deficient performance occurs when counsel's representation falls below an objective standard of reasonableness. *Id*. at 688; *Hicks*, 384 F.3d at 213; *Wickline v. Mitchell*, 319 F.3d 813, 819 (6th Cir. 2003), *cert. denied*, 540 U.S. 955 (2003). Prejudice is established by showing that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Wickline*, 319 F.3d at 819. Judicial scrutiny of counsel's performance must be highly deferential. *Strickland,* 466 U.S. at 689; *Alder v. Burt,* 240 F. Supp.2d 651, 672 (E.D. Mich., 2003). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Stricklan*d, 466 U.S. at 689.

Brinkley claims that his counsel were ineffective for:

a. failing to object to improper questioning and instructions to the jury;
b. bringing forth matters to the jury's intention which would have been improper for the prosecutor to introduce;
c. failing to make significant objections to the State's presentation of evidence concerning the robbery of the City Diner;
d. failing to object to the aggravating specifications;
e. conceding Brinkley's guilt as to the City Diner robbery;
f. failing to object to the prosecutor's misstatement of law during *voir dire* in which the burden of proof for aggravating circumstances was shifted to Brinkley;
g. failing to object when the trial court repeatedly stated during *voir dire* that if the law requires a death sentence the jury must vote to impose death as a sentence but if the law requires a life sentence they must "consider" voting for life as a sentence;
h. failing to investigate, develop and explore the dubious scientific validity of the shoe print analysis that was relied upon by the State and its alleged expert Ted Manasian;
i. failing to conduct a meaningful cross-examination of the State's alleged "expert" on fingerprint analysis, Det. Terry Cousin;
j. failing to conduct a meaningful challenge to the testimony of witnesses who claimed to be able to identify Brinkley's handwriting;
k. failing to object, or otherwise preserve the issue, when the deputy coroner, Dr. Diana Scala-

Barnett, testified as an expert for the State without the State first securing a ruling from the trial court that Dr. Scala-Barnett is an expert in forensic pathology and/or forensic medicine;

l. failing to ensure that all proceedings in the case were conducted on the record and with Brinkley present;

m. failing to conduct an effective cross-examination of State's witness Samuel Miller about the timing and substance of the criminal sentences he had received immediately before, and after, Miller spoke to the lead investigator in Brinkley's case;

n. failing to cross-examine Lamont Pettaway when material impeachment evidence was available and failing to conduct any cross-examination of Pettaway;

o. failing to present adequate expert psychological assistance in Brinkley's defense;

p. willingness to permit the jury to hear the 9-1-1 tape notifying police of the discovery of Shantae Smith's dead body;

q. ineffective as to counsel's statements in the defense closing argument that only served to advance the State's interest in obtaining a conviction;

r. failing to object to the prosecutor's comment in closing argument that Brinkley had attempted an alibi;

s. trial counsel were also ineffective in that they failed to preserve for appellate review a number of meritorious issues, including:

1) failing to rehabilitate or challenge for cause a juror who possessed an incorrect pre-determined concept of who should be sentenced to death (Prospective Juror No. 16);

2) failing to make a motion that all references to State's Exhibit 20 be stricken from the record and that the court give curative instructions;

3) failing to object to the prosecutions's misstatement of facts related to the use of the victim's ATM card while telephone calls were made from Shantae Smith's apartment after the State claimed she was dead;

4) failing to challenge the constitutionality of the Ohio death penalty statute as violative of the U.S. Constitution on the ground that Ohio's death penalty is contrary to international treaties and principles of international law to which the Unites States is bound; and

5) failing to preserve any issues that were raised by Brinkley in state court proceedings but were found to have been waived and/or failing to preserve any issues that are raised by Brinkley in this habeas proceeding but which are found to be subject to a procedural default resulting from trial counsel's failure to raise and/or preserve the issue.

Discussion

a.      failing to object to improper questioning and instructions to the jury

-57-

     b.     bringing forth matters to the jury's intention which would have been improper for the prosecutor to introduce

It appears that these two issues were not presented to the State court and are procedurally defaulted. If this Court were to consider the first two issues, it would find them to be without merit because Brinkley failed to present specific facts to support these allegations.

     c.     failing to make significant objections to the State's presentation of evidence concerning the robbery of the City Diner

This issue was never raised as an ineffective assistance of counsel claim in the State courts. Thus, it is procedurally defaulted. The underlying claim was determined adversely to Brinkley in his fourth claim for relief. Failure to succeed on the underlying claim requires denial of the ineffective assistance of counsel claim based on this issue. *Orbe v. True*, 233 F. Supp.2d 749, 765 (E.D. Va., 2002), *aff'd*, 82 Fed. Appx. 802 (4th Cir. 2003) *cert. denied*, 541 U.S. 970 (2004).

     d.     failing to object to the aggravating specifications

Brinkley argues that his counsel should have objected to the capital specifications alleging that Brinkley was either the principal offender in the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. That the aggravated murder was allegedly committed while committing one of the specified felonies and that it was committed with prior calculation and design allegedly is both irrelevant to the death sentence and impossible to reconcile with a specification that the defendant is the principal offender in the aggravated murder.

Ineffective assistance of counsel in regard to the underlying claim was not submitted to the Ohio courts and is procedurally defaulted. The underlying claim will be discussed in the seventeenth claim for relief wherein the Court will find it to be without merit. *Orbe*, 233 F. Supp.2d at 765. Therefore, Brinkley cannot succeed on this claim based on ineffective assistance of counsel.

> e.      conceding Brinkley's guilt as to the City Diner robbery

The Ohio Supreme Court ruled that counsel made an acceptable tactical decision not to strenuously challenge his guilt as to the City Diner robbery. Evidence of his guilt was compelling. *State v. Brinkley*, 105 Ohio St.3d at 251. Brinkley was an employee of the City Diner. He took the money from a co-employee. There could be no doubt of his guilt. The underlying claim was discussed in the fourth claim for relief and found to be without merit. Thus. Brinkley cannot succeed on an ineffective assistance of counsel claim based on this claim.

> f.      failing to object to prosecutor's misstatement of law during *voir dire* in which the burden of proof for aggravating circumstances was shifted to Brinkley

The Respondent submits that this issue was presented to the Ohio Supreme Court and that it is preserved for federal habeas review. The prosecutor stated that, "[W]e also have to prove additional facts associated with that that are called specifications that would take an ordinary aggravated murder and make it more serious and puts it into a special class of cases that the legislature says the death penalty could be considered, because we don't consider the death penalty in cases of murder or aggravated murder without the specification."  Tr. Vol. 6, pgs. 285-286. This comment does not

amount to a shifting of the burden of proof.

      g.    failing to object when the trial court repeatedly stated during *voir dire* that if the law requires a death sentence the jury must vote to impose death as a sentence but if the law requires a life sentence they must "consider" voting for life as a sentence

This issue was not presented to the Ohio court. Thus, it is procedurally defaulted. If the Court were to consider this issue, it would find it to be without merit. This underlying claim will be discussed in Brinkley's fourteenth claim for relief where it will be found to be without merit. Failure to succeed on the underlying claim requires denial of the ineffective assistance of counsel claim based on this issue. *Orbe*, 233 F. Supp.2d at 765.

      h.    Failing to investigate, develop and explore the dubious scientific validity of the shoe print analysis that was relied upon by the State and its alleged expert Ted Manasian

The Sixth Circuit has held that the science of footwear analysis is neither new nor novel. Expert testimony on footwear comparisons has been admitted in courts in the United States for years. *United States v. Rodgers*, 85 Fed. Appx. 483, 486-87 (6th Cir. 2004), *cert. denied,* 541 U.S. 1055 (2004). *See United States v. Mahone*, 328 F.Supp.2d 77, 89 (D. Me., 2004), *aff'd*., 453 F.3d 68 (1st Cir. 2008). Prior to Brinkley's trial, the expert had testified 43 times as an expert in footwear impressions in other trials. Tr. Vol. 12, pgs. 1567-68.  Brinkley does not explain the alleged deficiency in his counsel's cross-examination of the expert. As found by the Ohio Supreme Court, his counsel made several key points: that the expert could not discern the size of the shoe from the partial prints; that an unknown number of Nike shoes had been sold; that Brinkley's shoe, while consistent with the

-60-

print, may not have actually made the shoe impression. *State v. Brinkley*, 105 Ohio St.3d at 250. Also, counsel skillfully avoided reemphasizing the expert's testimony.  Brinkley has not shown that the result of the trial would have been different had his counsel challenged the government's shoeprint evidence and testimony.

      i.    failing to conduct a meaningful cross-examination of the State's alleged "expert" on fingerprint analysis, Det. Terry Cousin

The Ohio Supreme Court determined that counsel did not have any basis to extensively cross-examine a finger print expert, and doing so would only have emphasized damaging testimony. *State v. Brinkley*, 105 Ohio St. 3d at 251. Persons trained and experienced in latent fingerprint identification have been permitted to testify about their opinions as to whether a given individual was a source of a latent fingerprint. *Payne*, 2006 WL 508784 at * 22; *United States v. Havvard*, 117 F. Supp.2d 848, 851 (S.D. Ind., 2000).  Brinkley's counsel also made some beneficial points during cross-examination of the fingerprint expert. The expert could not say whether the fingerprint was placed at the same time as the writing on the note, and that other prints that were on the paper could have been smudged. Tr. Vol. 11, pgs. 1458-59. Since there was other evidence connecting Brinkley to the murder, he was not prejudiced by counsels' performance.

      j.    failing to conduct a meaningful challenge to the testimony of witnesses who claimed to be able to identify Brinkley's handwriting

The Ohio Supreme Court decided that counsel had no reason to cross-examine the detective or Smith's landlord about Brinkley's handwriting exemplar. The landlord believed the note was

written by Brinkley because he had received other notes in the same handwriting, but he did not

identify who wrote them. He never testified that he knew Brinkley's handwriting. Tr. Vol. 11, pgs.

1377-93. The detective testified that he asked Brinkley for a handwriting sample because of the note

found at the crime scene. He did not compare the sample with the note. Again, Brinkley was not

prejudiced by counsels' performance in this regard.

> k.    failing to object, or otherwise preserve the issue, when the deputy coroner, Dr. Diana Scala-Barnett, testified as an expert for the State without the State first securing a ruling from the trial court that Dr. Scala-Barnett is an expert in forensic pathology and/or forensic medicine

The Ohio Supreme Court ruled that Brinkey did not object to the State's failure to formerly

tender the deputy coroner as an expert, but claims of plain error lacked merit. *State v. Brinkley*, 105

Ohio St. 3d at 248, 250. Thus, this sub-claim is procedurally defaulted. The underlying claim will be

discussed in Brinkley's fourteenth claim for relief where it will be found to be without merit, thereby

rendering ineffective assistance of counsel as to this issue also to be without merit. *Orbe*, 233 F.

Supp.2d at 765.

> l.    failing to ensure that all proceedings in the case were conducted on the record and with Brinkley present

The Ohio Supreme Court denied this claim containing the underlying issue in Brinkley's

proposition of law XI. The Respondent concedes that this sub-claim was presented to the Ohio

Supreme Court. Brinkley's seventh claim for relief in this case contains the underlying claim. Since

the Court found the underlying claim to be meritless, the ineffective assistance of counsel claim based

on the same premise must also fail. *Orbe*, 233 F. Supp.2d at 765.

      m.    failing to conduct an effective cross-examination of State's witness Samuel Miller about the timing and substance of the criminal sentences he had received immediately before, and after, Miller spoke to the lead investigator in Brinkley's case

Brinkley brought this claim in the Ohio court of appeals in post-conviction proceedings but it was not addressed. Review of the Ohio Supreme Court shows that the issue was not presented. This sub-claim could have been supported by the trial record and should have been brought on direct appeal. Therefore, it is procedurally defaulted. If it were to be considered, the Court would find it to be without merit.

The length of sentence received by a witness and dates served is not relevant to credibility. *State v. Fricke*, 13 Ohio App.3d 331, 333 (Ohio App., 1st Dist. 1984). The conviction, and not the sentence imposed, is used to determine bias or credibility. *See* Ohio Rules of Evidence 609(A)(1). Evidence that a witness other than the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year. Miller's sentence was discussed in the Eighth Ground for relief wherein it was determined that Miller's sentence had nothing to do with his testimony.

      n.    failing to cross-examine Lamont Pettaway when material impeachment evidence was available and failing to conduct any cross-examination of Pettaway

Brinkley brought this claim in the Ohio court of appeals in post-conviction proceedings but it was not addressed. Review of the Ohio Supreme Court record shows that the issue was not

presented. This subpart could have been supported by the trial record and should have been brought on direct appeal. Therefore, it is procedurally defaulted. If it were to be considered, the Court would find it to be without merit.

Pettaway was Smith's new boyfriend even though she was still living with Brinkley. He brought her home from work on the day of the murder. According to Brinkley, there was evidence that Pettaway was afraid of Brinkley. At trial, Pettaway testified that Smith "wouldn't let me in." Tr. Vol. 12, pg. 1616. Yet, he told the police that Shantae had asked him to spend the night. Brinkley asserts that the importance of the discrepancy is that Pettaway is either making a crucial mistake about the last few moments he spent with Shantae, or he was making up his testimony at trial to cast further aspersions on Brinkley. By telling the police that Shantae had invited Pettaway into her apartment, the inference was allegedly that Shantae had no fear of Brinkley or of him knowing about Pettaway. But, because of Pettaway's testimony, the jury was left with the contrary impression, prejudicial to Brinkley, that Smith was a frightened woman who would not let her new boyfriend come into her apartment for fear of retaliation by Brinkley. Defense counsel were allegedly also ineffective for failing to inquire about Pettaway's statement to police that Pettaway's sister was with him when he took Shantae Smith home on January 7, 2000. Pet. pgs. 42-43. Brinkley contends that cross-examination would have created doubt as to his guilt. Pettaway knew that Brinkley had threatened Smith.

Counsels' avoidance of cross-examination of Pettyway may have been their concern that the

jury might learn the reason behind her fear of Brinkley. Tr. Vol 12, pgs. 1616-19. This would have been reasonable trial strategy. Brinkey has not explained the importance of the alleged presence of Pettaway's sister when he was driving Smith home. Even if the jury had heard all of this information, there was sufficient evidence without Pettaway's testimony establishing Brinkley's guilt.

   o.  failing to present adequate expert psychological assistance in Brinkley's defense

   Brinkley contends that counsel were ineffective during the guilt phase of the trial for failing to present evidence that he suffered from childhood trauma, narcissistic personality disorder and substance abuse disorder. This claim was not presented to the Ohio courts and is procedurally defaulted.

   The tenth claim for relief involves alleged errors that occurred during the guilt phase of the trial. None of these conditions would have been relevant at that stage because Brinkley did not claim that he was insane or incompetent.

   p.  willingness to permit the jury to hear the 911 tape notifying police of the discovery of Shantae Smith's dead body

   Appellate counsel challenged the ineffectiveness of trial counsel concerning the testimony of the person who called 911. The Respondent submits that this issue was presented to the Ohio Supreme Court and that it is preserved for federal habeas review. The information on the tape that the victim was lying on the floor covered in blood was given to the jury by Smith's mother, the person who found the body. The witness in question was called to identify the voice on the tape

because Smith's mother said it was not her voice. The Court agrees with the State court that the identity of the person who called 911 was unimportant. Also, it is unlikely that Brinkley was convicted because Smith's body was covered in blood. Any danger of unfair prejudice was minimal. *United States v. Lloyd*, 462 F.3d 510, 516-17 (6th Cir. 2006) (nothing about the *content* of the information on the tape created a danger of unfair prejudice).

> q.    ineffective as to counsel's statements in the defense closing argument that only served to advance the State's interest in obtaining a conviction

The Respondent submits that this issue was presented to the Ohio Supreme Court and that it is preserved for federal habeas review. Brinkley's counsel, in closing arguments, commented that Brinkley fled to Chicago because of what happened at the City Diner. Tr. Vol. 13, pg. 1878. But counsel further stated: "I would submit to you his flight to Chicago was all about the City Diner, nothing to do with this Shantae Smith and her demise...." Tr. Vol. 13, pg. 1879. The Court finds nothing inappropriate in counsel's reference to that fact that Brinkley fled. Counsel clarified his earlier statement limiting his remark to the City Diner robbery.

> r.    failing to object to the prosecutor's comment in closing argument that Brinkley had attempted an alibi

Brinkley claims that the prosecutor's comment referring to an alibi was an improper effort to suggest to the jury that Brinkley had an obligation to present evidence. Tr. Vol. 13, pgs. 1827, 1847. Part of the sub-claim, a note written by Brinkley to Smith's landlord, was raised in the Ohio Supreme Court. Thus it is preserved for federal habeas review.  Brinkley raised this underlying sub-claim in

his sixteenth claim for relief where it will be found to be without merit.

      s.     Trial counsel were also ineffective in that they failed to preserve for appellate review a number of meritorious issues, including:

          a) failure to rehabilitate or challenge for cause a juror who possessed an incorrect pre-determined concept of who should be sentenced to death (Prospective Juror No. 16);

          b) failure to make a motion that all references to State's Exhibit 20 be stricken from the record and that the court give curative instructions;

          c) failure to object to prosecutions' misstatement of facts related to the use of the victim's ATM card while telephone calls were made from Shantae Smith's apartment after the State claimed she was dead;

          d) failure to challenge the constitutionality of the Ohio death penalty statute as violative of the U.S. Constitution on the ground that Ohio's death penalty is contrary to international treaties and principles of international law to which the Unites States is bound,

          e) failure to preserve any issues that were raised by Brinkley in state court proceedings but were found to have been waived and/or failure to preserve any issues that are raised by Brinkley in this habeas proceeding but which are found to be subject to a procedural default resulting from trial counsel's failure to raise and/or preserve the issue.

Brinkley raised this claim in the Ohio Supreme Court which rejected it because he failed to cite any recorded references or any specific meritorious issues that were not preserved. The sub-claims raised in letters b, c, and d will be addressed in other free standing claims, i.e., the sixteenth, and twenty-sixth claims for relief, where they will be found to be without merit.

In letter a, Brinkley complains about his counsels' failure to rehabilitate or challenge for cause a juror who had an incorrect view of who should receive the death penalty. Review of the transcript shows that counsels' performance as to Juror Number 16 was adequate. In answer to a question asked

by the prosecutor, Juror Number 16 said that he believed that in all cases of a purposeful killing, the killer should receive capital punishment. Tr. Vol. 6, pg. 198. But when the prosecutor explained about mitigating circumstances, he indicated that he could balance mitigating evidence with aggravating circumstances. Tr. Vol. 6, pg. 198. He further stated he could consider a life term. Tr. Vol. 6, pg. 201. Brinkley has not shown any prejudice resulting from the seating of Juror Number 16.

In letter e, Brinkley alleges ineffective assistance of counsel for failing to raise issues that were later found to be waived by the State court as well as issues raised here that are found to be procedurally defaulted. He has not named the specific issues. This appears to be a catch-all. The Court will consider only the specific issues raised.  In any event, the Court must examine every issue as to its capability for habeas review.

Brinkley argues that none of his sub-claims in his tenth claim for relief are procedurally defaulted.  The Ohio court of appeals held that the claims raised by appellant that are pending before the Ohio Supreme Court cannot be litigated in a petition for post-conviction relief because said claims are barred by the doctrine of *res judicata*. *State v. Brinkley*, 2004 WL 2384455 at * 1. But there is no indication as to which claims the statement applies. Where a defendant has new counsel on appeal and the trial court record contains sufficient evidence to support the claim, Ohio law requires the claim of ineffective assistance of counsel to be brought on direct appeal. If defense counsel chooses to bring an ineffective assistance of counsel claim on direct review, *res judicata* prevents him from raising the claim again  in post-conviction relief. Bringing an ineffective assistance of counsel claim

-68-

on direct review results in preclusion of the opportunity to present evidence outside the record in post-conviction proceedings. *Williams v. Anderson*, 460 F.3d 789, 800 (6th Cir. 2006). The Ohio court may have been invoking that rule. Certainly, if a claim raised in post-conviction relief is duplicative of a claim before the Ohio Supreme Court, it would be barred by *res judicata* in post-conviction relief. However, the Ohio Supreme Court would have addressed the issue and therefore, *res judicata* would not apply.

In *Williams,* the Sixth Circuit held that counsel's decision to raise a claim on direct appeal without evidence on the record to support it prejudices the petitioner because he is now precluded from raising the claim in post-conviction relief. *Id*. at 801. It further, held that ineffective assistance of appellate counsel constitutes cause for failing to present a claim to the state court. Where the cause is ineffective assistance of counsel, a showing of prejudice is unnecessary. *Id.* Review of these sub-claims does not reveal a situation where a claim was brought on direct appeal without sufficient support, thus foreclosing the claim in post-conviction relief with evidence *de hors* the record. Since none of his sub-claims have merit, Brinkley has not shown a violation of constitutional rights. *Seymore v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001). He must first show that his counsel was ineffective. He has not done so. The issue was addressed because it was raised in Brinkley's Traverse.

### Eleventh Ground for Relief

The eleventh claim for relief involves ineffective assistance of counsel during the sentencing

phase of the trial. Brinkley asserts that his counsel were ineffective in:

    a. failing to conduct a thorough pre-mitigation investigation;

    b. failing to obtain and utilize the expert services of a trained mitigation specialist;

    c. not properly preparing witnesses and their selection was driven by considerations of "who's available and can say something nice," not by a cohesive mitigation strategy that was developed after a thorough mitigation investigation;

    d. the ineffective use of a psychologist or psychiatrist that was essential to a proper and cohesive mitigation case;

    e. failing to object to the trial court's instruction that if the jury found the aggravating circumstances and mitigating factors to be in equipoise, they were required to "consider" a life sentence. (Tr Vol. 14, pg.. 2114);

    f. failing to object to the prosecutor's comment during the penalty-phase opening statement that mitigating factors "lessen the moral culpability of the defendant or diminish the appropriateness of the death sentence." (Tr. Vol. 14, pg. 2035);

    g. failing to object to the prosecutor's argument to the jury in closing that they should not be swayed by the tears that had been shed on the witness stand by members of the Brinkley family and by his injection of facts not in evidence concerning tears shed by members of the victim's family. (Tr Vol. 14, pg. 2083-84);

    h. failing to object to the prosecutor's statement in closing argument in which he instructed the jury that they were not to consider a life sentence until they had first rejected death. (Tr. Vol. 14, pg. 2090).

Counsel for Brinkley alleged in the Ohio Supreme Court that his counsel failed to present additional mitigating evidence. The court found the argument to be without merit reasoning that counsel made tactical decisions. *State v. Brinkley*, 105 Ohio St.3d at 251. The Respondent agrees that Brinkley's counsel presented a claim that his attorneys presented an insufficient amount of mitigation evidence. In his motion for post-conviction relief filed in the trial court, Brinkley alleged ineffective assistance of counsel in the mitigation stage for failure to use a mitigation specialist, failure to investigate and present sufficient mitigation, failure to prepare witnesses prior to testimony, failure

-70-

to present expert psychological assistance and failure to present evidence that the death penalty is applied in an arbitrary manner. The trial court found the claims to be without merit and in the alternative, were barred by *res judicata*. The court of appeals affirmed the *res judicata* ruling. *State v. Brinkley*, 2004 WL 5119 at * 1-3. Brinkley's procedural argument is the same as in his tenth claim for relief. The failure to investigate was brought before the Ohio Supreme Court in a general manner. There was no specific allegations. Apx. Vol. 5, pg.112.  However, that sub-claim is preserved for federal habeas review. The remaining claims presented in post-conviction relief are procedurally defaulted.

The United States Supreme Court, in *Wiggins v. Smith*, 539 U.S. 510, 533 (2003), held that *Strickland* does not require defense counsel to investigate and present every possible type of mitigating evidence no matter how unlikely it would assist the defendant. A strategic decision to forego certain mitigation evidence is reasonable to the extent that "reasonable professional judgments support the limitation on investigation." *Id*. (quoting *Strickland,* 466 U.S. at 690-91).  "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The Sixth Circuit  stated, "[N]o decision to forgo the presentation of mitigation evidence is reasonable trial strategy under *Strickland* unless the decision is made after a reasonable investigation into mitigation evidence." *Johnson v. Mitchell*, 585 F.3d 923, 940 (6th Cir. 2010) (quoting *Williams*, 460 F.3d at 804).

The Supreme Court, in *Rompilla v. Beard*, 545 U.S. 374 n. 7 (2005), and *Wiggins* 539 U.S.

at 524, has unequivocally declared that a thorough and complete mitigation investigation is absolutely necessary in capital cases.  Under the ABA standards in effect during Brinkley's trial, defense counsel had a duty to investigate both the merits and mitigating circumstances in general terms: According to 1 ABA Standards for Criminal Justice 4-4.1, p. 4-53 (2d ed.1980), "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." The accompanying two-page commentary stated that defense counsel have "a substantial and important role to perform in raising mitigating factors," and that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.,* at 4-55. *See Bobby v. Van Hook*, 130 S.Ct. 13, 16-17 (2009). A partial, but incomplete mitigation investigation does not satisfy the requirements of *Strickland*.  *Dickerson v. Bagley,*  453 F.3d 690, 694 (6th Cir. 2006). Some effort at independent investigation must be made in order to arrive at a reasoned, informed decision as to whether the found material should be used. *Johnson*, 585 F.3d at 940. A strategic decision not to perform a complete investigation is inadequate when a full investigation would have revealed extensive mitigation evidence. *Dickerson*, 453 F.3d. at 696. An investigation must be performed if the investigator does not know the relevant facts that the investigation would uncover. *Id.*  In evaluating the reasonableness of an attorney's investigation, the court must consider the amount of evidence already known to counsel as well as whether the known

-72-

evidence would lead a reasonable attorney to investigate further. *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir. 2008). The court should focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of defendant's background was reasonable. *Johnson*, 585 F.3d at 940 (citing *Wiggins*, 539 U.S. at 523).

In *Cornwell v. Bradshaw*, 559 F.3d 398, 407-08 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 1141 (2010), the court noted that in most cases where the Supreme Court has found capital defense counsel to be insufficient, defense counsel almost entirely failed to investigate the defendant's background, or defense counsel stopped investigating even though it had no legitimate defense upon which to rely. For an example it used *Wiggins* wherein defense counsel presented no evidence of the defendant's severely dysfunctional childhood, which involved physical and sexual abuse and foster care. 539 U.S. at 516. Counsel relied only on a pre-sentence report and city social services records. *Id.* at 523-24. The court found the lack of further investigation particularly unreasonable given that counsel had not discussed any other mitigating evidence to at least create some kind of defense. *Id.* at 524-27. *Cornwell*, 559 F.3d at 407-08. In *Rompilla*, the defense counsel failed to do an investigation into the defendant's background thereby ignoring signs of a troubled childhood, alcoholism and mental issues. *Id*. 545 U.S. at 379.

a.    failing to conduct a thorough pre-mitigation investigation.

Brinkley has been authorized to expand the record, and has presented extensive evidence of counsels' alleged failure to conduct a thorough mitigation investigation and to present sufficient

evidence to the jury. Defense counsel, a clinical psychologist and two forensic psychiatrists were deposed, and their depositions were made part of this record. The experts concluded that Brinkley was narccistic, might have a had bipolar disorder, had a delinquent behavior disorder, was an alcoholic, used drugs, and they explained how these conditions adversely effected his behavior. The attorneys decided before trial that there would be no medical or mental testimony. Thebes Dep. pg. 32. They knew about Brinkley's background, social history, educational history, mental health history and criminal history to make an informed decision about mitigation. *Id*. at pg. 36. The only mitigation would be testimony of family members hoping that Brinkley's mother would be convincing enough and emotionally appealing to spare him the death penalty. *Id.* at pgs, 49, 50. One attorney stated that he felt uncomfortable presenting a personality defect to the jury because he did not see any benefit and it would only hurt. *Id*. at pgs. 37, 38. A forensic psychiatrist was hired, but the attorney does not remember discussing theories of mitigation or whether a report was prepared. Dech Dep. pgs. 36, 77. Although they knew about Brinkley's personality disorder, they did not use narcissism because they felt it would be a detriment. Thebes Dep. pgs. 92, 93. The attorneys did not want the jury to learn about Brinkley's brutal rape of a 15 year old girl when he was also 15. *Id*. at pg. 98.

In *Cullen v. Pinholster*, 2011 WL 1225705 (U.S. Apr. 4, 2011), the respondent alleged that trial counsel failed to adequately investigate and present mitigating evidence, including evidence of mental disorders. He supported his claim with school, medical and legal records, as well as declarations from family members. He also alleged that counsel failed to furnish an expert with

background materials. *Id*. at * 6.  A psychiatrist diagnosed him with bipolar disorder and seizure disorders. *Id*. The expert stated that had he known about this material, he would have conducted further inquiry before concluding that respondent suffered only from a personality disorder. *Id*. The district court granted an evidentiary hearing wherein respondent presented two new medical experts who testified that he had organic personality syndrome and that he suffered from partial epilepsy and brain injury. *Id*. at * 7.  The court of appeals reversed the district court's grant of the writ holding that an evidentiary hearing was barred by 28 U.S.C. § 2254(d)(1). The Supreme Court granted certiorari to resolve whether review under § 2254(d)(1) allows consideration of evidence introduced in an evidentiary hearing, and whether the court of appeals properly granted respondent relief on his claim of ineffective assistance of counsel during the penalty phase of the trail. *Id*. at * 8. The Court held that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. The Court stated at * 8:

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

In the present case, the additional evidence allowed through expansion of the record cannot be used to determine whether counsel was ineffective in failing to thoroughly investigate and present mitigating evidence.

The Court continued, finding that its decision did not render § 2254(e)(2), allowing discovery, superfluous. It determined that this statute continues to be effective where § 2254(d)(1) does not bar federal relief. Not all federal claims by state prisoners are within the scope of § 2254(d), which applies to claims adjudicated on the merits in state court. Further, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims not adjudicated on the merits.  *Id* at * 10.

In the present case, although the issue was presented to the Ohio Supreme Court, there was no discussion. The court merely combined all issues regarding ineffective assistance of counsel and considered counsels' conduct to be adequate strategy.  *State v. Brinkley*, 105 Ohio St.3d at 250.

The issue then arises as to whether § 2254(e)(2) applies.[5] If so, the court had the authority to allow new evidence. On the other hand, if the summary ruling by the state court constitutes a ruling on the merits, *Pinholster* applies and the new evidence is not admissible.

The Supreme Court answered this question in another recent case. In *Harrington v. Richter*, 131 S.Ct. 770 (2011), the Court examined § 2254(d) which sets forth the standard of review in habeas cases applying the AEDPA. The statute bars relitigation of any claim decided in state court unless the petitioner shows the exceptions contained therein. *Id.* at 784. *See* § 2254(d). The Court held that §

---

[5]    In *Holland v. Jackson*, 542 U.S. 649, 653 (2004), the United States Supreme Court held that the restrictions set forth in 28 U.S.C § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence without an evidentiary hearing."

2254(d) does not require a state court to give reasons before its decision can be considered adjudicated on the merits. *Id.* at 785. Thus, the State court ruling in the present case constituted an adjudication on the merits, and the new evidence presented by Brinkley cannot help him. He still must prove that the State court decision that his counsel were not ineffective in their mitigation investigation and presentation of mitigating evidence was contrary to or an unreasonable application of federal law as determined by the Supreme Court. *Id.* "An unreasonable application of federal law is different from an incorrect application" *Id.* (quoting *Williams*, 529 U.S. at 410). ,

Counsel did prepare for mitigation before the trial started. Dech went to Chicago to meet with Brinkley's family. Brinkley's sister, mother and three aunts briefly testified during mitigation. They testified similarly. Each said that they loved Brinkley. His mother stated that Brinkley grew up in the projects which was populated by low income people living in poverty. Tr. Vol. 14, pg. 2051. She also told the jury that her husband beat her in front of Brinkley and that is when Brinkley started running away. *Id*. at pg. 2053.  Brinkley's aunt stated that Brinkley's father was murdered when Brinkley was 7 years old. *Id*. at 2061. Evidence of childhood trauma, narcisstic personality disorder and alcohol and drug dependency were not presented at trial. However, the family's testimony covered the cause of those problems. Robert Smith Aff, Vol. 9, pg. 139. Brinkley never informed his counsel about drug and alcohol abuse. Certainly, he was the best person to do so. In fact, he discussed alcohol and drug abuse with the psychologist. Brinkley's counsel decided from the beginning of their representation that they would use only family members because they did not want the jury to know about his

criminal history. Although a psychologist and psychiatrist were hired for mitigation purposes, counsel decided not to call them as witnesses. Counsel made a tactical decision from the beginning of their representation that they would use only family members for mitigation evidence because they did not want the jury to know about the rape of the 15 year old girl.

b.     failing to obtain and utilize the expert services of a trained mitigation specialist

Although a psychologist and psychiatrist were hired for mitigation purposes, counsel decided not to call them as witnesses because they did not want the jury to learn that Brinkley raped a 15 year old girl. Counsel made a tactical decision not to obtain and use expert testimony.

c.     not properly preparing witnesses and improper selection method

Brinkley contends that his witnesses should have brought out the following information.

Alberta Brinkley was only 14 years old when her son Grady was born in Chicago, Illinois.

Grady's father, Gregory Eiland, was only 16. Alberta and Gregory never married.

Brinkley's father was chronically unemployed and engaged in illegal activities. He died at 22 from a stab wound to the throat. Grady was 7 years old.

During much of the first eleven years of his life, Brinkley was raised by his grandparents – Ruby and William Brinkley. Ruby Brinkley was a strong and decent woman whom Grady loved dearly. When she died suddenly of lung cancer in 1978, Grady was profoundly affected by her loss, and he began losing interest in school and abusing substances. He was only 11 years old.

After the death of his grandmother, Brinkley was bounced back and forth between his mother and his elderly grandfather. By this time his mother had married a man named Sean Shapiro.

Because his mother was rarely around, Brinkley became the designated babysitter for his very young half-sister, Sean. Brinkley's mother was often on the streets with her friends, and she was too young and preoccupied with her own issues to be a steady adult influence for Brinkley at this time in his life.

-78-

Brinkley's mother eventually divorced Sean Shapiro and married Thomas Rollins. Rollins drank heavily and viciously abused Alberta Brinkley. Grady Brinkley was often a witness to the abuse. Rollins also abused Grady: he would punch him and hit him with a belt. Brinkley would get upset and sometimes would run away to his grandfather's house.

Brinkley went from being his grandmother's pride and joy, where attention and love were lavished upon him, to being virtually alone and without consistent supervision, all at a very young age. His mother was often not around because she was working or with her friends, and she was, in any event, incapable of providing the guidance and direction that Brinkley needed at this point in his life.

Brinkley is bright and has a good mind. He is a capable person when he applies himself. He excelled at sports in his youth, and he was, and still is, an accomplished basketball player.

He applied for and was accepted at one of the top Catholic high schools in the nation, St. Rita of Cascia High School, an Augustinian Catholic college preparatory school for young men located on the south side of Chicago. St. Rita's is a prestigious high school (recently ranked as one of the top 25 Catholic high schools in the nation), but, at the time, the vast majority of its students were white. Brinkley is black. Brinkley started at St. Rita's in the summer of 1981 when he was 14. However, his experience at the school was plagued by racial and/or

socio-economic tension. His immaturity and the general lack of supervision and discipline at home, coupled with his steadily progressing substance abuse, caused him to lash out when he was teased or suffered perceived abuse. This promptly resulted in his expulsion from St. Rita's and to a steady downward spiral from which he never really recovered. He bounced around a number of high schools after that: Hales Franciscan High School, Harper High School, Hubbard High School, and then back to Harper High School.

Had there been strong, steady, reliable adult supervision in his life, and a stable home environment to return to every day after school, it is easy to imagine that Brinkley's life would have gone in an entirely different direction (such as the direction that his cousins' lives have taken them after starting in the same neighborhood but with two strong parents and consistent discipline). (See, e.g., PCR Petition, Exhibit 20 (Affidavit of Quince T. Brinkley, Jr.), Exhibit 19 (Affidavit of Wilzena Thompson)). Brinkley would have graduated from an elite high school, perhaps gone on to college, and today, at 39 years old, he might

be a productive member of society.

But it was not to be. After his grandmother's death, there was virtually no discipline

in his life and nowhere for him to go where he could feel safe and secure. He inevitably gravitated to the street crowd and his substance abuse became more problematic. Brinkley's young mother could not control her son. She made poor choices in her marriages, and this only made the home life more intolerable for Brinkley. At one point in 1982, when Brinkley was

14 or 15 years old, his mother had him arrested on the pretext that he had stolen $100 from her, but she really wanted to see if locking him up in jail would help Brinkley change his ways. (See, e.g., PCR Petition, Exhibit 14 (Affidavit of Alberta Brinkley); Exhibit 15). It only made things worse.

Brinkley ended up spending up to several months in a juvenile facility. When he was released, his behavior was worse and he was even harder to control. Although the juvenile court had ordered family counseling as part of his release, the family stopped going to the counseling sessions after only some five visits. Thomas Rollins did not want to go any longer.

After his release from the juvenile facility, Brinkley's usage of alcohol and drugs escalated.

By the time he was 15, Brinkley was using LSD, homemade wine, and marijuana. (PCR Petition, Exhibit 13 (Affidavit of Robert L. Smith, Ph.D., ¶ 13)). By the age of 21 (1988), he was using alcohol and powder cocaine on marijuana. Between 1994 and 1999, he switched to drinking Tequila, a fifth or more per day. His cocaine use was variable, ranging from $100 to $500 worth of crack cocaine per day. This pattern of alcohol and cocaine use continued up to the time of Brinkley's arrest for the instant offense. (Id.).

During one of his juvenile placements, Brinkley obtained his graduate equivalent degree ("GED") in 1985 at the age of 18. (Id.).

Pet. pgs. 51-52.

In *Pinholster*, the respondent argued that counsel should have pursued and presented additional evidence about his family members and their criminal, mental and substance abuse problems, his schooling and his medical and mental health history including his epileptic disorder. 2011 WL 1225705 at * 3. The state court agreed that counsels' actions were sound trial strategy. *Id*. They wanted to get the prosecutor's aggravated witnesses excluded for lack of notice, if that failed,

to put on his mother. Counsel had previously talked with his mother, and had contacted a psychiatrist. The psychiatrist concluded only that Pinholster had no signs of mental disorder other than psychopathic personality traits. He was aware of hyperactivity as a child, hospitalization at age 14 for incorrigibility, alleged epileptic disorder and history of drug dependency. *Id*. at * 14.  Yet, he told counsel that Pinholster did not suffer from brain damage, was not significantly intoxicated or impaired on the night in question and did not have an impaired ability to appreciate the criminality of his conduct. *Id*. The court found that it was reasonable penalty phase strategy to focus on evolving sympathy for his mother. *Id*. Counsel admitted he had no recollection of interviewing family members, other than Pinholster's mother, attempting to acquire school or medical records or interviewing former teaches or counselors. *Id*.

According to *Pinholster*, since this evidence was not before the State court, this Court cannot consider it in support of Brinkley's argument.

d.       the ineffective use of a psychologist or psychiatrist

Richard Smith opined that as a result of Brinkley's experience growing up, he developed a personality disorder called narcissistic personality disorder and an addiction to alcohol and cocaine. R. Smith Exp. Rec. Vol. 1, pg. 55. The disorders impaired his functioning at the time of the offense. *Id*. at pg. 56. Narcissistic personality disorder influences the way a person views himself, views other people and responds to his environment, and is dysfunctional. *Id*. It can cause criminal activity. *Id*. at pg. 68. The evidence in support of this sub-claim is not admissible here because of *Pinholster*. The

original record does not disclose the information elicited from this expert.

      e.    failing to object to the trial court's instruction that if the jury found the aggravating circumstances and mitigating factors to be in equipoise, they were required to "consider" a life sentence. (Tr. Vol 14, pg. 2114).

      f.    failing to object to the prosecutor's comment during the penalty-phase opening statement that mitigating factors "lessen the moral culpability of the defendant or diminish the appropriateness of the death sentence." (Tr. Vol. 14, pg. 2035).

      g.    failing to object to the prosecutor's argument to the jury in closing that they should not be swayed by the tears that had been shed on the witness stand by members of the Brinkley family and by his injection of facts not in evidence concerning tears shed by members of the victim's family. (Tr Vol. 14, pg. 2083-84).

      h.    failing to object to the prosecutor's statement in closing argument in which he instructed the jury that they were not to consider a life sentence until they had first rejected death. (Tr. Vol. 14, pg. 2090).

The underlying claims brought in letters e through h are raised in following claims for relief.

Any found to be without merit will result in denial of the related ineffective assistance of counsel

claim. See the thirteenth and sixteenth claims for relief.

Twelfth Ground for Relief

In his twelfth claim for relief, Brinkley asserts ineffective assistance of appellate counsel in

failing to raise the following issues:

    a. prosecutorial misconduct in numerous respects throughout both phases of the trial, and including:

    1) The state suppressed material evidence related to blood in the kitchen sink that appeared in State Exhibit 20;

    2) In its opening remarks and closing argument the prosecutor misstated crucial facts related to the use of Shantae Smith's ATM card while telephone calls were being made from her apartment.

    b. Ineffective assistance of trial counsel in numerous respects throughout both phases of the trial including:

-82-

1) Counsel failed to rehabilitate or challenge for cause a juror who possessed an incorrect pre-determined concept of who should be sentenced to death (Prospective Juror No. 16);

2) Trial counsel failed to make a motion that all references to State's Exhibit 20 – a photograph of dishes in the sink of the victim's apartment – be stricken from the record and that the court give curative instructions;

3) Trial counsel failed to object to prosecutions' misstatement of facts related to the use of the victim's ATM card while telephone calls were made from Shantae Smith's apartment after the state claimed she was dead;

4) Trial counsel provided ineffective representation when he conceded Brinkley was guilty of the City Diner robbery.

c. failing to raise on direct appeal, and/or failing to properly raise, the errors of the trial court in:

1) denying the defense motion to sever the improperly joined City Diner charges; and/or

2) failing to bar evidence of the City Diner robbery in the trial of the aggravated murder of Shantae Smith.

d. failing to raise on direct appeal, and/or failing to properly identify for the appellate court, the errors of trial counsel in not preserving meritorious issues for appellate review either by failing to make contemporaneous objections at trial and/or failing to otherwise properly preserve meritorious issues for appellate review.

e. raising on direct appeal any issues or claims that, because the claims were dependent on evidence outside of the trial court's record, should have been presented in the post-conviction review proceedings and not in the direct appeal.

f. ineffective assistance during the oral argument in the Ohio Supreme Court. Without Brinkley's  consent and contrary to the facts and the evidence in the trial court record, appellate counsel made statements during the argument that appeared to suggest that counsel believed Brinkley was involved in the murder.

g. failed to ensure that a complete record was available to the Ohio courts for appellate review.

Respondent agrees that the prosecutorial misconduct and ineffective assistance of appellate counsel claims included in letters a and b were presented to the Ohio courts in Brinkley's Application to Reopen Direct Appeal. The remaining allegations were never presented to the Ohio courts and are

procedurally defaulted.

Brinkley contends that Ohio lacks an adequate and effective corrective process for death sentenced individuals to redress ineffective assistance of appellate counsel. Therefore, there was no need for Brinkley to present any of his ineffective assistance of appellate counsel claims to the Ohio courts. *Lines v. Larken*, 208 F.3d 153, 163 (3rd Cir. 2000) ("If an appropriate remedy does not exist or its utilization is frustrated by the state system...the deference accorded the state judicial process must give way to the primary role of the federal court to redress constitutional deprivation").

Ohio law requires that claims of ineffective assistance of appellate counsel must be raised in an Application to Reopen Direct Appeal to the Ohio Supreme Court pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure.

Rule 26(B) provides in pertinent part:

A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

The Sixth Circuit stated in *Mapes v. Coyle*, 171 F.3d 408, 413-14 (6th Cir. 1999), *cert denied*, 528 U.S. 946 )1999):

Since the central issue before us is whether, as the federal district court found, Mapes's appellate counsel was constitutionally ineffective for failing to raise several alleged trial errors, we must first determine whether the trial court in fact erred. If it did not, there can be no constitutional deficiency in appellate counsel's failure to raise

-84-

meritless issues. If the trial court did err, the questions then become whether appellate counsel was constitutionally ineffective for failing to raise those errors on appeal and, if so, whether the petitioner was prejudiced by counsel's unsatisfactory representation. We shall address those questions in due course, but we must, of course, first examine Mapes's allegations of error, even though, on their own merits, they may be defaulted.

Under Rule 26, there is no entitlement to appointed counsel. Before counsel can be appointed, the indigent applicant must show that there is no genuine issue as to whether the applicant was deprived of the effectiveness of counsel on appeal. App. R. 26(B)(6)(a), (B)(2)(5). This requirement allegedly deprives an indigent applicant of a meaningful opportunity to present a claim.

Rule 26(B)(4) restricts an application for reopening and an opposing memorandum to ten pages exclusive of affidavits and part of the record. Brinkley asserts that an applicant must have a reasonable opportunity to present the merits of his claim and to have the issues heard and determined by the court. *Michael v. Louisiana*, 350 U.S. 91, 93 (1995).

The Ohio Supreme Court has held that an Application to Reopen a Direct Appeal under Rule 26 is a collateral challenge to the effectiveness of counsel in the direct appeal. It is not part of the direct appeal. *Morgan v. Eads*, 104 Ohio St.3d 142 (2004). Thus, it resembles the process used in post-conviction proceedings. The Court will discuss the adequacy of Ohio post-conviction proceedings in Brinkley's twenty-second claim for relief where it will be found to be without merit.

The Court concludes that letters c, d, e, f, and g were not presented to the Ohio Supreme Court and are procedurally defaulted. The underlying claims raised in letters a, b, and c and g have been or

-85-

will be discussed in other grounds for relief: suppression of blood evidence – sixteenth ground for relief; misstatement of facts – sixteenth ground for relief; juror had predetermined concept of death – tenth ground for relief; failure to make motion to strike references to exhibit 20 – sixteenth ground for relief; misstatement of facts – sixteenth ground for relief; concession of guilt – tenth ground for relief; prejudicial joinder and evidence of City Diner robbery – fourth ground for relief; and failure to ensure that a complete record was made - sixteenth ground for relief. Since these claims were or will be shown to be without merit, the ineffective assistance of appellate counsel claims premised upon the same facts must also be without merit.

> d. failing to raise on direct appeal, and/or failing to properly identify for the appellate court, the errors of trial counsel in not preserving meritorious issues for appellate review either by failing to make contemporaneous objections at trial and/or failing to otherwise properly preserve meritorious issues for appellate review.

Brinkley has not identified the specific issues he claims should have been preserved for review. His intention must be to raise ineffective assistance of appellate counsel for any claims raised here that are considered defaulted. The Court has or will consider all of the underlying claims even if defaulted. None of them have been found to be meritorious. *See Wickline*, 319 F.3d at 824 n. 5. (counsel failed to demonstrate that there is a "reasonable probability" that, but for his counsel's failure to object to the prosecutor's comments, the result of the sentencing proceeding would have been different).

> e. raising on direct appeal any issues or claims that, because the claims were dependent on evidence outside of the trial court's record, should have been presented in the post-

conviction review proceedings and not in the direct appeal.

Brinkley alleges that to the extent evidence supporting a claim or sub-claim of ineffectiveness of trial counsel was not apparent in the trial record, Brinkley's appellate counsel performed below an objective standard of reasonableness by raising on direct appeal those claims or sub-claims of ineffective assistance of trial counsel including the sub-claim alleging that trial counsel failed to present additional mitigating evidence. Ohio law requires that where an ineffective assistance of counsel claim cannot be supported solely on the trial court record, it should not be brought on direct appeal. *Williams*, 460 F.3d at 800.

This claim concerns alleged mitigation errors which the Court has determined have no merit in Brinkley's Eleventh Ground for Relief. Thus, Brinkley has not shown that he was prejudiced by counsels' mitigation strategy.

    f.    ineffective assistance of counsel during the oral argument in the Ohio Supreme Court.

Without Brinkley's consent and contrary to the facts and the evidence in the trial court record, appellate counsel allegedly made statements during the argument that appeared to suggest that counsel believed Brinkley was involved in the murder. Counsel has not specified the exact statements in question, nor has he explained how he has been prejudiced by comments made before experienced supreme court justices.

Thirteenth Ground for Relief

-87-

Brinkley argues that the trial court provided the jury with erroneous jury instructions in the penalty phase of the trial as to the following instructions:

a. instruction concerning sympathy and mercy;
b. instruction regarding equipoise;
c. mistakes and misstatements in the written instructions submitted to the jury.

The Ohio Supreme Court considered Brinkley's claim regarding sympathy and mercy. Thus, this claim is preserved for federal habeas review. Brinkley's challenge to the court's "equipoise" instruction was presented to the same court but was rejected under a plain error analysis because of counsels' failure to object to the instruction at trial. Here he argues that the Ohio Supreme Court has applied the contemporaneous objection rule unevenly and inconsistently with regard to similar claims. Since the Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground, *Williams*, 380 F.3d at 968, this issue is procedurally defaulted. It will be considered by the Court and found to be without merit. The third issue, mistakes in the written charge given to the jury, was never submitted to the Ohio courts and is procedurally defaulted. Brinkley contends that ineffectiveness of appellate counsel serves as cause for any failure to present this issue to the State court. As previously stated, a petitioner may not bring an ineffective assistance of counsel claim as cause for a default when that ineffective assistance of counsel claim itself is procedurally barred. *Jamison*, 100 F. Supp.2d at 551. A claim of ineffective assistance of appellate counsel must be raised in an application for reopening in the court of appeals under Rule 26(B). *Monzo*, 281 F.3d at 577. The third sub-claim will also be addressed and found to be without merit.

The Ohio Supreme Court rejected Brinkley's claim as follows:

First, Brinkley argues that the trial court erred in instructing the jury, over objection, that mitigating factors are those which "in fairness are to be considered" instead of instructing that the factors are to be considered "in fairness and mercy." But we reject Brinkley's claims. *See, e.g.*, *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 93 (trial court need not refer to "fairness and mercy" in reference to mitigating factors); *State v. O'Neal* (2000), 87 Ohio St.3d 402, 416, 721 N.E.2d 73 ("mercy is not a mitigating factor"); *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212 ("Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors").

Second, Brinkley claims that the trial court erred in instructing the jury to "consider" a life sentence if the jury found the aggravating circumstances and mitigating factors were in equipoise. But Brinkley mischaracterizes the trial court's instructions, which follow:

"If you find the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstances * * * outweigh the mitigating factors present in this case, then *it will be your duty to decide* which of the following life sentence alternatives should be imposed[.]"

* * *

"If the weight of the aggravating circumstances and mitigating factors *are equal, then you must proceed to consider the life sentence alternatives.*

"You are not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence alternatives. You should proceed to *consider and choose one of the life sentence alternatives* if any one or more of you conclude that the State has failed to prove * * * that the aggravating circumstances outweigh the mitigating factors." (Emphasis added.)

Later the court reiterated:

"You shall return a verdict of death if you unanimously, and that means all 12, find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, you shall then begin deliberations on the life sentence options, *and, if possible, unanimously return a verdict of* [one of the life options]." (Emphasis added.)

Defense counsel did not object to the instructions on this point, and we find no plain

-89-

error. See *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 95 (the language of the "equipoise" instruction, "while possibly awkward, did not create plain error or prejudice"). We reject proposition XV.

*State v. Brinkley*, 105 Ohio St.3d at 253-254.

In *Buchanan v. Angelone,* 522 U.S. 269, 276 (1998), the Supreme Court determined that the standard for reviewing penalty phase jury instructions is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (quoting *Boyde v. California,* 494 U.S. 370, 380 (1990)). A state does not have to affirmatively fabricate the manner in which juries consider mitigating evidence. *Id*.

a. instruction concerning sympathy and mercy

There is no anti-mercy requirement in the Ohio statutes. *California v. Brown,* 479 U.S. 538, 541 (1987), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (1987).  A jury is required to accept as mitigating those factors which the Supreme Court has held are proper to be considered in mitigation. But they may not exert general sympathy. *Webb v. Mitchell*, 2006 WL 3333842 * 32 (S.D. Ohio, Nov 14, 2006), *aff'd*., 586 F.3d 383 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 2110 (2010). Mercy may be considered, but Ohio law does not mandate that a trial court give a mercy instruction. *Mapes*, 171 F.3d at 415-16; *Hartman*, 333 F. Supp.2d at 677.  This claim is without merit.

b. instruction regarding equipoise

Before instructing that the jury must consider the life sentence alternatives if the aggravating

and mitigating circumstances were equal, the judge explained that if the state failed to prove beyond a reasonable doubt that the aggravating circumstances did not outweigh the mitigating factors it would be their duty to decide which life sentence alternative to impose. So the jury should have interpreted the latter instruction to clarify the former. If the two circumstances were equal, the jury were to consider not whether a life sentence should be returned but rather which life sentence should be returned.

c. mistakes and misstatements in the written instructions submitted to the jury

Brinkley has not identified the alleged mistakes, how constitutional law was violated and how he was prejudiced by the alleged mistakes. Therefore, this sub-claim is without merit.

Fourteenth Ground for Relief

In his fourteenth ground for relief, Brinkley alleges that the trial court committed numerous errors including:

a. applying the wrong standard in conducting the death penalty *voir dire*;
b. permitting a witness to testify about the victim's fear of Brinkley in violation of court order;
c. permitting a witness to testify as an expert with regard to matters on which the witness was not qualified as an expert;
d. mistakes in the written instructions given to the jury.

Sub-parts a and c were rejected by the Ohio Supreme under the plain error standard but are

-91-

procedurally defaulted because counsel failed to object to the alleged errors at trial.[6] *Thomas v. Warren*, 398 F.Supp.2d 850, 861 (E.D. Mich.,2005) (a state court does not fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative). Sub-part d is procedurally defaulted because it was never brought before the Ohio courts. If the Court were to consider these three sub-parts, it would find them to be without merit. Sub-part b was properly presented to the Ohio Supreme Court and is preserved for federal review.

    a. *voir dire* standard

Brinkley argues that the trial court erred by indicating to prospective jurors, during the death qualification process, that if the law requires a death sentence they must vote to impose death as a sentence, but if the law requires a life sentence they must "consider" voting for a life sentence.  The law does not call for the jury to consider a life sentence if the aggravating circumstances and mitigating factors are in equipoise, it requires a life sentence.

The Ohio Supreme Court dealt with this issue as follows:

In proposition of law V, Brinkley argues the trial court erred in advising prospective jurors during *voir dire* that "if the law requires a death sentence they must vote to impose death as a sentence but if the law requires a life sentence they must *consider* voting for" a life sentence. (Emphasis added.) However, this argument has no merit. First, Brinkley never objected at trial to the phrasing of these *voir dire* questions, and he thereby waived the issue save plain error. *Williams* (1977), 51 Ohio St.2d 112, 5

_____

      [6]     The Court has determined that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground.

O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. See, e.g., *State v. Stallings* (2000), 89 Ohio St.3d 280, 285, 731 N.E.2d 159 (failure to object to trial court's misstatements during voir dire waived issue). Second, no plain error occurred. The trial court's use of the term "consider" referred to all options, including all life sentences. The trial court never suggested that the jury need not vote for life if the jury found the death sentence inappropriate. Brinkley quotes only part of the *voir dire* of Juror 62 to sustain his argument. But the following expanded extract of that *voir dire* demonstrates its fairness.

"THE COURT: [If the defendant is found guilty of the charges and specifications] then the jury is going to be *asked to consider what the penalty should be.*

"There are four possibilities. One possibility is life imprisonment without parole. The second possibility is life imprisonment with parole eligibility after 30 full years of prison. Third possibility, life in prison with parole after 25 full years, and the final possibility is penalty of death.

[Discussion of presumption of innocence, juror availability, media exposure omitted.]

"THE COURT: Are you religiously, philosophically, morally or otherwise opposed to the death penalty?

"PROSPECTIVE JUROR: No.

"THE COURT: * * * [I]f you were seated as a juror, heard all the evidence, got the instructions of law and you felt after weighing the evidence and applying the law that the death penalty was appropriate, you would vote to impose that penalty?

"PROSPECTIVE JUROR: Yes.

"THE COURT: And * * * if * * * after weighing the evidence and hearing the instructions of law you felt *the death penalty was inappropriate, would you consider the other sentencing options of life imprisonment?*

"PROSPECTIVE JUROR: Yes.

"THE COURT: * * * [During] the sentencing phase, * * * [after] a verdict of guilty

-93-

* * * as to aggravated murder and the specification, the question is this. *Would you automatically vote to impose a sentence of death regardless of the facts on the sentencing phase, or would you consider all sentencing options?*

"PROSPECTIVE JUROR: *Consider all sentencing options*.

* * *.

"MR. DECH [Defense counsel]: * * * [A]t the sentencing phase you'll be hearing mitigating factors which may or may not be related to the offense which was charged. Will you listen to everything and then make your decision?

"PROSPECTIVE JUROR: Yes.

"MR. DECH: Okay. And *if it is inappropriate for the death penalty, will you vote in favor of one of the life sentencing options?*

"PROSPECTIVE JUROR: Yes." (Emphasis added.)

The trial court and counsel questioned each prospective juror in a similar fashion. The context reveals that the court was simply asking whether an individual juror would fairly consider the choice of one of the life-imprisonment sentences as well as the death sentence. The trial court frequently used the term "consider" to refer to the choice among the three possible life sentences.

Moreover, the trial court routinely asked whether a prospective juror would automatically vote for the death penalty without considering all sentencing options. The trial court also informed each prospective juror of each sentencing option.

Third, the ordinary meaning of the term "consider" implies a fair and full deliberation rather than the cursory examination that Brinkley suggests. Webster's Ninth New Collegiate Dictionary (9th Ed.1983) 279 defines "consider" as follows: "1. To think about carefully." Black's Law Dictionary (5th Ed.1979) 277 defines "consider": "To fix the mind on, with a view to careful examination; to examine; to inspect. To deliberate about and ponder over. To entertain or give heed to."

In sum, Brinkley's complaint of plain error lacks merit. In context, the use of the term "consider" in *voir dire* was not misleading or improper. Hence, we reject proposition of law V.

-94-

*State v. Brinkley*, 105 Ohio St.3d at 242-244.

The Ohio Supreme Court found that the trial court's use of the term "consider" referred to all options, i.e., the death sentence and the three life sentences. The judge was asking each juror whether he or she would fairly consider one of the life sentences as well as death. As the court pointed out, the term "consider" implies a full and fair deliberation rather than a cursory examination. *Id*. at 244. Further, the prosecutor and the defense counsel referred to all of the options in their *voir dire* questioning. Tr. Vol. 7. pgs. 483-84; Tr.Vol. 5, pgs. 47-48, 65, 133.

b. Scope of Pettaway testimony regarding Smith's alleged fear of Brinkley

The Ohio Supreme Court rejected this sub-claim stating:

In proposition of law VII, Brinkley argues that the trial court erred when it denied his motion for a mistrial. Brinkley bases this claim on the following events. At a conference during trial, the trial court declared that it would admit evidence "that Shantae Smith had fear and apprehension of Grady Brinkley" but ordered that witnesses could not testify about why she had felt those fears. The trial court's ruling was correct. *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 74 (evidence that a victim had a fearful state of mind was admissible as a hearsay exception under Evid.R. 803 [3] but not "the reasons or basis behind the victim's fearful state of mind"). *Accord State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21-22, 514 N.E.2d 394. At trial, Pettaway testified that he dropped Smith off at her apartment after work on January 7 after midnight. Then Assistant Prosecuting Attorney Timothy Braun inquired as follows:

"Q. Did you go inside?

"A. No, she wouldn't let me in.

-95-

"Q. Why not?

"A. Because he was home.

"MR. THEBES [Defense counsel]: Objection.

"THE COURT: Sustained."

Brinkley's counsel then moved for a mistrial, declaring that this quoted testimony makes "an inference that is extremely prejudicial." But we hold that Brinkley's claim of error has no merit.

First, the trial court sustained the objection, and Brinkley never requested that the jury be given a cautionary instruction to disregard the testimony.

Second, the statement that Brinkley was home did not reasonably relate to Smith's fear. Instead, the most likely inference was simply that Smith felt that inviting Pettaway inside would be awkward because Brinkley was there. Moreover, at trial, the prosecutor recognized that Pettaway was "somebody who * * * was avoiding [Brinkley.] * * * [H]e was trying to avoid any confrontations." The fact that Smith never expressed any reluctance to go inside demonstrates that her fear was never implicated in Pettaway's testimony.

Third, even if the jury might have interpreted this testimony to imply that Smith was afraid of Brinkley, the testimony never related to the *reasons* for Smith's fear, the only category of evidence restricted by the trial court. Thus, we reject Brinkley's claim that this testimony violated "a rigid court order." Mistrials are necessary "only when the ends of justice so require and a fair trial is no longer possible." *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623. Pettaway's testimony did not deny Brinkley a fair trial. Therefore, we overrule proposition of law VII.

*State v. Brinkley*, 105 Ohio St.3d at 245-246.

Errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle v. McGuir*e, 502 U.S. 62, 67 (1991).  A federal constitutional violation must exist before a federal court

will get involved. *Coleman*, 244 F.3d at 542;  *Clemmons v. Sawders*, 34 F.3d 352, 357 (6th Cir. 1994).

Brinkley has not shown the existence of a federal constitutional violation. Pettaway's testimony never related to Smith's reasons for fearing Brinkley. Smith may not have wanted to invite Pettaway into her home after arriving at her residence because it could have been awkward to have the two men together, one an ex-boyfriend and the other the current boyfriend. Pettaway did not tell the jury that Smith was afraid of Brinkley. Further, defense counsel's objection was sustained.

### c. Expert testimony

The Ohio Supreme Court also rejected this sub-claim.

In proposition of law IX, Brinkley argues that the trial court erred when it permitted Dr. Diane Scala-Barnett, who had performed the autopsy on Smith, to testify as an expert as to the cause of Smith's death. At trial, the state did not formally tender Dr. Scala-Barnett as an expert witness, but Brinkley never objected to her testimony or qualifications. Thus, Brinkley waived all but plain error. *State v. Hartman* (2001), 93 Ohio St.3d 274, 286, 754 N.E.2d 1150; *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

Brinkley's claims of plain error lack merit. At trial, Dr. Scala-Barnett testified that she was a physician, had served a four-year residency in pathology, had one year of subspecialty training in forensic pathology, and had been board-certified in forensic pathology since 1986. Moreover, as a part of her duties, she had performed almost 6,000 autopsies.

Under Evid.R. 702(B), Dr. Scala-Barnett was "qualified as an expert by specialized knowledge, skill, experience, training, or education" to testify as a forensic pathologist as to the cause of death and how long Smith lived after receiving the fatal wound. Given her qualifications, the state's failure to tender her as an expert was of no consequence and did not create plain error. See *Hartman,* 93 Ohio St.3d at 286, 754 N.E.2d 1150.

-97-

> In fact, we recognized in *Baston,* 85 Ohio St.3d at 423, 709 N.E.2d 128, that Dr. Scala-Barnett's "experience as a deputy coroner and her board certifications in pathology and forensic pathology qualify her to testify regarding the cause of death." In *Baston,* we also held that the state's failure to formally tender Dr. Scala-Barnett as an expert did not create plain error. *Id*. Hence, we reject proposition IX as waived.

*State v. Brinkley*, 105 Ohio St.3d at 247-248.

Again, this is a matter of state evidentiary law. *Estelle*, 502 U.S. at 67. Brinkley has not shown any federal constitutional violation. Further, the witness testified as to the manner of Smith's death. Although she was not qualified as an expert by counsel, the record certainly established that she would have been accepted as an expert. "She was a physician, had served a four-year residency in pathology, had one year of sub-specialty training in forensic pathology, and had been board-certified in forensic pathology since 1986. Moreover, as a part of her duties, she had performed almost 6,000 autopsies." *State v. Brinkley*, 105 Ohio St.3d at 248.

d. Mistakes in the jury's written instructions

This sub-claim is similar to sub-claim c of the thirteenth ground for relief found to be without merit. The same reasoning applies.

Fifteenth Ground for Relief

Brinkley contends that the judge's *ex parte* meeting with the jurors after their sentencing recommendation but before he imposed sentence deprived him of his constitutional rights. The Respondent agrees that this ground was raised in the Ohio Supreme Court and is preserved for federal

-98-

habeas relief.

The Ohio Supreme Court rejected this claim stating:

In proposition of law XVIII, Brinkley contends that the trial judge erred in holding an off-the-record *ex parte* discussion with jurors after the jury had returned its penalty-phase verdict but before the trial court had imposed a sentence.

We previously considered and rejected an identical argument on this point in *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 96-99. We reject proposition XVIII for the same reasons. First, when the judge noted that he would speak with jurors, counsel did not object. If counsel were not present, they certainly had an opportunity to be present. Second, as in *Williams,* Brinkley never "established that he was prejudiced by any conversations." *Id.* at ¶ 98. Also as in *Williams,* Brinkley "has not even attempted to reconstruct what occurred." *Id.* Third, as in *Williams,* "when the judge and jury met, the jurors had satisfied their official task and were free to discuss the case." *Id.* at ¶ 99. Also, the trial court can be presumed to "consider 'only the relevant, material, and competent evidence in arriving at its judgment.' " *Id.,* quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Accord *Rushen v. Spain* (1983), 464 U.S. 114, 118-119, 104 S.Ct. 453, 78 L.Ed.2d 267. Thus, on the basis of *Williams,* we reject proposition XVIII.

*State v. Brinkley,* 105 Ohio St.3d at 254.

Brinkley has not explained how he was prejudiced by the judge's contact with the jurors. When the judge and jury met, the jurors' duty had been completed. There was no way the outcome of the trial was effected.  Further, Brinkley has not indicated how this meeting impaired the judge's ability to independently determine the appropriateness of the death penalty. The decision of the Ohio court was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Sixteenth Ground for Relief

In his sixteenth ground for relief, Brinkley asserts that he was deprived of a fair trial because

of the following prosecutorial misconduct:

a. prosecutor acted in bad faith when he sought the indictment for the (A)(3) death
specification;

b. prosecutor acted improperly when he presented false material evidence through the trial
testimony of State witness, Samuel Miller;

c. prosecutor also acted improperly concerning the testimony of Lamont Pettaway;

d. the trial court had ruled that the State could elicit testimony that the victim was fearful of
Brinkley but could not say why she was fearful. In spite of this order, the prosecutor elicited
the prohibited answer;

e. prosecutor acted improperly in withholding impeachment evidence that would have shown
bias and/or dishonesty on part of Lamont Pettaway;

f. during closing argument in the first phase of the trial, the state improperly argued
that Brinkley attempted an alibi which implied an obligation on Brinkley's part to present
evidence;

g. in rebuttal closing argument, the prosecutor specifically addressed Brinkley's unwillingness
to speak to the FBI after having been read his *Miranda* rights;

h. during opening comments of the mitigation phase, the prosecutor misstated the definition
of mitigating factors, i.e., mitigating factors are factors that lessen the moral culpability of
the defendant or diminish the appropriateness of the death penalty;

i. during the opening comments of the mitigation phase, the prosecutor misstated the closing
arguments, the prosecutor told the jury not to be swayed by the tears of Brinkley's family.
The prosecutor mentioned the tears of the victim's family – even though they did not testify
and improperly put the grief/victim impact before the jury;

j. prosecutor argued that the jury must first reject the death sentence before it could consider
a life sentence. In effect, the prosecutor gave the jury an improper "acquit first" instruction;

k. prosecutor improperly argued for death because of the pain that Brinkley caused the
victim's family;

l. prosecutor's opening and closing argument misstated crucial facts related to the use of the

-100-

victim's ATM card while telephone calls were being made from her apartment;

m. prosecutor also suppressed material evidence related to the blood in the kitchen sink that appeared in State Ex. 20.

Letters a, c, d, f, g, h, i, j, and k were presented to the Ohio Supreme Court as prosecutorial misconduct claims.  These sub-parts are preserved for federal habeas review. Letter b was submitted during post-conviction proceedings, while letter e was rejected on the basis of *res judicata*. Apx. Vol.11, pgs. 418-23.Thus letter e is procedurally defaulted. Letters l and m were presented in a Rule 26(B) Motion to the Ohio Supreme Court. These sub-parts are defaulted because claims must be presented to the state courts under the same theory in which they are later presented in federal court. *Lott*, 261 F.3d at 607, 611.

The underlying claims of the first four sub-claims, letters a, b, c, d  have been or will be discussed in connection with other free-standing claims, i.e., a. the indictment for the (A)(3) death specification, first ground for relief; b, false material evidence through the trial testimony of State witness, Samuel Miller, nineteenth ground for relief;  c, scope of the testimony of Lamont Pettaway, fourteenth ground for relief; and d, *Brady* claim, eighteenth ground for relief. The prosecutorial misconduct claims will fail if the underlying claims have no merit.

The United States Supreme Court has held that in order to prove a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974). The determination is made by examining the totality of the circumstances. *Hawkins v. Coyle,* 2005 WL 1684022 *18 (S.D. Ohio, Jul.19, 2005), *aff'd. in part, rev'd. in part*, 547 F.3d 540 (6th Cir. 2008), *cert. denied*, 130 S.Ct. 553 (2009) (citing *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)). The court must first find whether the prosecutor's statements were improper. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002).  If the statements are found to be improper, four factors are considered in weighing the extent of a prosecutor's misconduct: 1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; 2) whether they are isolated or extensive; 3) whether they were deliberately or accidentally placed before the jury; and 4) the strength of the competent proof to establish the guilt of the accused. *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997), *cert. denied*, 522 U.S. 1001 (1997). The prosecutorial misconduct must likely have had an impact on the outcome of the trial. *Byrd v. Collins,* 209 F.3d 486, 529 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001). The Sixth Circuit has stated that "for denial of due process to exist, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Pritchett,* 117 F.3d at 964

> e. prosecutor acted improperly in withholding impeachment evidence that would have shown bias and/or dishonesty on part of Lamont Pettaway.

As seen in Brinkley's tenth claim for relief, letter n, Brinkley's counsel did have impeachment evidence in their possession. In its post-conviction relief findings of fact and conclusions of law, the

trial court found that Brinkley's trial counsel had knowledge of information that had impeachment

potential. Apx. Vol.10, pg. 281.

      f. the state improperly argued that Brinkley attempted an alibi which implied an obligation
         on Brinkley's part to present evidence.

      The Ohio Supreme Court held that the prosecutor's comment concerning the false note written

to mislead the landlord was a reasonable inference on the evidence. The prosecution never expressly

said that Brinkley had an obligation to present evidence. The jury was told by the court that the

burden of proof was solely upon the prosecution. Tr. Vol. 10, pgs. 1176-77, Vol. 13, pg. 1905. The

Court finds that the decision of the Ohio court was not contrary to or an unreasonable application of

federal constitutional law.

      g. prosecutor specifically addressed Brinkley's unwillingness to speak to the FBI after having
         been read his *Miranda* rights.

      Brinkley had waived his *Miranda* rights and did answer some questions. Tr. Vol. 12, pgs.

1517-21. When asked about the bank card, he had no comment. 10/26/01 hearing, Tr. Vol. 4, pg. 63.

In  *United. States v. Ramirez,* 79 F.3d 298, 305 (2nd Cir. 1996), *cert. denied,* 519 U.S. 850 (1996),the

court held that the defendant who was properly advised of his rights, and answered some questions

and not others, did not invoke his right to remain silent. *See United States v. Goldman,* 563 F.2d 501,

503-04 (1st Cir. 1977), *cert. denied*, 434 U.S. 1067 (1978) (right to remain silent was waived and

prosecution was properly permitted to use, during case in chief and summation, two questions asked

by interrogating agent to which defendant either refused to respond or did not respond).


> h. during the opening comments of the mitigation phase, the prosecutor misstated the
>    definition of mitigating factor

During opening statement, the prosecutor stated that" mitigating factors are factors that lessen

the moral culpability of the defendant or diminish the appropriateness of the death sentence." Tr. Vol.

14, pg. 2035. The Ohio Supreme Court found this statement as to jury instructions to be erroneous.

*State v. Lawrence*, 44 Ohio St.3d 24, 29 (1989). *See State v. Williams*, 99 Ohio St.3d 493, 515, 516

(2003) (penalty-phase jury instruction, stating that mitigating factors could be considered by jury as

extenuating or reducing the degree of the defendant's blame or punishment, was prejudicial error).

In *State v. Getsy*, 84 Ohio St.3d 180, 200 (1998), the court decided that when reviewed in their

entirety, the instructions adequately guided the jury and did not restrict its consideration of mitigating

evidence.

In the present case, the State court instructed the jury that the sentencing verdict involves only

the issues as they relate to weighing of the aggravating circumstances against the mitigating factors.

Tr. Vol. 14, pgs. 2109-10. They were informed that they had to either recommend a sentence of death,

or that the defendant be sentenced to one of the life sentences. Tr. Vol. 14, pgs. 2113-14. Further, the

-104-

court explained to the jury what relevant mitigating factors to weigh against the aggravating

circumstance. Tr. Vol. 14, pg 2109. Brinkley has not alleged a federal constitutional error. Thus, this

sub-part is without merit.

> i. during closing arguments, the prosecutor told the jury not to be swayed by the tears of
> Brinkley's family. The prosecutor mentioned the tears of the victim's family – even though
> they did not testify – and improperly put the grief/victim impact before the jury.

The Sixth Circuit has held that there is no *per se* bar to the introduction of victim impact

evidence and argument. *Byrd*, 209 F.3d at 532 (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

Rather, the due process clause protects against victim impact evidence that is so unduly prejudicial

it renders the trial fundamentally unfair. *Id*. (citing *Payne*, 501 U.S. at 825); *See also Roe v. Baker*,

316 F.3d 557, 565-66 (6th Cir. 2002), *cert. denied*, 540 U.S. 853 (2003).

The state trial judge has control over whether to admit victim-impact evidence. The court in

*State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995), rejected a challenge to the prosecutor's remarks

stating, "we find that evidence which depicts both the circumstances surrounding the commission of

the murder and also the impact of the murder on the victim's family may be admissible during both

the guilt and the sentencing phases." Ohio thus permits, with some limitations, victim impact

testimony during capital sentencing proceedings. *See, e.g., State v. Hartman*, 93 Ohio St.3d 274, 292

(2001) (victim impact testimony permitted in capital cases where the testimony is not overemotional

or directed to the penalty to be imposed).

In Brinkley's case, the prosecutor was merely responding to extensive emotional testimony from Brinkley's family, who pleaded with the jury not to put their son, brother, and nephew to death. *State v. Brinkley*, 105 Ohio St.3d at 252.

> j. prosecutor argued that the jury must first reject the death sentence before it could consider a life sentence. In effect, the prosecutor gave the jury an improper "acquit first" instruction.

Brinkley contends that the prosecutor improperly argued that the jury must first reject the death sentence before it could consider a life sentence. Tr. Vol. 14, pg. 2090. Ohio Revised Code Section 2929.03(D)(2) provides that a jury must be unanimous when finding that aggravating circumstances outweigh mitigating factors. But the Ohio Supreme Court has ruled that pursuant to Ohio's death penalty statutes, an individual juror can prevent the death penalty by finding that mitigating circumstances are present in the case that he or she believes are not outweighed by the aggravating circumstances. *Ohio v. Brooks*, 75 Ohio St.3d 148, 162 (1996). The court stated that the jurors should be so instructed. *Id.* In summary, the jury does not have to decide unanimously whether a mitigating factor outweighs an aggravating circumstance. Once the jury decides that no mitigating factors outweigh an aggravating factor, they unanimously must agree upon which of the life imprisonment options to recommend. Rejection of the death penalty need not be unanimous.

In *Williams*, 460 F.3d at 810-813, the Sixth Circuit determined that the trial court's jury

instruction was improper because the trial court instructed the jury that an acquittal from death must be unanimous and only in that event could the jury consider life. In the present case, any misstatement by the prosecutor was corrected by the judge's jury instructions. The judge instructed the jury that " [Y]ou are not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence alternatives. You should proceed to consider and choose one of the life sentence alternatives if any one or more of you conclude that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." Tr. Vol. 14, pgs. 2114-15. Thus, the jury should have understood that they were not to find acquittal first before determining whether to impose a life sentence. *See Bobby v. Mitts*, 2011 WL 1631037 * 3 (U.S. May 2, 2011) (jury instruction during penalty phase that requires mandatory death penalty sentence that can only be avoided by an acquittal first before the jury has an opportunity to consider life imprisonment is not unconstitutional).

      k.  prosecutor improperly argued for death because of the pain that Brinkley caused the victim's family. Tr. Vol. 14, pg. 2104.

The Ohio Supreme Court determined that the prosecutor's "mention of the 'personal situation' of the victim's family, without more, doe not constitute misconduct." *State v. Brinkley*, 105 Ohio St.3d at 253. This sub-claim has no merit for the reasons discussed in letter i.

      l. The prosecutor's opening and closing argument misstated crucial facts related to the use of the victim's ATM card while telephone calls were being made from her apartment.

Brinkley refers to the prosecutor's failure to mention phone calls made from Smith's apartment at the same time as Brinkley was using the ATM account. Even if the prosecutor made some misstatements of crucial facts, this sub-part is without merit for several reasons: first, the trial court instructed the jury that statements of counsel are not evidence, Tr. Vol. 14, pg. 2115; second, defense counsel could have objected; and third, the defense had the opportunity to correct any misstatements of fact in their closing argument. Prosecutors have the freedom to argue reasonable inferences from the evidence. *Byrd,* 209 F.3d at 535.  Furthermore, the prosecutor's statement, "we know who did it" was an isolated comment and the evidence against Brinkley was strong.

      m. prosecutor also suppressed material evidence related to the blood in the kitchen sink that appeared in State Ex. 20.

According to Brinkley, the prosecutor suppressed material evidence related to the blood in the kitchen sink that appeared in State Ex. 20. State Ex. 20 was a photograph of dishes in the sink of the victim. The photo showed blood in the sink. During pre-trial proceedings, the prosecutor admitted that no testing of the blood was conducted and the State did not know whose blood it was. Tr. Vol. 11, pg. 1403, Tr. Vol. 8, pgs. 870-72, 870-72. The State elicited testimony from Detective Getz concerning State Ex. 20. The exhibit was admitted and later withdrawn as evidence, but the testimony remained. The State allegedly had an obligation to have the blood tested and the results provided to the defense. Brinkley argues that this evidence is especially relevant and exculpatory because of the presence of Lamont Pettaway, a suspect in the victim's death. Mr. Pettaway was seen with the victim

-108-

and was inside her apartment around the time of her death. Tr. Vol. 12, pg. 1619[7].

Detective Getz testified as to the blood in the sink in connection with the exhibit picture. The State never said there was blood. The detective said it "appeared to be blood." Tr. Vol. 11, pg. 1403. Brinkley knew about the blood at the time of the pretrial and could have had it tested.  The State did not suppress this evidence.

The Court concludes that, in regard to preserved sub-claims, the decisions by the State court were not contrary to or an unreasonable application of clearly established federal law. The State court's decisions as to sub-claims procedurally defaulted are without merit.

Seventeenth Ground for Relief

Brinkley argues that his constitutional rights were violated because the capital specifications in the indictment charged him both as being the principal offender in the commission of the aggravated murder and as committing the aggravated murder with prior calculation and design. The Ohio Supreme Court rejected this claim under a plain error standard after determining that Brinkley failed to preserve it by objection.[8]  Thus, this claim is procedurally defaulted. If the Court were to consider this claim, it would find it to be without merit.

---

[7]    Brinkey's statement is incorrect. There is no testimony that Pettaway was in Smith's apartment around the time of her death. In fact, he testified that he dropped her off early in the morning of January 7, 2000 and did not go inside. Tr. Vol. 12, pg. 1616.

[8]    The Court has determined that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground.

Ohio Revised Code Section 2929.04 provides:

(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt: (7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

State legislatures frequently set forth alternative means of committing a crime without intending to define separate elements or separate crimes. Therefore state law determines whether statutory alternatives are mutually exclusive. *Hawkins*, 2005 WL 1684022 at * 46 (citing *Schad v. Arizona,* 501 U.S. 624, 636 (1991). In *State v. Penix*, 32 Ohio St.3d 369, 371 (1987), the Ohio Supreme Court held that the language of the statute provides that principal offender and prior calculation and design are alternatives which are not to be charged and proven in the same cause. However, Ohio courts have allowed prior calculation and design to be charged disjunctively so the jury could not find both elements to be proven. *Hawkins*, 2005 WL 1684022 at * 46, (citing *State v. Cook*, 65 Ohio St.3d 516 (1992), *cert. denied*, 510 U.S. 1940 (1994). The court must instruct the jury that their verdict must be unanimous in agreeing on the alternatives. *Id*.

Although Brinkley was charged with both specifications, he sustained no prejudice because the court deleted reference to "prior calculation and design from the jury instructions. The jury was instructed to consider only whether Brinkley was the principal offender. Tr. Vol. 14, pgs. 2024, 2109.

-110-

Furthermore, this claim concerns a matter of state evidentiary law and is not a matter for habeas corpus review.  *Estelle*, 502 U.S. at 67. Accordingly, this claim has no merit.


### Eighteenth Ground for Relief

In his eighteenth ground for relief, Brinkley contends that the State unconstitutionally withheld exculpatory and/or impeachment evidence concerning the testimony of Lamont Pettaway and Samuel Miller in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Sub-claims (a) and (b)). The State allegedly withheld impeachment evidence that would have shown bias by Pettaway.  Brinkley argues that the prosecution had an obligation to provide defense counsel with Pettaway's criminal record of convictions in the Toledo Municipal Court which could have been accomplished by searching the municipal court records. This claim was presented to the Ohio courts during post-conviction relief proceedings. The court of appeals ruled that it was barred by the doctrine of *res judicata*. *State v. Brinkley*, 2004 WL 2384455 at * 1. Brinkley argues that procedural default does not apply because the claim relies on evidence *de hors* the record. The Court agrees. Thus, this claim has not been procedurally defaulted and is preserved for federal habeas review. In any event, it will be found to be without merit.

"Suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

faith of the prosecution." *Strickler v. Greene*, 527 U.S. 263, 280 (1999)(quoting *Brady*, 383 U.S. at 87). The prosecutor's duty to disclose includes impeachment evidence, exculpatory evidence, and evidence known only to police investigators. *Id.* at 280-81. The Court then noted that a *Brady* violation required proof that: (1) the evidence in question was favorable to the defendant; (2) the evidence was suppressed by the State; and (3) the defendant was prejudiced by the suppression. *Id.* at 281-82.

The standard for determining whether withheld exculpatory evidence violates due process was set out in *Jamison*, 100 F.Supp.2d at 672, as follows:

> Petitioner argues that the State of Ohio failed to provide Petitioner with all relevant, material, and exculpatory evidence at pretrial discovery proceedings. [If true, this failure may have violated Petitioner's rights under] the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The substance of that claim is based on the rule announced in *Brady v. Maryland*, 373 U.S. 83 (1963) and explored in later cases. These cases held that the suppression by the prosecution of evidence favorable to the accused in a criminal case violates due process if the evidence is material to guilt and sentencing regardless of the degree of culpability of the prosecution. *Id.* at 87. The trial prosecutor's duty to disclose exculpatory evidence extends to information in the possession of the prosecutor's office or in the possession of the law enforcement agency responsible for investigating the offense. This duty to disclose also applies to impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972).
>
> ***
>
> A true *Brady* violation consists of three components. *Strickler v. Greene,* 527 U.S. 263 (1999). First, a petitioner must show that the evidence at issue was favorable to him. *Id.* Secondly, the petitioner must demonstrate that the State suppressed the evidence. *Id.* Thirdly, the petitioner must satisfy the materiality inquiry by establishing the prejudice suffered because of the suppression. *Id.* In making a decision whether

-112-

certain exculpatory evidence is material, the reviewing court must assess the cumulative effect of all such suppressed evidence. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). The favorable evidence is material when there is a reasonable probability that the result of the proceeding would have been different if the prosecutor had disclosed the evidence to the defense. *Id*. at 434-35; *see also United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988). The question is not whether the defense would more likely than not have received a different verdict with the evidence. *Kyles*, at 434-35. Rather, a reasonable probability of a different result means that the net effect of the suppressed evidence would undermine the confidence in the outcome of the trial. *Id*. at 435.

Brinkley was allegedly prejudiced by the fact that Pettaway's bias was not revealed, and his credibility was never challenged. The jury was allegedly left with the impression that Lamont Pettaway was a grieving suitor. Brinkley contends that had they learned of recent assault charges, Criminal Temporary Protection Order, and Anti-Stalking Orders as to another woman, they would have been left with a different image of an important State's witness and his reason to lie. Pettaway's credibility was an important factor in Brinkley's trial. Brinkley's claims that Pettaway's remarks about sharing an apartment with Shantae Smith and possibly marrying her, Tr. Vol. 12, pgs. 1615-16, were crucial to the State's theory that Brinkley killed Shantae because she was leaving him for Pettaway. Pettaway claimed that Shantae told him that she was afraid of Brinkley. His honesty was on the line, and the jury allegedly had a right to hear that he had been convicted of a dishonest act.

The trial court found through the affidavit of Brinkley's trial counsel that counsel was aware of all the proceedings involving Pettaway in Toledo Municipal Court. In his affidavit he stated:

When I accepted the appointment in this case I initially considered Lamont Pettaway

-113-

to be a potential suspect. I immediately went to Toledo Municipal Court to determine if Lamont Pettaway had a criminal record. I was aware of all the proceedings in Municipal Court involving Mr. Pettaway and made the decision not to impeach Mr. Pettaway with the conviction of petty theft. I also discussed Lamont Pettayway's record of criminal convictions with assistant prosecutor Timothy F. Braun to determine if there was an out of state record or other criminal record before I cross examined Lamont Pettaway.

Apx. Vol. 10, pgs. 102-03.

Although brought under a prosecutorial misconduct theory, the court determined that the prosecution did not have an obligation to provide a defendant with information he already had.  Apx. Vol. 10. Pg. 281-82.  The *Brady* rule does not apply where evidence was available to defendant from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence. *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004), *cert. denied*, 544 U.S. 945 (2005).

Brinkley also argues that *Brady* was violated by the prosecution when it presented false material evidence through the testimony of Samuel Miller. (Sub-claim (b)).The issue of Miller's testimony was raised as a prosecutorial misconduct claim  As it was not based on *Brady*, this sub-claim is unexhausted and procedurally defaulted. The issue of Miller's alleged false testimony is the subject of Brinkley's nineteenth ground for relief. Failure to disclose the alleged fact that this key witness committed perjury would be a nonissue if the next claim is found to be without merit.

Nineteenth Ground for Relief

In his nineteenth ground for relief, Brinkley contends that his rights to due process and a fair

-114-

trial were violated because his conviction and death sentence were obtained as a result of the State's presentation of the false testimony of Samuel Miller. The Respondent acknowledges that this claim was presented to the Ohio courts during post-conviction relief proceedings and is therefore preserved for federal habeas review.[9]

Violation of the right to a fair trial may occur where the prosecution knowingly and deliberately introduces or uses false evidence and perjured testimony at trial, and there is a reasonable likelihood that the perjured testimony could have affected the jury's verdict. *United States v. Bagley,* 473 U.S. 667, 678 (1985); *United States v. Agurs,* 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Carter v. Mitchell,* 443 F.3d 517, 535 (6th Cir. 2006)*, cert.* denied,549 U.S. 1127 (2007); *Weatherspoon v. Bouchard,* 2006 WL 2571564, *2 (W. D. Mich., Sep. 5, 2006). In order to establish a false-testimony claim, the petitioner must show: (1) that the prosecution presented false testimony; (2) that the prosecution knew was false; and (3) that it was material. *Abdus-Samad v. Bell,* 420 F.3d 614, 625 -26 (6th Cir. 2005), *cert. denied*, 549 U.S. 952 (2006). The statement must be "indisputably false" rather than "merely misleading." *Id*. (quoting *Byrd,* 209 F.3d at 517-18).

Miller testified at trial that, while in jail with Brinkley, Brinkley told him that he was going to kill Smith. This testimony helped the State to argue that one of Brinkley's motives for killing Smith was that she had started seeing someone else while he was in jail for the City Diner robbery. Tr. Vol.

---

[9]  Letter b in the Sixteenth ground for relief pertained to prosecutorial misconduct which was not raised in post conviction proceedings.

13, pgs. 1728-30. During the post-conviction relief investigation, Miller allegedly told an investigator that he never heard Brinkley say anything about wanting to kill Smith. He supposedly was pressured by another inmate, Jones, to testify as he did because Brinkley had robbed this inmate's girlfriend. Brinkley asserts that Miller informed the prosecutors that his earlier statements were not true, and he did not want to testify at Brinkley's trial. Further, Miller claims that the State's representatives threatened to hinder Miller's future efforts to be released on parole if he refused to testify. According to Brinkley, it was actually Jones who heard Brinkley say he was going to kill Smith. Miller was allegedly called to testify instead of Jones because the State was not willing to offer Jones an acceptable deal.

Brinkley supported his argument in State court with the affidavit from the investigator, but not from Miller. The Ohio courts found the statements in the affidavit to be hearsay. Jones failure to testify had no effect as to whether Miller told prosecutors that Brinkley did not make any inculpatory admissions to him, that he told prosecutors that Jones pressured him into testifying, or that Miller attempted to recant his statements.

Miller's attorney submitted an affidavit in the post-conviction relief proceedings denying Brinkley's claims. The attorney, Joseph R. Scalzo, Jr. stated:

> I was appointed by Judge Jensen to represent an inmate named Samuel L. Miller during the pendency of the above styled case. Mr. Miller was a potential witness against the defendant, Grady Brinkley. The Lucas County Prosecutor's Office had requested that Samuel L. Miller be represented by competent counsel to negotiate any

-116-

terms or conditions regarding testimony.

I was present for all meetings that occurred between my client and representatives from the Lucas County Prosecutor's Office. At the time of his testimony, my client had reached the end of his prison sentence. Samuel L. Miller's only condition for testifying was that he wanted to be released directly from the Lucas County Jail and not be processed and released from the Ohio Department of Rehabilitations and Corrections because he was concerned about the consequences of being labeled a "snitch" while he was in the custody of the Ohio Department of Rehabilitations and Corrections.

*** 

During these meetings, Samuel L. Miller never changed his story or recanted about what happened during the time he was confined with Grady Brinkley, in the Lucas County Jail. He never told the prosecutors that Grady Brinkley didn't tell him that he was going to kill Shantae Smith. Furthermore, the prosecutors never threatened to hurt Samuel L. Miller with the Parole Board.

Apx. Vol. 10, pg. 85-86.

Brinkley has not shown that Miller's testimony was false. Further, the Ohio court correctly decided that the investigator's statements concerning Miller's alleged recantation were hearsay. The decision of the Ohio Supreme Court was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Twentieth Ground for Relief

Brinkley alleges that he was denied due process because the Ohio courts failed to fulfill their statutory duty in imposing and reviewing his death sentence, and the Ohio Supreme Court failed to perform the required meaningful proportionality review of his death sentence. The Ohio Supreme

Court addressed this issue summarily rejecting it. Therefore, it is preserved for federal habeas review.[10]

This claim is without merit because no proportionality review is required. *Buell*, 274 F.3d at 368 (citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)). Ohio law requires proportionality review, but the review must be consistent with constitutional requirements. *Dickerson, v. Mitchell*, 336 F.Supp.2d 770,  789 (N.D. Ohio, 2004), *rev'd on other grounds* 453 F.3d 690 (6th Cir. 2006). A trial judge has the duty to reweigh the aggravating circumstances and mitigating circumstances before determining whether to impose a death sentence or a life sentence, R.C. 2929.03(D)(3), and to state this finding in a separate opinion. R.C. 2929.03(F). The judge must examine the state's proportionality review to determine whether the imposition of a death sentence on the petitioner is patently unjust or "shocks the conscience."  The state court's comparison of other cases in which the death penalty was imposed is not to be second guessed. *Id.*; *Taylor*, 296 F. Supp.2d at 839.  Because proportionality review is not required by the Constitution, states have a great latitude in defining the pool of cases used for comparison. *Wickline*, 319 F.3d at 824. The Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed.  *Id.*; *Buell*, 274 F.3d at 369.

Examination of the Ohio Supreme Court's opinion shows that it has complied with Ohio

---

[10]        The Respondent asserts that this claim is related to the twenty-third and twenty-fourth grounds for relief and did not address it.

statutory and Sixth Circuit law in its independent sentence evaluation. *State v. Brinkley*, 105 Ohio St.3d at 259.  It compared Brinkley's case with other cases involving aggravated murder to escape detention, apprehension or trial, combined with murder during a robbery. It also found the death penalty proportional when compared with similar robbery cases, some of which featured strong mitigating evidence. That is all that is required.

### Twenty-first Ground for Relief

In his twenty-first ground for relief, Brinkley contends that his counsel were ineffective for failing to argue that the death penalty in Lucas County is applied in an arbitrary and capricious manner. The matter was raised in post-conviction relief proceedings and found to be barred by the doctrine of *res judicata* because it could have been raised on direct appeal. Apx. Vol. 10, pg. 283. For that reason, the claim is procedurally defaulted. The underlying claim will be discussed in Brinkley's twenty-fifth ground for relief where it will be found to be without merit. This claim based on the same argument is also without merit.

### Twenty-second Ground for Relief

Brinkley argues that Ohio's post-conviction relief proceedings, including its *Murnahan*/Application for Reopening Direct Appeal neither afford an adequate corrective process nor comply with due process or equal protection under the Fourteenth Amendment. The portion of this claim concerning Ohio's post-conviction relief statute, R.C. 2953.21, was presented to the Ohio

courts and is preserved for federal habeas review. (Sub-claim (a)). Apx. Vol 11, pg. 102, Vol. 12, pg.

80. The *Murnahan*/Application to Reopen Direct Appeal was not raised in the  State courts. (Sub-

claim (b)). If the Court were to consider this issue, it would find it to be without merit.

Post-conviction proceedings are civil rather than criminal proceedings. *Murray v. Giarratano,*

492 U.S. 1, 13 (1989).  A state has no obligation to provide post-conviction review. *Pennsylvania v.

Finley*, 481 U.S. 551, 557 (1987); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001), *cert. denied*,

535 U.S. 940 (2002). Therefore, challenges to a state's post-conviction procedures are not cognizable

as independent claims in habeas corpus proceedings unless state collateral review violates some

independent constitutional right, such as equal protection. *Clark v. McLemore*, 291 F. Supp.2d 535,

542 (E.D. Mich., 2003) (citing *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996), *cert.

denied*, 519 U.S. 907 (1996)).  A petition for writ of habeas corpus is not the proper method for a

criminal defendant to challenge errors or deficiencies in state post-conviction proceedings because

the claims usually address collateral matters and not the underlying conviction giving rise to the

defendant's incarceration. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). Any challenges or

amendments to the interpretation of Ohio's appellate and post-conviction remedies belongs with the

highest judicial tribunal of Ohio, not with this Court. *Keener v. Ridenour,* 594 F.2d 581, 590 (6th

Cir.1979). *See Webb,* 2006 WL 3333842 at * 31 (claims concerning errors or deficiencies in state

post-conviction proceedings address collateral matters rather than the underlying state conviction

giving rise to the prisoner's incarceration).

-120-

The same reasoning applies to the Rule 26(B) aspect of this issue. The Ohio Supreme Court has held that proceedings to reopen appeals from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel, are collateral post-conviction proceedings as are post-conviction proceedings and are not part of the direct appeal process. *Morgan v. Eads,* 104 Ohio St.3d 142 (2004).  *Also See Weeks v. Angelone,* 176 F.3d 249, 271 (4th Cir. 1999), *aff'd,* 528 U.S. 225 (2000) (page limit merely limited the manner in which Weeks could present his arguments; it did not wholly prevent him from presenting his claims); *Winburn v. Curtis*, 2000 WL 33244272, *13 (E.D.Mich., Jan, 31, 2000) (fifty-page limitation did not deprive petitioner access to the court as he could have reduced his brief without sacrificing any of his claims). Further, any relief available with respect to this issue would not relate to Brinkley's custody or sentence. This claim is without merit.

Twenty-third Ground for Relief

Brinkley argues that his death sentence is unconstitutional because, in his opinion, the trial judge relied on facts not established by the evidence and improperly considered a nonstatutory aggravating circumstance. The Respondent submits that this claim was presented to the Ohio Supreme Court and is preserved for federal habeas review.

The first, second, and third grounds for relief, which the Court found to be without merit, involved sufficiency of the evidence. This claim appears to concern the same issues in regard to the

-121-

judge's opinion. The Ohio Supreme Court rejected this claim as follows:

> In proposition of law XX, Brinkley complains that the trial court's sentencing opinion was fatally flawed because the trial court "[made] up facts not in evidence" and improperly considered a nonstatutory aggravating circumstance.
> First, we reject Brinkley's assertion that the trial court made up evidence by finding that Brinkley killed Smith in order to rob her. The evidence proves that Brinkley did exactly that. On January 7, Brinkley killed Smith, stole her coat, and attempted 16 times to access her bank account through her ATM card.
> Second, the trial court did not, contrary to Brinkley's assertion, rely upon on a nonstatutory aggravating circumstance, namely, prior calculation and design. Count 3, charging the aggravated murder of Smith, included prior calculation and design as an essential element of the offense charged. The jury found Brinkley guilty of that charge. Thus, that element was part of the nature and circumstances of the crime. The trial court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.
> Moreover, the trial court must examine the nature and circumstances of the offense to determine whether they are mitigating. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311. Finally, when a court correctly identifies the aggravating circumstance, "that court is presumed to rely only on that circumstance, and not on nonstatutory aggravating circumstances." *State v. Hill,* 73 Ohio St.3d at 441, 653 N.E.2d 271; see, also, *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376.

*State v. Brinkley,* 105 Ohio St.3d at 254-255.

As to the court's alleged improper consideration of prior calculation and design as an aggravating circumstance, examination of the opinion shows that the specification was not an aspect of his decision. He reiterated the wording of the indictment which included the term prior calculation and design when explaining the conviction. He did not rely on it. Also, as previously stated, the jury could not have found him guilty of prior calculation and design since it was not included in the jury

-122-

charge. The term is not found elsewhere in the court's opinion. The Court finds that the decision of the Ohio Supreme Court was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Twenty-fourth Ground for Relief

In his twenty-fourth ground for relief, Brinkley asserts that he was denied due process because of the Ohio Supreme Court's failure to consider the proportionality of his death sentence and to conduct a meaningful analysis of its appropriateness. The court allegedly did not give effect to mitigation evidence and improperly considered evidence to be aggravating circumstances. Specifically, the court failed to properly review whether death was an appropriate sentence for Brinkley, failed to fully explain its reasons for affirming a death sentence and failed to fulfill the obligation to meaningfully review the proportionality of Brinkley's death sentence. The Respondent agrees that this claim was preserved for federal habeas review, it having been presented to the Ohio Supreme Court.

The Ohio Supreme Court sufficiently evaluated Brinkley's mitigation evidence and sentence in accordance with Ohio law. *State v. Brinkley*, 105 Ohio St.3d at 258-59. Issues relating to aggravating circumstances and proportionality were discussed by this Court in grounds for relief one, two, three, and twenty and found to be without merit. Brinkley faults the Ohio Supreme Court for failing to consider in its proportionality review cases in which the death penalty was sought and not

obtained. The Sixth Circuit has held that, in "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed." *Williams,* 380 F.3d at 962 -963(quoting *Buell*, 274 F.3d at 369*; see also Wickline,* 319 F.3d at 824-25; *Coleman,* 268 F.3d at 453. The Court finds that the decision of the Ohio Supreme Court was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Twenty-fifth Ground for Relief

Brinkley contends that the death penalty is applied arbitrarily and capriciously in Lucas County. (Sub-claim (a)).This claim is related to Brinkley's twenty-first ground wherein he alleges ineffective assistance of counsel for failing to investigate and present available statistical data about the application of the death penalty in Lucas County. In this ground, Brinkley submits statistics attempting to show that the percentage of African Americans or individuals under the age of 25 receiving the death penalty is disproportionate to the number of like county residents. This sub-claim was presented to the Ohio courts during post-conviction relief proceedings. The court of appeals ruled that it was barred by the doctrine of *res judicata*. *State v. Brinkley*, 2004 WL 2384455 at * 1. Brinkley argues that procedural default does not apply because the claim relies on evidence *de hors* the record. The Court agrees. Thus, this claim has not been procedurally defaulted and is preserved for federal habeas review. In any event, it will be found to be without merit.

-124-

In *Smith v. Mitchell*, 348 F.3d 177, 211 (6th Cir. 2003), *cert. denied*, 543 U.S. 841 (2004), the court acknowledged that in 1980, the African-American population of Hamilton County was 19%. Since the death penalty law became effective on October 29, 1981, about 62% of the death penalty sentences in Hamilton County have been imposed on African-Americans. The court relied on *Coleman,* 268 F.3d at 441-42, wherein the Sixth Circuit rejected a challenge to Ohio's capital sentencing based on statistics similar to those Smith presented. In *Coleman,* the petitioner relied on a study finding a discrepancy between the Ohio representation in the Ohio population generally (9%), and on death row (49%). That court held that "[a]lthough the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court in *McCleskey* as insufficient to 'demonstrate a constitutionally significant risk of racial bias affecting the ... capital sentencing process.' "*Id.* (quoting *McCleskey v. Kemp*, 481 U. S. 279, 313 (1987). The Court finds no merit as to this sub-claim.

Further, Brinkley argues that the uncontrolled discretion afforded the Lucas County prosecutors in determining when to seek the death penalty compounds the problem. (Sub-claim (b)). This issue, brought in post-conviction relief, was barred by the doctrine of *res judicata* and is procedurally defaulted. The Supreme Court in *McCleskey*, 481 U.S. at 297, stated: "[b]ecause discretion is essential to the criminal process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Brinkley must show that the prosecution in his case acted with a discriminatory purpose. *Id.* 481 U.S. at 292; *Coleman*, 268 F.3d at 441-42; *Wiles v.*

*Bagley*, 2005 WL 1181859 * 43. (N.D. Ohio, May 18, 2005), *aff'd*, 561 F.3d 636 (6th Cir. 2009), *cert. denied*, 131 S.Ct. 1042 (2011). Further, in order to establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.  *United States v. Armstrong*, 517 U.S. 456, 465 (1996). The Court finds that Brinkley has not shown any discriminatory purpose on the part of the Lucas County prosecutor.

Based on the above discussion, as well as *Pinholster*, the Court finds that discovery, as requested by Brinkley, is unnecessary. This claim is without merit.

Twenty-sixth Ground for Relief

Brinkey raises numerous reasons why Ohio's death penalty scheme is unconstitutional. The Respondent agrees that all except one have been presented to the State court and are therefore, with that one exception, preserved for federal habeas review. The State court found that Brinkley's international law challenge, in addition to lacking merit, was not raised at trial. That sub-claim is procedurally defaulted. If the court were to consider this sub-claim it would find it to be without merit. Most, if not all, of these sub-claims have already been rejected by the Sixth Circuit.

*a.      Death Penalty Applied in Arbitrary and Capricious Fashion*

In *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), the Supreme Court set forth the following capital sentencing procedures likely to prevent arbitrary and capricious imposition of the death penalty: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing

-126-

where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. Ohio's death penalty statutes contain these preventative sentencing procedures.  *Buell*, 274 F.3d at 367. *See Bryd*, 209 F.3d at 539.

b.    *Aggravating Circumstances at Guilt Phase*

        In *Coleman*,  268 F.3d at 443, the Sixth Circuit held that Ohio's scheme is consistent with *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), wherein the Supreme Court stated:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

c.    *Ohio Criminal Rule 11(C)(3) Encourages Guilty Pleas*

        Ohio Criminal Rule 11(C)(3) allows a judge, in the interest of justice, to dismiss capital specifications if the defendant pleads guilty or no contest. The specifications are not automatically dismissed.  If the judge does not dismiss the specifications, the rule requires three judges to determine if the offense was aggravated murder and, if so, they must determine the presence or absence of the specified aggravating circumstances, if any, compared to any mitigating circumstances and impose sentence accordingly. In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court held

-127-

unconstitutional a statute that automatically dismissed the capital specifications when a defendant pleaded guilty or waived a jury. The death penalty could be imposed if recommended by a jury, but the statute did not include a procedure for imposing the death penalty on a defendant who waived a jury or pled guilty. However, the Supreme Court has never decided that a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea was invalid. *Benge,* 312 F. Supp.2d at 1033-34; *Frazier v. Mitchell,* 188 F.Supp.2nd 798, 839 (N.D. Ohio, 2001), *rev'd. on other grounds,* 343 F.3d 780 (6th Cir. 2003); *Jamison*, 100 F. Supp.2d at 763. There is no *per se* rule against encouraging guilty pleas. *Benge*, 312 F. Supp.2d at 1034 (citing *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)). Under Ohio Criminal Rule 11(C)(3), a defendant who pleads guilty to an indictment containing a death penalty specification can still receive the death penalty. *Id.* The Sixth Circuit has rejected the same argument. *See Cooey v. Coyle*, 289 F.3d 882, 924-25 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

d.    *Death Penalty Scheme Does Not Require Premeditation or Deliberation*

        Ohio Revised Code Section 2903.01(E) provides that "no person shall be convicted of aggravated murder unless the person is specifically found to have intended to cause the death of another..."    The Constitution does not require a premeditated and conscious desire to kill before a death sentence can be imposed. *Tison v. Arizona*, 481 U.S. 137, 158 (1986); *Hartman*, 333 F. Supp.2d at 677. Reckless indifference is an acceptable level of culpability to impose the death penalty. *Tison*, 481 U.S. at 156.

-128-

e.     *R.C 2929.03(D)(1) Claim*

Section 2929.03(D)(1) provides in relevant part:

Copies of any reports prepared under this division shall be furnished to the court, to
the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender
or the offender's counsel for use under this division. The court, and the trial jury if the
offender was tried by a jury, shall consider any report prepared pursuant to this
division.

A defendant may request a pre-sentence investigation or mental examination. If he so requests, the

resulting reports must be provided to the court, jury and the prosecutor. The Supreme Court found

that this procedure enhances the search for the truth and does not render the proceedings unfair.

*Williams v. Florida*, 399 U.S. 78, 82 (1970); *Frazier*, 188 F. Supp.2d at 838. The Sixth Circuit has

also rejected this claim without discussion. *Cooey,* 289 F.3d at 925-26; *Byrd*, 209 F.3d at 539. In

*Keene*, 2004 WL 3325797  * 76 (S.D. Ohio, Aug. 25, 2004) and *Jamison*, 100 F. Supp.2d at 763-64,

the courts denied relief on this issue reasoning that a defendant is not required to request a pre-

sentence investigation report or a mental examination. Also, R.C. 2929.024 allows a trial court to

provide funds to an indigent defendant for investigative services, experts and other necessary services

to prepare a defense. Since an indigent defendant is not required to utilize R.C. 2929.03(D)(1), this

procedure is not unconstitutional.

f.     *Mandatory Death Penalty Statutes Lack Specific Standards to Jurors in its Exercise of its*
      *Power to Determine Who Shall Receive the Death Penalty/ R.C. 2929.04(A) is Vague*

-129-

Brinkley argues that the statutory scheme fails to establish a standard for determining the existence of mitigating factors. The record on appeal must disclose to the reviewing court the considerations which motivated the death sentence. *Gardner v. Florida*, 430 U.S. 349, 361 (1977). But there is no requirement that the trial judge or jury identify and articulate the specific factors used to arrive at the decision.  Also, R.C. 2929.03(F) compels a trial judge to make a written finding as to the existence of mitigating factors and aggravated circumstances and the reason why the aggravating circumstances outweigh the mitigating factors allowing a reviewing court to make an independent determination of the appropriateness of the sentence.  *Dickerson*, 336 F.Supp.2d at 791. *See Wiles*, 2005 WL 1181859 at * 42.

g.     *State Not Required to Prove Absence of Mitigation*

The Supreme Court rejected this argument in *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002) (overruling *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty). A death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of the evidence is a constitutionally acceptable burden shifting. *Id.* A state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional as long as a state's methods of allocating the burdens of proof does not lessen the state's burden to prove every element of the offense charged, or to prove the existence of aggravating circumstances. *Id*. at 649-51. A defendants' constitutional rights are not violated by placing on him

the burden of proving mitigating circumstances sufficiently substantial to call for leniency. The state still has the burden to show the existence of aggravating circumstances that outweigh the existence of any mitigating factors. *Eley v. Bagley,* 2006 WL 2990520 * 37 (N.D. Ohio, Oct. 18, 2006), *aff'd.*, 604 F.3d 958 (6th Cir. 2010), *cert. denied*, 131 S.Ct. 822 (2010);  *Wiles*, 2005 WL 1181859 at * 43; *Madrigal v. Bagley*, 276 F. Supp.2d 744, 780 (N.D. Ohio 2003), *aff'd.*, 413 F.3d 548 (6th Cir. 2005).

h.      *Preponderance of Evidence in Mitigation Phase*

In *Walton*, 497 U.S. at 649-51, the Supreme Court wrote:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Id*. 497 U.S. at 650. The prosecution must prove beyond a reasonable doubt that any aggravating circumstances outweigh any mitigating factors. In addition, Ohio allows capital defendants "great latitude" in presenting mitigating evidence. *See* Ohio Rev.Code 2929.03(D)(1). *Jamieson.* 100 F. Supp.2d at 764-65. Further, in *Buchanan*, 522 U.S. at 275-76, the Supreme Court held that the Eighth Amendment does not require the jury be instructed on the concept of mitigating evidence or on particular statutory mitigating factors, and that states are free to structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it. *Smith,* 348 F.3d at 214.

i.      *No Consideration of Sympathy or Mercy*

-131-

There is no anti-mercy requirement in the Ohio statutes. *Brown,* 479 U.S. at 541. A jury may

consider mercy but Ohio law does not mandate that a trial court give a mercy instruction. *Mapes*, 171

F.3d at 415-16; *Hartman*, 333 F. Supp.2d at 677.

j.      *Residual Doubt Irrelevant*

Residual doubt is not a mitigating factor under Ohio law. *Coleman,* 268 F.3d at 447. "It is

irrelevant to the issue of whether the defendant should be sentenced to death." *State v. McGuire,* 80

Ohio St.3d 390, 686 N.E.2d 1112, 1123 (1997).

k.      *Bifurcated Trial Denies Impartial Jury and Effective Assistance of Counsel*

Death penalty statutes should be drafted in a manner that ensures that the sentencing authority

is given adequate information and guidance. This is best accomplished by a system that provides for

a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to

the imposition of sentence and is provided with standards to guide its use of the information. *Gregg,*

428 U.S. at 195.

Although two hearings are required, there is no requirement that the same jury sit for both

hearings. *Lockhart v. McCree*, 476 U.S. 162, 174-77 (1986). The Supreme Court has upheld against

constitutional attack the Georgia capital sentencing plan which provided that the same jury must sit

in both phases of a bifurcated capital murder trial. *Id*. at 179-80. The Supreme Court stated that it is

"unwilling to say that there is any one right way for a State to set up its capital sentencing scheme."

-132-

*Spaziano v. Florida*, 468 U.S. 447, 464 (1984). *See Hartman,* 333 F. Supp.2d at 675. In fact, the Court in *Lockhart* noted that a defendant may even benefit at the sentencing phase from any "residual doubts" that the jury might have had during the guilt phase, and the evidence in both trials would be repetitive which might not be consistently fair to the State and perhaps not even to the accused. *Lockhart*, 476 U.S. at 180-81.

l.      *Additional Data Required to Make Adequate Comparison*

Only one type of proportionality review is required - that in which the court makes sure that the sentence is proportional to the nature of the offense. *Pulley v. Harris,* 465 U.S. 37 (1984). Courts are not required to exercise another type of proportionality review, *i.e.,* comparing the sentence given in any particular case to the sentences given in other cases. *Cooey*, 289 F.3d at 928.

m.      *No Option to Choose Life Sentence When There Are Only Aggravating Circumstances*

Apparently Brinkley is arguing that the Ohio statute is unconstitutional because it forbids the sentencer to return a life sentence unless the aggravating circumstances fail to outweigh the mitigating factors. This argument was rejected in *Buell*, 274 F.3d at 368. The sentencer is required to have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of the death penalty. *Sumner v. Shuman*, 483 U.S. 66, 72 (1987); *Buell*, 274 F.3d at 368. Further, the Supreme Court held that the death penalty is constitutional if it is imposed only after a determination that the aggravating circumstances outweigh the mitigating

-133-

circumstances present in the particlar case, or there is no mitigating circumstances. *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990).  *Buell* held that Ohio's death penalty statute complies with both *Sumner* and *Blystone. Id*. 274 F.3d at 368; *Williams,* 380 F.3d at 964-65*; Benge*, 312 F.3d at 1034-35*; Hartman*, 333 F. Supp.2d at 676-77.

n.      *Jury Must Find That Death is the Only Appropriate Remedy*

In order to be considered constitutional, a capital sentencing scheme must "generally narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield*, 484 U.S. at 244; *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Jackson v. Anderson*, 141 F. Supp.2d 811, 849 (N. D. Ohio, 2001). In Ohio, the jury must find at least one aggravating circumstance before the death penalty may be imposed. *Gregg*, 428 U.S. at 162-164. By satisfying this requirement, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Zant*, 462 U.S. at 878; *Jackson*, 141 F. Supp.2d at 849. The narrowing function can be performed by the jury at either the sentencing phase or guilt phase of the trial. *Lowenfield*, 484 U.S. at 245; *Jamison*, 100 F. Supp.2d at 762. Unless the aggravating circumstance is vague or otherwise impedes the requirement that sentencing determinations be individualized, a state can select any substantive criteria it wants to decide who is eligible for the death penalty. *California v. Ramos*, 463 U.S. 992, 1001 (1983).

-134-

o.      *Inadequate Appellate Review*

After the sentencer has found that a defendant convicted of aggravated murder is eligible for the death penalty because one or more aggravating circumstances have been found beyond a reasonable doubt, a separate review of whether the aggravating circumstances outweigh the mitigating factors is conducted to determine the appropriateness of the death penalty. *Buell,* 274 F.3d at 368. The Ohio Supreme Court is required to review the trial court's decision and also independently determine whether the sentence is proportionate, non-excessive and appropriate in accordance with the aggravating circumstances and mitigating factors. This requirement gives the sentencing authority sufficient information to enable it to consider the character and individual circumstances of the defendant. The court in *Buell,* 274 F.3d at 368-69, found that this procedure sufficiently discerns who deserves the death penalty. *Benge*, 312 F.Supp.2d at 1035-36; *Jamison*, 100 F. Supp.2d at 765-66.

p.      *Neither a Three Judge Panel nor a jury Have to Identify Mitigating Factors When recommending a Life Sentence*

q.      *No Standardized Method of Comparison*

The record on appeal must disclose to the reviewing court the considerations which motivated the death sentence. *Gardner* 430 U.S. at 361. Ohio law does not require that a jury or three-judge panel which recommends life imprisonment, rather than death, to identify the mitigating factors which underlie the recommendation. There is no such constitutional mandate. Further, Ohio Revised Code 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating

-135-

factors and aggravating circumstances and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an independent determination of sentence appropriateness. *Dickerson,* 336 F.Supp.2d at 794.

r.      *Proportionality Review*

This claim has been found to be without merit in Brinkley's twentieth claim for relief.

s.      *Cruel and Unusual Punishment-Societal Interests Not Served*

In *Gregg*, 428 U.S. at 179, the Supreme Court rejected the argument that the death penalty is cruel and unusual punishment. The most marked indication of society's endorsement of the death penalty for murder is the legislative response to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). Since *Furman*, the legislatures of at least 35 states have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person. The Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death. These statutes have attempted to address the concerns expressed by the Court in *Furman* primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes. But all of the post-*Furman* statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people. *Gregg*,  428 U.S. at 179-81. Ohio's death penalty statutes satisfy the concerns identified in *Furman*.

t.      *No Compelling Interest*

The Court in *Gregg* rejected this argument, finding that the death penalty serves compelling state interests and is not "invariably disproportionate to the crime" of murder. *Gregg*, 428 U.S. at 183, 187; *Williams,* 380 F.3d at 966; *Greer*, 264 F.3d at 690; *Madrigal*, 276 F.Supp.2d at 809.

u.      *Ohio Statutes Violate International Law*

There is no indication that international law influences rulings under the federal constitution regarding the death penalty. In *Jamison*, 100 F. Supp.2d at 766-67, the court also considered organizations mentioned by Brinkley in determining that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme. Since about 90 countries still maintain the death penalty, no international law exists that supports the prohibition of the death penalty. *Id*. The countries that have abolished the death penalty have done so for moral, political or other reasons than out of a sense of legal obligation. *Buell*, 274 F.3d at 373. Abolition of the death penalty is not a customary norm of international law. *Id.* Any reaction by the United States to a violation of law is a domestic question belonging to the executive or legislative branches.

Twenty-seventh Ground for Relief

In his Twenty-Seventh Ground for Relief, Brinkley argues that the death penalty as administered by lethal injection constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments "because the State of Ohio is incapable of insuring that it can

-137-

professionally carry out executions without unnecessarily inflicting torture and pain." (Doc. 15-1 at ¶ 379). He further argues that the use of lethal injection violates the Due Process clause of the Fifth Amendment, as well as the Due Process and Equal Protection clauses of the Fourteenth Amendment. He asserts that this claim is "a general challenge to lethal injection by all methods and all means" and is, thus, properly brought in habeas. (Doc. 53 at ¶ 320).

Brinkley raised this claim in his petition for post-conviction relief. (Apx. Vol 9 at 46). The state trial court denied it on the grounds that (1) the Ohio Supreme Court had repeatedly upheld the constitutionality of the death penalty, and (2) Brinkley had raised this same issue on his direct appeal, which was still pending. (Apx. Vol. 10 at 283-84). Brinkley appealed the trial court's resolution of this claim, arguing that it could not be fully litigated without evidence outside the record. (Apx. Vol. 11 at 100-101). The state appellate court rejected Brinkley's claim, finding that it was duplicative of the claim he had raised on direct appeal and, therefore, barred by the doctrine of *res judicata*. *See State v. Brinkley*, 2004 WL 2384455 at *1 (6th Dist. Ct. App. Ohio, Oct. 22, 2004).

It is unclear whether Brinkley's post-conviction lethal injection claim is, in fact, duplicative of his direct appeal claim. Brinkley did raise a method of execution claim on direct appeal, but mistakenly raised it in the context of electrocution rather than lethal injection.[11] (Apx. Vol. 5 at 147).

---

[11]  The State of Ohio eliminated electrocution as a means of administering the death penalty in November 2001, leaving lethal injection as the only method of execution in Ohio at the time of Brinkley's direct appeal.

The Ohio Supreme Court summarily dismissed this claim.  It is unclear whether that court construed Brinkley's claim as a lethal injection claim and dismissed it on the merits or, alternatively, rejected it as moot since electrocution was no longer in use at the time.  *See State v. Brinkley*, 105 Ohio St.3d 231, 256 (2005).

Respondent maintains that this claim is procedurally defaulted because the Ohio post-conviction courts rejected it on the basis of *res judicata*.  Brinkley argues at length that the Ohio post-conviction courts improperly applied the doctrine of *res judicata* under the unique procedural circumstances of this case.  He maintains that this claim, therefore, is not procedurally defaulted and should be considered on the merits. (Doc. 53 at ¶ 320, referencing and incorporating ¶¶ 94-118).  Even if it were to consider this claim on the merits, however, the Court would find this claim to be without merit for the reasons set forth below.[12]

Ohio Revised Code Section 2949.22 provides:

A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death.  The application of the drug or combination of drugs shall be continued until the person is dead.  The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the

---

[12]    Because the Court will consider this claim on the merits, it need not address the various arguments Brinkley raises in his Traverse regarding whether the state appellate court properly applied the doctrine of *res judicata* to forestall review of his lethal injection claim.

death sentence is executed.

The Sixth Circuit recently ruled that a death row inmate's challenge to Ohio's method of execution under the above statute was cognizable on habeas review where the challenge, if successful, could render his death sentence invalid.  *See Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011).   In the instant case, Brinkley has made it clear that he is challenging Ohio's execution protocol as a general matter, stating that it is a challenge to lethal injection, "by all methods and all means."  (Doc. 53 at ¶ 320).  Accordingly, the Court finds that Brinkley's lethal injection claim is clearly cognizable in habeas.[13]

_____

[13]     The Court notes that Brinkley has raised a separate challenge to Ohio's specific lethal injection protocol under 42 U.S.C. § 1983.  In September 2007, Brinkley was granted leave to intervene in a consolidated § 1983 action filed in the Southern District of Ohio by death row inmates challenging various aspects of Ohio's lethal injection protocol.  *See Cooey v. Kasich, et al.*, Case No. 2:04-CV-1156 (S.D. Ohio) (ECF 227). In July 2011, that court issued an Opinion granting plaintiff Kenneth Smith's motion for a preliminary injunction, and staying his execution until further order of the court. The court ruled that Smith had demonstrated that he was likely to succeed on the merits of his claim that Ohio's lethal injection protocol is unconstitutional, in light of evidence that Ohio was deviating from its execution policy in a number of fundamental respects.  *Cooey v. Kasich*, 2011 WL 2681193 at * 21-26 (S.D. Ohio July 8, 2011).  Defendants in that case subsequently revised Ohio's execution protocol to address the court's concerns and issued a new execution protocol effective September 18, 2011.  On November 4, 2011, the court denied plaintiff Reginald Brooks' motion for preliminary injunction, finding that "the State of Ohio has apparently learned the lessons of its prior embarrassments and corrected its course." *Cooey v. Kasich*, Case No. 2:04CV1156 (S.D. Ohio) (ECF 1046 at 2).  For purposes of this Court's habeas review of Brinkely's lethal injection claim under the AEDPA, however, *Baze v. Rees*, 553 U.S. 35 (2008) and *Cooey v. Strickland*, 589 F.3d 210 (6th Cir.

The Supreme Court has long held the death penalty to be constitutional.  *Gregg v. Georgia*, 428 U.S. 153, 177 (1976).  In *Baze v. Rees*, 553 U.S. 35 (2008), that Court examined Kentucky's three-drug lethal injection protocol (which was similar to Ohio's protocol at the time) and found that it did not violate the Eighth Amendment's prohibition against cruel and unusual punishment.  In so finding, the Court declared that "the Constitution does not demand the avoidance of all risk of pain in carrying out executions" since "[s]ome risk of pain is inherent in any method of execution– no matter how humane– if only from the prospect of error in following the required procedure."  *Id*. at 47.  Indeed, the Court noted that it has never invalidated a State's method of execution as the infliction of cruel and unusual punishment. *Id* at 48.  It did, however, point out its objections in the past to "the deliberate infliction of pain for the sake of pain," such as punishments that "involve torture or a lingering death."  *Id*. at 49.  Thus, the Court found that, in order to constitute cruel and unusual punishment, an execution method must present a "substantial" or "objectively intolerable" risk of serious harm.  *Id*. at 61-62.  After reviewing Kentucky's lethal injection protocol, the Court found that it did not meet that standard.

A year after *Baze* was decided, Ohio adopted a single-drug lethal injection protocol, with a

_____

2009), which follows *Baze*, remain the controlling, "clearly established federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  *See Lynch v. Hudson*, 2011 WL 4537890 at * 132 (S.D. Ohio, Sept. 28, 2011) (finding *Baze* and *Cooey* to be controlling precedent in considering habeas challenge to Ohio's lethal injection protocol); *Frazier v. Bobby*, 2011 WL 5086443 at * 58, fn 22 (N.D. Ohio, Oct. 25, 2011) (same).

back-up method for intramuscular injection should vascular access be problematic.  This protocol was designed to provide a more humane alternative to the risk of pain arising from the use of the three-drug regimen previously used in Ohio and at issue in *Baze*.  In *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009), the Sixth Circuit considered numerous objections to this new protocol, including "the undue risk of improper implementation of Ohio's protocol, leading to severe pain," "the employment of untrained and insufficiently competent medical personnel," and "the lack of supervision of the execution process by a licensed physician."  *Id*. at 223.  Relying on *Baze*, the court held that Ohio's new protocol (including both the use of a one-drug protocol and the back-up injection method) did not violate the Eighth Amendment. *Id*. at 223-24.  It stated that "[p]ermitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of judicial authority."  *Id*. at 225.

In addition, the court held that Ohio's statute providing the method of execution, Ohio Rev. Code. § 2949.22, did not create a liberty and property interest in a quick and painless execution protected by the Due Process Clause.  *Id.* at 234.   Finally, the court noted that, since *Baze*, every federal court of appeals that has addressed challenges to various states' lethal injection protocols has rejected them.  *Id*. at 221.

In light of the above, this Court finds that the Ohio courts' rejection of Brinkley's lethal injection claim was neither contrary to, nor an unreasonable application of, clearly established

-142-

federal law.[14]  Brinkley's Twenty-Seventh Ground for Relief is without merit.

Twenty-eighth Ground for Relief

In his twenty-eighth and final ground for relief, Brinkley argues that his conviction and

death sentence are unconstitutional because of the cumulative effect of the many errors that

occurred during his trial and in all subsequent proceedings. This claim was raised in the Ohio

Supreme Court and rejected. Those claims before that court are preserved for federal habeas

review. Brinkley presented it again in his post-conviction proceedings wherein it was rejected on

the basis of *res judicata*. Any issues brought in post-conviction proceedings not raised in the Ohio

Supreme Court are procedurally defaulted.

The Sixth Circuit in *Lorraine v. Coyle*, 291 F.3d 416, 418 (6th  Cir. 2002) *cert. denied*,

538 U.S. 1069 (2003), noted that the Supreme Court has not held that distinct constitutional

claims can be cumulated to grant habeas relief.[15] Because Brinkley must prove that the judgment

of the Ohio courts is contrary to a United States Supreme Court decision, he cannot succeed on

---

[14]     This is so regardless of whether the Court examines the Ohio Supreme Court's
summary dismissal of Brinkley's method of execution claim, or the state appellate
court decision affirming the trial court's rejection of the claim on both the merits
and *res judicata* grounds.

[15]      The court acknowledges that, in a later case, the Sixth Circuit
granted habeas relief on cumulative error grounds.  *DePew v.
Anderson*, 311 F.3d 742, 751 (6th Cir. 2002).  Because the *DePew*
petitioner had filed his petition prior to the AEDPA's effective
date, however, the AEDPA provisions did not apply. *Id*. at 748.

this claim. *Scott,* 302 F.3d at 607. The Sixth Circuit ruled in *Moore v. Parker*, 425 F.3d 250, 256

(6th Cir. 2005), *cert. denied*, 549 U.S. 1027 (2006), that even constitutional errors that would not

individually support habeas relief cannot be cumulated to support habeas relief. *Williams*, 460

F.3d at 816 (the law of this Circuit is that cumulative error claims are not cognizable on habeas

because the Supreme Court has not spoken on this issue).

### VII. Certificate of Appealability Analysis

The Court now must determine whether to grant a Certificate of Appealability ("COA")

for any of Brinkley's  claims. The Sixth Circuit Court of Appeals has determined that neither a

blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a

capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability,

which ideally should separate the constitutional claims that merit the close attention of counsel

and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484,

487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for

certificate of appealability for district court's analysis of claims). Thus, in concluding this

Opinion, this Court now must consider whether to grant a COA as to any of the claims Brinkley

presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may

not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the
> detention complained of arises out of process issued by a State
> court . . .

(2) A certificate of appealability may issue under paragraph (1) only if the
applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole

difference between the pre-AEDPA and post-AEDPA statutes is that the petitioner must now

demonstrate he was denied a constitutional right, rather than the federal right that was required

prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the

pre-AEDPA and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).

In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v.*

*Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in

the statute. *Id.* at 483. Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial
> showing of the denial of a constitutional right, a demonstration that, under
> *Barefoot*, includes showing that reasonable jurists could debate whether (or, for
> that matter, agree that) the petition should have been resolved in a
> different          manner or that the issues presented were "'adequate to deserve
> encouragement to    proceed further.'"

-145-

*Id.* at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

After taking the above standard into consideration, the Court finds as follows.

The Court will not issue a COA for claims 10(m), (n), 11(b), (c), (d), 16(e), 21, 25(b) and 27.  The Court of Common Pleas of Lucas County found that these claims had been raised on direct appeal and barred them on grounds of *res judicata*. Accordingly, they are unequivocally procedurally defaulted.

Equally undisputed is the defaulted status of claims 16(l) and (m). Brinkley first raised these claims in his application to reopen the direct appeal as ineffective assistance of appellate

-146-

counsel claims.  Because he raises them as distinct grounds for relief here, the defaulted status of these claims is not debatable.  *Lorraine* 291 F.3d at 425.  Thus, the Court will not issue a COA for these claims.

The Court will not issue a COA for claims 10(c), (d), (e), (p), 11(e), (f), (g), (h) and 18(b) since they were not raised under the same theory as presented to the State.  Therefore, they are procedurally defaulted.  Accordingly, they are unequivocally procedurally defaulted.

The Court will not issue a COA for claims 10(a), (b), (g), (o), 12(c), (d), (e), (f), (g), 13(c), 14(d), 18(a), 22(b) and 26(u). These claims were never raised at any point in Mack's appeals and are unexhausted. Accordingly, they are unequivocally procedurally defaulted.

The Court will not issue a COA for claims 10(k), 13(b), 14(a), (c) and 17 since counsel failed to object. Therefore, they are procedurally defaulted.

No COA will issue for ground 1 (insufficient evidence to support Brinkley's conviction of the aggravated circumstance under R.C. 2929.04(A)(3)). This Court agreed with the Ohio Supreme Court's reasoning that the jury could reasonably conclude that Brinkley fled Toledo to avoid a trial and punishment for the robbery of the diner, and that his conduct in this regard was connected to Smith's murder. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to Brinkley's second ground for relief (sufficiency of the evidence with respect to the aggravating circumstance set forth in

-147-

R.C. 2929.04(A)(7)). The aggravated circumstance was satisfied by Brinkley taking the ATM card, irrespective of whether he was ultimately successful in withdrawing funds from Smith's bank account using her ATM card. A COA will not be issued for this claim.

No COA will issue for ground 3 (insufficient evidence to support Brinkley's conviction for aggravated murder).  Circumstantial evidence is sufficient to convict a defendant. Scientific evidence was present in the form of Brinkley's fingerprint and shoeprint. The shoeprint was not given great weight. It was only one of seven pieces of evidence pointed out by the Ohio Supreme Court. No reasonable jurist would disagree with this Court's finding.

No COA will issue for ground 4 (prosecutor improperly and in bad faith brought an indictment joining the City Diner robbery and the homicide of the victim).   Brinkley's conduct after the robbery, i,e, failing to appear in court, Smith's personal liability for his bail and the fact that she knew he was fleeing to Chicago, and Brinkley's stealing Smith's coat and ATM card show that the City Diner robbery and the aggravated murder and robbery of Smith were related. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to Brinkley's fifth ground for relief  (oral statements made to police were obtained in violation of Brinkley's rights under *Miranda*). The facts set forth above show that there was no coercion by law enforcement officers. A COA will not be issued for this claim.

-148-

No reasonable jurist would debate this Court's conclusion as to Brinkley's sixth ground for relief (Brinkley alleges that he was denied his right to an impartial jury because a prospective juror who expressed reservations about the death penalty was excused for cause). The trial judge's questions clarified the prospective juror's answers to *voir dire* questions, and the juror finally stated she could never impose the death penalty. She clearly stated her partiality. A COA will not issue for this claim.

No reasonable jurist would debate this Court's conclusion pertaining to ground for relief 7 (unconstitutional deprivation of right to be present at every critical stage of trial). Brinkley was present at the critical stages of his trial. The court was aware of his right to be present, and at the times complained of, Brinkley was actually present, asked to go back to his cell, or his presence was not needed. A COA will not issue for this claim.

No COA will issue for ground 8 (trial court wrongfully limited the cross-examination of a State's witness). At trial, Brinkley's counsel wanted to cross-examine the witness to suggest that Miller had received a deal and a favorable sentence in 2000 because he informed on Brinkley and/or that he informed on Brinkley in expectation of such a deal and favorable sentence regardless of whether the sentence was in fact related to his cooperation. The witness was sentenced well before Brinkley's trial and his prosecutor knew nothing about his conversation with police about Brinkley's case. Brinkley did not show the existence of a tacit agreement between the State and the witness.

-149-

No reasonable jurist would disagree with this Court's finding.

No COA will issue for ground 9 (reasonable doubt instruction given to the jury was constitutionally defective). The reasonable doubt instruction given to the jury was Ohio's statutory definition of reasonable doubt. The Sixth Circuit has ruled that Ohio's definition of reasonable doubt does not violate due process.  No reasonable jurist would disagree with this Court's finding.

No COA will issue for ground 10(f) (failing to object to the prosecutor's misstatement of law during *voir dire* in which the burden of proof for aggravating circumstances was shifted to Brinkley).

The comment did not constitute a shifting of the burden.  No reasonable jurist would disagree with this Court's finding.

The Court will not issue a COA for ground 10(h) (failing to investigate, develop and explore the dubious scientific validity of the shoe print analysis that was relied upon by the State and its alleged expert).  Brinkley's counsel made several key points: that the expert could not discern the size of the shoe from the partial prints; that an unknown number of Nike shoes had been sold; and that Brinkley's shoe, while consistent with the print, may not have actually made the shoe impression. Brinkley has not shown that the result of the trial would have been different had his counsel challenged the government's shoeprint evidence and testimony. No reasonable jurist would dispute this Court's finding.

The Court will not issue a COA for ground 10(i) (failing to conduct a meaningful cross-examination of the State's alleged "expert" on fingerprint analysis). Brinkley's counsel made some beneficial points during cross-examination of the fingerprint expert. Since there was other evidence connecting Brinkley to the murder, he was not prejudiced by counsels' performance. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to ground 10(j) (failing to conduct a meaningful challenge to the testimony of witnesses who claimed to be able to identify Brinkley's handwriting). Counsel had no reason to cross-examine the detective or Smith's landlord about Brinkley's handwriting exemplar. The landlord believed the note was written by Brinkley because he had received other notes in the same handwriting, but he did not identify who wrote them. He never testified that he knew Brinkley's handwriting. No COA will issue for this claim.

The Court will not issue a COA for ground 10(l) (failing to ensure that all proceedings in the case were conducted on the record and with Brinkley present). The Court denied the underlying claim in Brinkley's seventh claim for relief.  No reasonable jurist would disagree with this Court's finding.

The Court will not issue a COA for ground 10(p) (willingness to permit the jury to hear the 911 tape notifying police of the discovery of Shantae Smith's dead body).  The identity of the

-151-

person who called 911 was unimportant.  It was unlikely that Brinkley was convicted because Smith's body was covered in blood. Any danger of unfair prejudice was minimal. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to ground 10(q) (ineffective as to counsel's statements in the defense closing argument that only served to advance the State's interest in obtaining a conviction). The Court found nothing inappropriate in counsel's reference to that fact that Brinkley fled. Counsel clarified his earlier statement limiting his remark to the City Diner robbery. No COA will issue for this claim.

No reasonable jurist would debate this Court's conclusion as to ground 10 (r) (failing to object to the prosecutor's comment in closing argument that Brinkley had attempted an alibi). The underlying claim was discussed in Brinkley's  sixteenth claim for relief where it was be found to be without merit. No COA will issue for this claim

The Court will not issue a COA for ground 10(s) (trial counsel were ineffective in that they failed to preserve for appellate review a number of meritorious issues). In (a) (counsels' failure to rehabilitate), review of the transcript showed that counsels' performance as to Juror Number 16 was adequate.  In (e) (ineffective assistance of counsel for failing to raise issues that were later found to be waived by the State court), this Court rejected this claim because Brinkley did not name the specific issues. The sub-claims raised in letters b, c, and d were addressed in other free

standing claims, i.e., the sixteenth, and twenty-sixth claims for relief, where they were found to be without merit. No reasonable jurist would disagree with this Court's finding.

The Court grants a COA for ground 11(a) (ineffective assistance of counsel for failing to conduct a thorough pre-mitigation investigation). Counsel did prepare for mitigation before the trial started. Counsel went to Chicago to meet with Brinkley's family. Brinkley's sister, mother and three aunts briefly testified during mitigation about his life growing up and about certain incidents that could have effected his personality. However, counsel did not find out about Brinkley's alcohol and drug abuse. A jurist of reason could conclude that if a psychologist and psychiatrist were hired for mitigation purposes to provide this information and counsel would not have made a strategic decision to use only family members because of a criminal conviction, at least one juror would not have voted for the death penalty. Accordingly, a COA will issue for this claim.

No reasonable jurist would debate this Court's conclusion as to grounds 12(a) and (b) (prosecutorial misconduct in numerous respects throughout both phases of the trial) because the underlying claims have been discussed in other grounds for relief and found to be without merit. No COA will issue for these claims.

The Court will not issue a COA for ground 13(a) (erroneous jury instructions in the penalty phase of the trial as to the instruction concerning sympathy and mercy) because there is no anti-

mercy requirement in the Ohio statutes, and Ohio law does not mandate that a trial court give a mercy instruction. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to ground 14(b) (scope of Pettaway testimony regarding Smith's alleged fear of Brinkley). Brinkley did not show the existence of a federal constitutional violation. Pettaway's testimony never related to Smith's reasons for fearing Brinkley. Smith may not have wanted to invite Pettaway into her home after arriving at her residence because it could have been awkward to have the two men together, one an ex-boyfriend and the other the current boyfriend. Pettaway did not tell the jury that Smith was afraid of Brinkley. Further, defense counsel's objection was sustained.   No COA will issue for this claim.

The Court will not issue a COA for ground 15 (judge's *ex parte* meeting with the jurors after their sentencing recommendation but before he imposed sentence deprived Brinkley of his constitutional rights) because the jurors' duty had been completed when the judge and jury met. There was no way the outcome of the trial was effected.  Brinkley did not indicate how this meeting impaired the judge's ability to independently determine the appropriateness of the death penalty. No reasonable jurist would disagree with this Court's finding.

No COA will issue for grounds 16(a) (prosecutor acted in bad faith when he sought the indictment for the (A)(3) death specification),  (b) ( prosecutor acted improperly when he

-154-

presented false material evidence through the trial testimony of State witness, Samuel Miller, (c) (prosecutor  acted improperly concerning the testimony of Lamont Pettaway, (d) (trial court had ruled that the State could elicit testimony that the victim was fearful of Brinkley but could not say why she was fearful). In spite of this order, the prosecutor elicited  the prohibited answer).  These sub-claims were discussed in connection with other free-standing claims and found to be without merit.  No reasonable jurist would disagree with this Court's findings.

No reasonable jurist would debate this Court's conclusion as to ground 16(f) (during closing argument in the first phase of the trial, the State improperly argued that Brinkley attempted an alibi which implied an obligation on Brinkley's part to present evidence) because the prosecutor's comment concerning the false note written to mislead the landlord was a reasonable inference on the evidence, the prosecution never expressly said that Brinkley had an obligation to present evidence and the jury was told by the court that the burden of proof was solely upon the prosecution. A COA will not be issued for this sub-claim.

No reasonable jurist would debate ths Court's conclusion as to ground for relief 16(g) (prosecutor specifically addressed Brinkley's unwillingness to speak to the FBI after having been read his *Miranda* rights). Brinkley waived his *Miranda* rights and did answer some questions. When asked about the bank card, he had no comment. A defendant who has been properly advised of his rights and answers some questions does not invoke his right to remain silent. A COA will not be issued for this sub-claim.

-155-

No reasonable jurist would debate ths Court's conclusion as to ground for relief 16(h) (during the opening comments of the mitigation phase, the prosecutor misstated the definition of mitigating factor). Although the prosecutor's statement was erroneous, the court correctly instructed the jury. No constitutional error occurred. A COA will not be issued for this sub-claim.

The Court will not issue a COA for Brinkley's ground for relief 16(i) (during closing arguments, the prosecutor told the jury not to be swayed by the tears of Brinkley's family and improperly put the grief/victim impact before the jury).  There is no *per se* bar to the introduction of victim impact evidence and argument. Ohio permits, with some limitations, victim impact testimony during capital sentencing proceedings. No reasonable jurist would disagree with this Court's finding.

A COA will not issue for ground for relief 16(j) (prosecutor argued that the jury must first reject the death sentence before it could consider a life sentence giving the jury an improper "acquit first" instruction). The judge gave the correct jury instruction so the jury should have understood that they were not to find acquittal first before determining whether to impose a life sentence. No reasonable jurist would disagree with this Court's finding.

The Court will not issue a COA for Brinkley's ground for relief 16(k) (prosecutor improperly argued for death because of the pain that Brinkley caused the victim's family). Mention of the personal situation of the victim's family, without more, doe not constitute misconduct. No

-156-

reasonable jurist would disagree with this Court's finding.

The Court will not issue a COA for ground 18(a) (State unconstitutionally withheld exculpatory and/or impeachment evidence concerning the testimony of Lamont Pettaway). Brinkley argued that the prosecution had an obligation to provide defense counsel with Pettaway's criminal record of convictions in the Toledo Municipal Court which could have been accomplished by searching the municipal court records. The *Brady* rule does not apply where evidence was available to defendant from other sources than the State, and Brinkley was aware of the essential facts necessary for him to obtain that evidence. No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to ground 19 (Brinkley's rights to due process and a fair trial were violated because his conviction and death sentence were obtained as a result of the State's presentation of the false testimony of Samuel Miller). Brinkley did not show that Miller's testimony was false, and the Ohio court correctly decided that the investigator's statements concerning Miller's alleged recantation were hearsay. A COA will not issue for this claim.

No reasonable jurist would debate this Court's conclusion as to ground 20 (denial of due process because the Ohio courts failed to fulfill their statutory duty in imposing and reviewing Brinkley's death sentence, and the Ohio Supreme Court failed to perform the required meaningful

proportionality review of his death sentence). This claim is without merit because no proportionality review is required, and examination of the Ohio Supreme Court's opinion shows that it had complied with Ohio statutory and Sixth Circuit law in its independent sentence evaluation. A COA will not issue for this claim.

The Court will not issue a COA for ground for relief 22(a) (Ohio's post-conviction relief proceedings neither affords an adequate corrective process nor complies with due process or equal protection under the Fourteenth Amendment) A state has no obligation to provide post-conviction review. A petition for writ of habeas corpus is not the proper method for a criminal defendant to challenge errors or deficiencies in state post-conviction proceedings because the claims usually address collateral matters and not the underlying conviction giving rise to the defendant's incarceration. Any challenges or amendments to the interpretation of Ohio's appellate and post-conviction remedies belongs with the highest judicial tribunal of Ohio, not with this Court. No reasonable jurist would disagree with this Court's finding.

The Court will not issue a COA for ground for relief 23 (death sentence unconstitutional because, in his opinion, the trial judge relied on facts not established by the evidence and improperly considered a nonstatutory aggravating circumstance). The court did not rely on an improper nonstatutory aggravating circumstance, i.e, prior calculation and design.  It was not a significant part of his decision. He reiterated the wording of the indictment which included the term prior calculation and design when explaining the conviction. Also the jury could not have

found him guilty of prior calculation and design since it was not included in the jury charge. No reasonable jurist would disagree with this Court's finding

No reasonable jurist would debate this Court's conclusion as to ground 24 (denial of due process because of the Ohio Supreme Court's failure to consider the proportionality of Brinkley's death sentence and to conduct a meaningful analysis of its appropriateness). The Ohio Supreme Court sufficiently evaluated Brinkley's mitigation evidence and sentence in accordance with Ohio law. In limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, The Ohio court properly acted within the wide latitude it is allowed. A COA will not be issued for this claim.

The Court will not issue a COA for ground for relief 25(a) (death penalty is applied arbitrarily and capriciously in Lucas County). The Sixth Circuit has held that even though racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court.  No reasonable jurist would disagree with this Court's finding.

No reasonable jurist would debate this Court's conclusion as to ground 26 (Ohio's death penalty scheme is unconstitutional).  These sub-claims have already been rejected by the Sixth Circuit.  A COA will not issue for this claim.

No reasonable jurist would debate this Court's conclusion as to ground 28 (Brinkley's

conviction and death sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial and in all subsequent proceedings).  The Sixth Circuit noted that the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Further, this Court has concluded that no errors have occurred in State court proceedings. A COA will not issue for this claim.

VII. Conclusion

For the foregoing reasons, the Petition is denied. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to ground 11(a), and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.R.App.P. 22(b) as to that ground only. As to all remaining grounds, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed.R.App.P. 22(b).

IT IS SO ORDERED.

Date: 12/05/11                                    /s/   John R. Adams
                                                          JOHN R. ADAMS
                                                          UNITED STATES DISTRICT JUDGE